**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **DANIKA YAMPIERRE** ) | |
| **4448 Kerry Court** ) | |
| **Aberdeen, MD 21001** ) | |
| ) | **Case No.: 21-1209** |
| *Plaintiff*, ) | |
| ) | |
| **v.** ) | |
| ) | |
| **BALTIMORE CITY, MARYLAND:** ) | |
| **BALTIMORE POLICE DEPARTMENT** ) | |
| **242 W. 29th Street** ) | **JURY TRIAL DEMANDED** |
| **Baltimore, MD 21211** ) | |
| ) | |
| *Defendant*. ) | |
| ) | |
| **Serve:** ) | |
| ) | |
| **The Baltimore City Law Department** ) | |
| **Office of Legal Affairs** ) | |
| **C/O City Hall, Room 101** ) | |
| **100 N. Holliday St., Suite 101** ) | |
| **Baltimore MD, 21202** ) | |
| ) | |
| **Baltimore Police Headquarters** ) | |
| **601 E. Fayette St.** ) | |
| **Baltimore, MD 21202** ) | |

_____

<u>**COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES**</u>

COMES NOW, Danika Yampierre, Plaintiff, (hereinafter "Plaintiff") by and through undersigned counsel, and complains against Defendant, Baltimore City Police Department, (hereinafter "Defendant" or "BPD") and in support thereof states as follows:

<u>**INTRODUCTION**</u>

1. On August 10, 2016, the Department of Justice published a scathing report about the Baltimore Police Department's widespread constitutional violations, the targeting of

African Americans, and a culture of retaliation.[1] And, while the investigation and report focused largely on how Baltimore police abused the law, the people they were meant to serve, and the public trust, the complicit institutional engine that acquiesces in the destruction and demise of BPD's own Black women officers and sergeants remains pervasive, continuous, and swept under the rug. ***This case is about when the police are fearful of the police—their own brothers and sisters in blue.***

2. This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* ("Title VII"); the Civil Rights Act of 1866, Section 1981(a) ("Section 1981"), 42 U.S.C. § 1320d-6, *et seq.*; and the Maryland Fair Employment Practices Act, Md. Code § 20-601, *et seq.* (FEPA) for the Defendant's unlawful harassment, discrimination based on race (African American), sex (Female), sexual harassment, disability, and retaliation against the Plaintiff, including, but not limited to, Defendants' unlawful and discriminatory preference and treatment, as well as retaliating against Plaintiff for her statutorily-protected activity.

## JURISDICTION AND VENUE

3. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*, and Section 1981, to redress and enjoin employment practices of the Defendant.

4. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

---

[1] https://www.justice.gov/opa/pr/justice-department-announces-findings-investigation-baltimore-police-department, "Justice Department Announces Findings of Investigation into Baltimore Police Department," May 17, 2021.

5. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Baltimore, Maryland.

6. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transact substantial business in this District, and Defendants maintain employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

7. Plaintiff has exhausted all of her administrative remedies.

8. Plaintiff filed a complaint with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission (EEOC) on January 9, 2020 alleging race (African American) discrimination, sex (Female), sexual harassment, disability, and retaliation.

9. On March 8, 2021, after Plaintiff's request through her counsel, the Department of Justice ("DOJ") issued Plaintiff a Right-to-Sue Letter.

10. Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

## NATURE OF THE ACTION

11. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

12. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility, and denial of her constitutional and statutory rights.

13. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

14. Plaintiff, Sergeant Danika Yampierre, is an African American female who resides in Harford County.

15. Defendant is a municipal police force, whose jurisdiction encompasses Baltimore, Maryland, the State's largest city.

16. The BPD is the 8th largest municipal police force in the United States, staff by nearly 3,100 civilian and sworn personnel. The Department's jurisdiction covers Maryland's largest city, with a population of 611,648.

17. Sgt. Yampierre works at the Baltimore Police Department ("BPD") and is a member of Baltimore City Lodge No. 3, Fraternal Order of Police ("FOP"), which is a Maryland corporation that is designated as the exclusive representative of Baltimore Police Officers holding the ranks of police officer, police agent, flight officer, police sergeant, police lieutenant, and detective. The relationship between employer representative BPD and employee representative Lodge is governed by a Collective Bargaining Agreement ("CBA" or "Agreement").

18. A Memorandum of Understanding II ("MOU II") covers Unit II employees, which include Police Sergeants and Police Lieutenants.

19. The Baltimore City Lodge No. 3, Fraternal Order of Police, Unit II ("Lodge") provides labor management relations, establishes leave and salary requirements, work hours database management for those employed by the police department.

20. During the relevant period, Defendant employed Plaintiff, Sgt. Yampierre.

21. During the relevant period, Plaintiff was Defendant's employee within the meaning, and entitled to the protections of Title VII.

## FACTUAL ALLEGATIONS

22. Plaintiff, Sgt. Danika Yampierre, has been employed by Defendant, the Baltimore City Police Department ("BPD") from August 15, 2006 until present, as a Detective Sergeant.

23. Plaintiff has worked in the Headquarters/City Hall Security Unit since May 2013 and has received consistent and continuous excellent remarks on her performance evaluations during this time.

24. On or around March 2019, Lieutenant Deanna Effland was assigned to the Headquarters/City Hall Security unit.

25. Plaintiff and Lt. Effland became acquainted after this transfer to which Plaintiff then informed Lt. Effland of the problems that were plaguing the Unit. Specifically, Plaintiff informed Lt. Effland that Officer Abdulsalam Ajikobi was a difficult officer to command and that many of the Unit's issues stemmed from his insubordination and noncompliance.

26. On or around March 2019, Officer Ajikobi had a heated verbal altercation with another officer, Officer Teddy Parris. Plaintiff attended to this issue, to which Officer Parris informed Plaintiff that Officer Ajikobi was creating a hostile work environment and that he did not want to have any other interactions with Officer Ajikobi going forward. Plaintiff attempted to reconcile this issue and noted the altercation.

27. On or around April 23, 2019, Officer Ajikobi had another heated verbal altercation with two officers, Officer Raymond Cook and Officer Teddy Parris. Plaintiff documented the incident and reported it to Lt. Effland. Plaintiff attempted to schedule mediation between the three officers, however, Officer Ajikobi refused to attend. Plaintiff then informed Lt. Effland of the steps she took to mediate and resolve this issue and assured Lt. Effland that she would follow up with Officer Ajikobi about possible resolutions. Plaintiff waited a couple of weeks for Lt. Effland to provide any advice or guidance on how she would like to proceed with this issue. Plaintiff continued to receive inquiries from the involved officers about the outcome during this time, but could provide any updates or guidance to them as their Sergeant because Lt. Effland never provided a follow up to her.

28. Then, on or around May 3, 2019, Plaintiff reconvened with Lt. Effland regarding the previous incident to inquire about the next steps in the process. Lt. Effland not only did not diffuse the situation, but it became apparent that she had no plans to reprimand Officer Ajikobi. Instead, Lt. Effland boasted about how Officer Ajikobi gifted her a unique bottle of wine.

29. On or around June 2019, Plaintiff and her husband discovered that she was pregnant.

30. On or around mid-June 2019, Plaintiff attempted to once again inquire with Lt. Effland about any next steps regarding the altercation that occurred between Officers Ajikobi, Cook, and Parris. However, Lt. Effland again dismissed the Plaintiff and her efforts to find a resolution. Instead, after speaking with Officer Ajikobi, Lt. Effland began working to undermine the Plaintiff and her role as Sergeant in her Unit. Lt. Effland began having private meetings with officers in the Unit, without having Plaintiff, their direct supervisor, present. Lt. Effland encouraged officers to skip Plaintiff in the line of command whenever

they requested leave or overtime, so that they would go directly to Lt. Effland instead of the Plaintiff. Lt. Effland also began having private meetings with Sergeant McEntyre to discuss the Unit's next phase in an effort to ostracize and alienate the Plaintiff from her coworkers and direct reports.

31. Also on or around mid-June 2019, without basis or justification, Lt. Effland removed the Plaintiff's duty of organizing and completing the Unit's officer schedules, which had been her responsibility for four (4) years.  Based on reason and belief, Lt. Effland did this so that she could schedule herself and officers she favored in the Unit to coveted shift times. Additionally, Lt. Effland approved herself and those same officers for overtime shifts. Before Lt. Effland's arrival, Lieutenants were not permitted to work overtime as it drained the budget. However, Lt. Effland made an exception for herself and Lt. Brian Pearson so that they could receive overtime pay. Furthermore, Lt. Effland altered the schedule to operate on a Monday – Friday week. Plaintiff advised against this, as the Unit operates twenty-four hours a day, seven days a week, and does not close. When the schedule operates on business days it makes it difficult to schedule officers on weekend shifts without compensating them for overtime rates. Lt. Effland dismissed these concerns and continued to operate the Unit and the scheduling as she saw fit, contrary to Departmental policy and practice.

32. On or around July 2019, Lt. Effland was again informed about Officer Ajikobi's continuing insubordinate and dangerous behavior. Instead of addressing this issue, Lt. Effland connivingly informed Officer Ajikobi that the Plaintiff was targeting him and had an objective to have him removed from the Unit. The reality is, Plaintiff was just trying to do her job as a Sergeant.

33. On or around August 2019, the Internal Affairs Integrity Unit was requested to investigate Lt. Effland for misuse of overtime.

34. On or around August 27, 2019, Plaintiff notified her command of her pregnancy, specifically mentioning that her pregnancy was high-risk so that they could understand the necessity of her being able attend doctor's appointments at different times of the day. With the lingering concern of the statistically high mortality rate of African American women during pregnancy and childbirth, Plaintiff was seeking support and an accommodation for her medical appointments.

35. Then, on or around August 28, 2019, Lt. Effland received a phone call in the presence of Officer Raymond Cook. The caller's identity was never determined, but they informed Lt. Effland that the Plaintiff visited Internal Affairs and filed a complaint against Lt. Effland regarding her misuse of overtime and that she had provided a statement detailing these accusations. Lt. Effland became upset and ordered the Plaintiff into her office to discuss this leaked information, despite the fact that it was untrue. Plaintiff was not the source of the complaint against her. When Plaintiff arrived to Lt. Effland's office however, she was not present. Plaintiff then proceeded to wait for her in the Security Camera room. When Lt. Effland entered she was visibly upset and extremely agitated. Lt. Effland then proceeded to chastise and berate Plaintiff about why she reported her to Internal Affairs and demanded to know why the Plaintiff had not informed Lt. Effland prior to reporting her, even though the Plaintiff had advised Lt. Effland that she did not file a complaint against her. Lt. Effland continued to aggressively question Plaintiff about the details of her Internal Affairs complaint, to which the Plaintiff did not respond, not only because she had no information to provide, but also because Lt. Effland's conduct was against Departmental

policy for whistleblowing, a legally protected activity. Lt. Effland became even more agitated and began attempting to intimidate the Plaintiff in an effort to force her to respond.

36. As a result of Lt. Effland not getting information from the Plaintiff, she called the Unit's Civilian Director Randolph Reynolds and informed him that a meeting needed to be scheduled between him, Lt. Effland, and the Plaintiff to determine the basis for which the Plaintiff reported Lt. Effland to Internal Affairs. Despite this action being against Departmental policy for the protection of employees who engage in (or are perceived to have engaged in) protected activity, Director Reynolds agreed with Lt. Effland and ordered the Plaintiff to meet with him at 2:40 p.m. in his office. Plaintiff informed Lt. Effland that she would attend the meeting, but that she would not respond to any inquiries about what, if anything, she reported to Internal Affairs. Lt. Effland then exclaimed, "We'll see about that!" Plaintiff then immediately contacted Sergeant Anthony Faulk of Internal Affairs Integrity Unit to report this incident. In response, Sgt. Faulk advised Plaintiff to document this interaction in an administrative report (Form 95) and submit it to Internal Affairs, to which she did.

37. On or around August 29, 2019, Internal Affairs visited Plaintiff's Unit to collect Lt. Effland's Departmental phone so that they could determine who called Lt. Effland and leaked information from the Internal Affairs Integrity Unit to her. Lt. Effland was clearly visibly upset with the Plaintiff during this interaction, particularly since the Plaintiff had informed Internal Affairs of Lt. Effland's unprofessional and unethical questioning of her. Lt. Effland then entered the Security Camera room where the Plaintiff and Officer Tyrone Etheredge were stationed and declared, "I'm having a fucking four-day weekend off." This was another demonstration of Plaintiff's complaints that Lt. Effland was abusing her

scheduling responsibilities in the Unit and taking time off  without another officer to take to fill in.

38. While in the Security Camera room as Internal Affairs confiscated her phone, Lt. Effland then erased her name from the Overtime post in which she had scheduled herself to work that following weekend. She then demanded that the Plaintiff find her a replacement with less than 24 hours-notice. Plaintiff responded that since Lt. Effland is the Commander of the Unit and responsible for scheduling, it was her responsibility to find her own replacement. Lt. Effland responded that she was not going to find her own replacement because it was the Plaintiff's responsibility. Plaintiff then reminded Lt. Effland that her shift was complete, and that it will be extremely difficult to find a replacement for the weekend at that late hour. Lt. Effland, in a clear effort to retaliate against the Plaintiff, stated that if the Plaintiff did not find Lt. Effland's replacement then Lt. Effland would draft Plaintiff to work Lt. Effland's scheduled overtime hours. Plaintiff then reminded Lt. Effland that per their contract, Lt. Effland cannot draft the Plaintiff on her last day to work overtime shifts that Lt. Effland scheduled for herself. To continue the harassment and retaliation, Lt. Effland then responded that she would just change Plaintiff's scheduled shift that had been 7:00 a.m. – 3:00 p.m. for the last eight (8) years, to 2:00 p.m. – 10:00 p.m. Plaintiff informed Lt. Effland that this was an abuse of discretion and a clear violation of the police officers FOP contract. However, Lt. Effland dismissed these claims and reiterated that the Plaintiff will be working the new shift to cover her overtime, even though the Plaintiff provided several reasons why she could not accommodate that shift. Lt. Effland then exited the Security Camera room and sent an email to the Director informing him that the Plaintiff would be working the 2:00 p.m. – 10:00 p.m. shift to cover Lt.

Effland's overtime, in lieu of working her regular hours, and that Lt. Brian Pearson will work overtime to fill the Plaintiff's regularly scheduled shift. Plaintiff then immediately contacted the Internal Affairs Integrity Unit to inform them of this retaliatory behavior. Internal Affairs advised the Plaintiff to document this incident in another report and submit it immediately, which she did.

39. On or around August 30, 2019, Lt. Effland did not appear for her assigned overtime shift that she scheduled for herself. Plaintiff was then forced to find a replacement to cover the shift since Lt. Effland had abandoned her post without finding a replacement beforehand. After conducting a thorough and meticulous search, the Plaintiff was able to fill the abandoned shift with Police Officer Charles Green who volunteered to work until 10:00 p.m. to cover Lt. Effland's vacant shift. Later that same day, Police Officer Ajikobi, who has a history of insubordination and jumping command, emailed Lt. Effland claiming that the Plaintiff "forced" Officer Green to work past his shift, which was untrue.

40. Later in the day on August 30, 2019 around 6:00pm, Lt. Effland sent an email to Officer Green advising him to leave his post at City Hall and write a report about how the Plaintiff demanded that he work past his shift. Officer Green immediately contacted the Plaintiff to inquire about what he should do. The Plaintiff advised Officer Green to not leave his post at City Hall and that she will contact Director Reynolds about Lt. Effland's conduct. Director Reynolds then sent Lt. Effland an email informing her that no officer would be asked to leave their assigned post to write a report and that if she needed something completed, she needed to inform Director Reynolds and not the individual officer. Lt. Effland then attempted to charge the Plaintiff with insubordination for not working past her shift to cover for Lt. Effland's abandoned shift, which was baseless and untrue. Plaintiff

reported the entire incident, specifically Lt. Effland's conduct, to Internal Affairs. Later that day, Director Reynolds informed Plaintiff that Lt. Effland would be removed from the Unit due to her behavior and misconduct.

41. On or around September 3, 2019, Lt. Brian Pearson was assigned to the Headquarters/City Hall Security Unit. Plaintiff then attended a meeting with Lt. Pearson and Sgt. McEntyre to discuss the ongoing issues in the Unit that were primarily being caused by Officer Ajikobi. Lt. Pearson assured the Plaintiff and Sgt. McEntyre that he would investigate these claims further. Later that same day, Lt. Pearson approached the Plaintiff to discuss the basis for Lt. Effland's transfer out of the Unit, since Lt. Effland had told him a different narrative. Plaintiff refused to discuss the details of Lt. Effland's transfer since the Internal Affairs investigation was ongoing.

42. On or about September 4, 2019, Lt. Pearson held a private meeting with Officer Ajikobi and advised him to file an EEOC complaint against the Plaintiff before she had the opportunity to remove him from the Unit.

43. On or around September 5, 2019, while Plaintiff was out of work attending a doctor's appointment, she received a call from Sgt. Freda Arrington from the EEOC. Sgt. Arrington informed Plaintiff that Officer Ajikobi had filed an EEOC complaint against her and Sgt. Arrington inquired if the Plaintiff was interested in attending mediation. Plaintiff agreed.

44. On or about September 6, 2019, Plaintiff attended a mediation meeting with Sgt. McEntyre, Sgt. Arrington, and Officer Ajikobi. Sgt. Arrington advised Officer Ajikobi that his complaint against the Plaintiff was not considered an EEOC case, but she still wanted to see if mediation would help find an amicable solution. At some point during the meeting, Officer Ajikobi became visibly upset and agitated that the Plaintiff had documentation to

refute his claims. Officer Ajikobi informed the attendee's that he had only filed an EEOC complaint because Lt. Pearson advised him to, since the Plaintiff was working to have him removed from the Unit. After the meeting concluded, Sgt. Arrington informed Officer Ajikobi that his claims were not valid and that he needed to follow orders to prevent future disagreements. Based on reason and belief, Officer Ajikobi had a problem taking orders from Sgt. Yampierre because of her gender.

45. On or about September 13, 2019, Officer Ajikobi filed a complaint with Internal Affairs alleging the same facts as his EEOC complaint. It was later determined that Officer Ajikobi filed this complaint in response to Lt. Pearson being told that the EEOC complaint was not valid. Detective Pitts from Internal Affairs then contacted the Plaintiff so that she could be served the complaint and other papers that documented Officer Ajikobi's complaint. Due to the close relationship that Officer Ajikobi had with the Commander of Internal Affairs, Major Stephanie Lansey, his complaint was expedited through the system and he was able to complete an interview the same day.

46. On or about September 25, 2019, Plaintiff attended a meeting with Lt. Pearson, Sgt. McEntyre, and Director Reynolds. Plaintiff and Sgt. McEntyre informed Lt. Pearson and Director Reynolds of the issues they had been trying to resolve with Officer Ajikobi. Director Reynolds informed them that he needed documentation in order to substantiate their claims.

47. On or about September 25, 2019, Plaintiff submitted a second written notification regarding her pregnancy and the importance of her attending her scheduled doctors' appointments. Lt. Pearson acknowledged this notification and replied that he supports her,

cares about her health, and will ensure that the Unit is covered before she departs for each appointment, or words similar.

48. On or about September 25, 2019, Plaintiff wrote an administrative report (Form 95) to have her leave balance audited before she left for maternity leave since her paystubs were reflecting inaccurate numbers as to her balances of vacation leave, legacy leave, and sick leave.

49. On or about September 30, 2019, Plaintiff emailed all the documentation of Officer Ajikobi's misconduct and insubordination to Lt. Pearson and Director Reynolds. Director Reynolds replied by thanking her and stating that he will discuss the documentation with Lt. Pearson.

50. On or about early October 2019, Plaintiff still had not received any updates on the documentation she provided regarding Officer Ajikobi.

51. On or about mid-October 2019, Lt. Pearson began sexually harassing the Plaintiff and Sgt. Leslie Williams. Lt. Pearson would often ask the Plaintiff and Sgt. Williams to go out with him after work because he was lonely after his most recent relationship ended. Despite the fact that the Plaintiff and Sgt. Williams rejected his advances each time, Lt. Pearson continued to make these requests with increasing pressure. Lt. Pearson made the Plaintiff and Sgt. Williams extremely uncomfortable every time he interacted with them.

52. On or about November 3, 2019, Plaintiff was informed by Sgt. Williams that Officer Ajikobi had been charged with insubordination.

53. On or about November 8, 2019, while on a pre-approved vacation, Plaintiff received a text message from Lt. Brian Pearson that was addressed to her and Sgt. McEntyre stating that Officer Ajikobi had been transferred out of the Unit to work for his close friend, Major

Stephanie Lansey. Lt. Pearson then replied that he was "going to pop out of [Plaintiff's] birthday cake," or words similar, to celebrate this news.

54. On or about November 10, 2019, Lt. Pearson sent Plaintiff another text message that Officer Ajikobi's transfer had been cancelled as a result of the numerous complaints that had been filed against him by the Plaintiff.

55. On or about the week of November 18, 2019, Officer Ajikobi bypassed the chain of command to schedule a meeting with Director Reynolds and Lt. Pearson directly. Officer Ajikobi was upset about his transfer being cancelled and began to make false accusations about the Plaintiff in order to provide a retaliatory reason for the complaints filed against him.

56. On or about November 22, 2019, Plaintiff received an email from Director Reynolds stating that he had received information that the Plaintiff was engaging in favoritism, despite the lack of evidence, and that from this point forward she would not be responsible for completing the Unit's schedule. Director Reynolds also barred Sgt. Leslie Williams, who charged Officer Ajikobi with insubordination, to work overtime in the unit. Director Reynolds claimed that these changes were not punitive, but to create a "good working order" for the Unit. Through these actions, the Defendant was beginning to turn the victim, Sgt. Yampierre, into the villain.

57. On or around November 22, 2019, the Plaintiff spoke with Lt. Pearson about the inconsistency in command, and how it did not follow that Officer Ajikobi was able to secure a meeting with Director Reynolds in a short amount of time while the Plaintiff was still waiting to schedule one. Lt. Pearson attempted to console Plaintiff by stating he was

not involved in the decision that Director Reynolds made about the schedule and that he does not want the Plaintiff to get too upset since she was pregnant.

58. On or around November 22, 2019, Plaintiff drafted an administrative report (Form 95) addressed to Director Reynolds that outlined the hostile work environment that Lt. Pearson had created. Plaintiff also detailed the numerous sexual harassment that she has experienced from Lt. Pearson and the need for an immediate resolution.

59. On or around November 25, 2019, Lt. Pearson sent a text message to Plaintiff and Sgt. McEntyre requesting a meeting between the three of them. This eventual meeting took place in the Plaintiff's office, in which Lt. Pearson stated that the meeting's objective was an informal meeting to "clear the air." Lt. Pearson then asked the Plaintiff if she was okay, to which the Plaintiff replied, "I'm good." Lt. Pearson then continued to press the Plaintiff, eventually stating that she is not good and demanded to know why. Lt. Pearson's continued pressure to have the Plaintiff express herself was not applied out of care or compassion, but rather to extract a statement from her that could lead to a legitimate complaint against her. The Plaintiff then replied that she was trying to avoid getting upset over something that is out of her control, for the sake of her and her unborn child's health. Lt. Pearson asked her to elaborate on that statement, and she reiterated that it is unprofessional for an officer to be able to meet with Director Reynolds without following the protocol, especially while she had been waiting several months to meet with Director Reynolds after submitting substantial documentation regarding Officer Ajikobi's insubordination and conduct towards her. Lt. Pearson once again stated that those decisions were made by Director Reynolds and that Lt. Pearson is not involved. After the meeting concluded, Lt. Pearson then inquired about when the Plaintiff will move to light duty or go on maternity leave.

The Plaintiff then stated that she will work until her last day of full duty, but that it depends on her health. Lt. Pearson then informed the Plaintiff that she would not be able to remain in the Unit if she went on light duty because those positions can only be fulfilled by full duty officers. Reluctantly, Plaintiff replied that she will stay on full duty because she did not want to be transferred from the Unit.

60. On or around November 26, 2019, Lt. Pearson wrote the Plaintiff up in retaliation for her submitting her two original complaints to Director Reynolds.

61. Then, on or around November 27, 2019, Plaintiff received a text message from Lt. Pearson asking if she had an altercation with a SWAT officer. Plaintiff immediately contacted Lt. Pearson and informed him that she did have an altercation with a SWAT officer who was insubordinate and failed to obey direct orders from the Plaintiff. The Plaintiff also informed Lt. Pearson that she had contacted this officer's command to report the incident. Lt. Pearson then replied in a derogatory and inflammatory tone that she needed to draft an administrative report and submit it to him immediately. The Plaintiff was confused by this request, as the Commander of SWAT, Captain Joe Jones, had directed her that an administrative report was unnecessary since his officer had been the aggressor. Captain Jones then contacted Lt. Pearson to inform him that this was an unnecessary step, but Lt. Pearson dismissed him. Lt. Pearson then called the Security Camera Room and asked CSO Corrina Johnson, "Did Sgt. Yampierre put that report in my mailbox like I asked her to?"

62. On or around November 29, 2019, Director Reynolds wrote the Plaintiff up yet again, without basis or justification, two days after Lt. Pearson wrote a complaint against the Plaintiff.

63. On or around December 2, 2019, the Plaintiff received an email from the Human Resources Department stating that they had been informed by Director Reynolds that the Plaintiff is pregnant. Director Reynolds had no right to divulge this information to Human Resources or at all. Human Resources informed Plaintiff about the documentation that she needed to submit as quickly as possible as a result of her pregnancy and projected maternity leave. Based on reason and belief, Director Reynolds told Human Resources about the Plaintiff's pregnancy in an effort to have her involuntarily transferred from the Unit since the Departmental policy had changed regarding whether officers working light duty could remain in that specific Unit.

64. On or around December 3, 2019, the Plaintiff was requested by Detective Anita Pitts to come to Internal Affairs so that she could be served with trumped up charging papers for "Disrespecting Lt. Pearson in a meeting on November 25" and also for "Inappropriate workplace environment."

65. As a result of these baseless charges, on or around December 10, 2019, the Plaintiff submitted an administrative report (Form 95) that requested a meeting with Director Reynolds. Lt. Pearson then informed the Plaintiff that Director Reynolds did not want to have a meeting with her.

66. On or around December 12, 2019, Major Stephanie Lansey abruptly reassigned the Plaintiff's Internal Affairs case from Detective Pitts to another detective. Based on reason and belief, Major Lansey did not have faith that Detective Pitts would provide the Plaintiff with a guilty outcome and wanted to orchestrate a particular negative outcome.

67. On or around December 16, 2019, Director Reynolds sent out an email to the Plaintiff, Lt. Pearson, and Sgt. McEntyre declaring that Lt. Pearson and Sgt. McEntyre are the only

supervisors who are permitted to command the Unit. This was a direct attack on the Plaintiff, who has more experienced than both commanders, considering Sgt. McEntyre had only been in the Unit for four (4) years while Lt. Pearson had only been assigned to that Unit for three (3) months. Director Reynolds elaborated that he had mentioned in previous emails that the Plaintiff is not authorized to assist in commanding decisions or perform any of her supervisory duties in the unit, and that any disobedience to this order would result in consequences.

68. On or around December 26, 2019, the Plaintiff submitted her hostile work environment claim to the Internal Affairs Integrity Unit via email by way of Sgt. Anthony Faulk in order to prevent Major Stephanie Lansey from intercepting the claim and making it disappear.

69. On or around December 31, 2019, the Plaintiff requested a meeting with the Chief of Staff of the Police Commissioners Office, Eric Melcanon in order to report the discriminatory and retaliatory issues she was experiencing in the workplace, but Mr. Melcanon responded that he could not meet with her.

70. On or around January 9, 2020, after exhausting all of her administrative remedies to no avail, the Plaintiff filed an EEOC complaint against the Baltimore Police Department for race, gender, disability, and family status discrimination as well as sexual harassment and retaliation.

71. On or around January 29, 2020, the Fiscal Unit had reconciled the Plaintiff's leave balance two weeks before she went on maternity leave.

72. On or around February 14, 2020, Plaintiff went out on maternity leave.

73. On or around February 18, 2020, while out on maternity leave, the Plaintiff was contacted by Kimberly Parks in Internal Affairs to return her call regarding a complaint that had been lodged against her.

74. On or around February 24, 2020, the Plaintiff was contacted by Detective Eric Geddis from the Internal Affairs Integrity Unit who inquired to see if she was working. The Plaintiff replied that she was not, to which Detective Geddis stated that he knew she was on leave but would like to know when she would return. Detective Geddis also wanted to discuss an internal complaint that was lodged against her. The Plaintiff then asked if this complaint was related the one she had submitted via Sgt. Faulk. Detective Geddis said it was not, but that the complaint alleged that she often came to work late and left early. The Plaintiff asked when this complaint was submitted, and he replied that it was about a week ago. The Plaintiff was stunned that she had submitted a complaint over two months ago and had heard nothing, but that a complaint against her was submitted a week ago and Commander Stephanie Lansey from Internal Affairs had that complaint expedited to an investigation. Based on reason and belief, this move was in direct response to the Plaintiff's complaint submission from December 26, 2019. Detective Geddis stated that he did not know how this occurred, but that the complaint had been placed on his desk and he was told to investigate it immediately.

75. On or around February 26, 2020, while still on maternity leave, the Plaintiff was again contacted by someone from Internal Affairs, this time by Detective Syreeta Harvin. Detective Harvin inquired about whether the Plaintiff was working and available to meet. Detective Harvin communicated to the Plaintiff that she had received allegation papers against her that needed to be served as soon as possible. The Plaintiff advised Detective

Harvin that she was out on maternity leave and that she did not yet know when she will return. Detective Harvin requested that the Plaintiff keep her abreast of her return date, as she was feeling internal pressure to resolve this case.

76. On or around March 5, 2020, as a result of the exacerbated stress from her work environment and Plaintiff's feelings that the Defendant was orchestrating a scheme to push her out of the Department, the Plaintiff horridly gave birth to her child on the sidewalk without any professional medical assistance.

77. On or around March 13, 2020, the Plaintiff underwent emergency surgery to address the complications she sustained during childbirth.

78. On or around March 26, 2020, while still on maternity leave, the Plaintiff was contacted by Sergeant Freda Arrington from the Baltimore Police Department Equal Employment Opportunity Commission requesting to discuss the federal EEOC complaint that the Plaintiff had filed in January 2020. The Plaintiff confirmed that she had filed this complaint, to which Sgt. Arrington replied that the Baltimore Police Department requires that a separate internal investigation must be completed. To this date, the Plaintiff has received no updates or information regarding this alleged internal investigation.

79. On or around May 15, 2020, the Plaintiff underwent a second surgery to address the complications she sustained during childbirth.

80. On or around June 15, 2020, the day before the Plaintiff's scheduled third surgery, she was contacted once again by Detective Syreeta Harvin from Internal affairs stating that Major Stephanie Lansey is pressuring Detective Harvin's supervisor into obtaining the Plaintiff's return date. Detective Harvin elaborated that she is facing pressure to investigate the three internal complaints that had been lodged against the Plaintiff. The Plaintiff informed

Detective Harvin that she does not yet have a return date due to her prevailing medical complications that she sustained during childbirth.

81. On or around June 16, 2020, the Plaintiff underwent her third surgery to address the complications that she sustained during childbirth.

82. On or around July 7, 2020, as a result of the pressure she was feeling by agents of the Defendant, the Plaintiff returned to work on light duty.

83. On or around July 7, 2020, without warning, Lieutenant Gene Ryan approached the Plaintiff and informed her that Director Reynolds directed him to communicate to Plaintiff that she is no longer permitted to park in the parking space that had been designated to her for the past eight (8) years. Lt. Ryan informed the Plaintiff that he did not have an alternate parking space yet available for her, but that she can continue to park there until they have found a suitable alternate. On the days that the Plaintiff did not work, Sgt. McEntyre and other officers in the Unit were free to park in what had been her historically assigned parking space, without any repercussions or threat of disciplinary action.

84. On or around July 27, 2020, the Plaintiff was contacted by Detective Eric Geddis who inquired about whether the Plaintiff had returned to work from maternity leave. The Plaintiff responded that she had indeed returned. Detective Geddis then directed the Plaintiff to report to Internal Affairs on July 29, 2020 so that she could be served with the allegation papers.

85. On or around July 29, 2020, the Plaintiff reported to Internal Affairs and was served the allegation papers for Notice of Accused.

86. On or around August 2020, Lt. Ryan approached the Plaintiff and informed her that Director Reynolds had been inquiring about when the Plaintiff would return to full duty

from light duty. The Plaintiff then informed Lt. Ryan that she did not yet have an estimated

date, due to her severe medical complications that she sustained during childbirth. Lt. Ryan

responded that he would inform Director Reynolds of these updates.

87. On or around August 2020, Detective Eric Geddis requested that the Plaintiff report to

Internal Affairs to sign a notification for her statement that she was scheduled to provide

on September 3, 2020.

88. On or around August 28, 2020, the Plaintiff received an email from Detective Geddis that

her scheduled statement for September 3, 2020, which she had been harassed throughout

her maternity leave to come in and give to Internal Affairs, had been cancelled. Plaintiff

was told the meeting would be rescheduled for a later date.

89. On or around September 2020, the Plaintiff was transferred from locator and to a medical

locator by order of her command, even though they had been advised against that decision

by Lt. Ryan since the Plaintiff was still on light duty due to her pregnancy complications.

90. On or around October 11, 2020, the Plaintiff received her allegations papers via email from

Detective Syreeta Harvin and was offered to provide recorded statement over the phone.

91. On or around November 18, 2020, the Plaintiff received a notification that the internal

complaint filed by Director Reynolds regarding the Plaintiff's parking spot was deemed

"unfounded." Further, the three complaints filed by Lt. Brian Pearson, Plaintiff's reported

harasser, were also not sustained.

92. On or around December 9, 2020, Director Reynolds advised Lt. Gene Ryan that he will be

altering the Plaintiff's permanent Monday – Friday schedule that she had worked for the

past eight (8) years and would be placing her in a leave group with rotating shifts and days

off, instead. Lt. Ryan advised Director Reynolds that he disagreed with that decision due

to the fact that Sgt. McEntyre was retiring, and Plaintiff would be the only remaining supervisor in the Unit.

93. On or around December 10, 2020, Sergeant Brian Frazier ordered Plaintiff to report to Internal Affairs to discuss another complaint lodged against her. When the Plaintiff arrived, she was escorted into a private meeting with Lt. Sean Mahoney and Sgt. Brian Frazier. Lt. Mahoney informed the Plaintiff that the superior commanders, such as Major Stephanie Lansey did not react favorably to the "not sustained" findings of the previous complaints, and that they were going to resubmit the charges in an effort to receive a different result. Lt. Mahoney and Sgt. Frazier then asked the Plaintiff to sign a verbal letter that detailed these previous charges as "not sustained." The Plaintiff indicated to both Lt. Mahoney and Sgt. Frazier that the findings had been decided in the previous charges so she will not be signing that document. Lt. Mahoney communicated to Plaintiff that she would face no repercussions for refusing to sign the letter, but her refusal would provide ammunition for other charges. The Plaintiff wrote "refused" on the signature line on the letter.

94. On or around December 11, 2020, Lt. Sharon Talley ordered the Plaintiff to move her vehicle from her parking spot. Lt. Talley informed the Plaintiff that this order came directly from Director Reynolds who also stated that if the Plaintiff refused to move her vehicle, he would have it towed. The Plaintiff complied with this order. Sgt. McEntyre then began parking in that space without repercussions.

95. On or around December 29, 2020, Internal Affairs forwarded the Plaintiff's 2019 internal complaint to the States Attorney's Office in an effort to secure criminal charges against the Plaintiff. This was direct retaliation for the Plaintiff's refusal to sign the verbal letter about the resubmission of charges.

96. On or around the week of January 4, 2021, the Plaintiff contacted Detective Eric Geddis from Internal Affairs to receive an update on the status of her case, as it would be expiring within 30 days. Detective Geddis informed the Plaintiff that the case was still pending review by the Commanders. The Plaintiff then asked Detective Geddis how the case is pending review without the Plaintiff having completed an interview first. Detective Geddis was unable to provide additional information, as the case had been forwarded up the chain and was no longer his responsibility.

97. On or around the week of January 11, 2021, five members out of ten total detectives of the Plaintiff's unit began receiving Grand Jury summons to testify in a filed case against the Plaintiff. The States Attorney's Office originally summoned CSO Corrina Johnson, but then rescinded this summons. The four remaining members that were summoned were Sgt. Marlon McEntyre, Detective Raymond Cook, Detective Shakisha Foye, and Detective Abdulsalam Ajikobi, all of whom are officers that the Plaintiff had reprimanded in the past. The remaining individuals of the Unit that were not summoned were Detective Teddy Parris, Detective Charles Green, Detective Tyrone Etheredge, and Detective Edward Taylor. CSO Corrina Johnson was never recalled. The latter individuals were not summoned due to their favorable opinions of the Plaintiff and their accurate retelling of the issues presented that demonstrate the Plaintiff in the proper, lawful light.

98. On or around January 19, 2021, the summoned officers appeared for their grand jury testimony.

99. On or around January 28, 2021, once the Plaintiff had arrived home after work, she was ordered to report back to the Unit. The Plaintiff informed Lt. Ryan that she had a doctor's appointment that she needed to attend. Lt. Ryan urged the Plaintiff to report back to work

immediately to meet with Lt. Daniel Popp from Internal Affairs. The Plaintiff then cancelled her doctor's appointment at the last minute and returned to Police Headquarters per their orders. Upon arrival, the Plaintiff was met by Lt. Gene Ryan, Lt. John Jackson, and Sgt. Angela Carter-Watson. All three commanders escorted the Plaintiff to Internal Affairs to inform the Plaintiff that she was being suspended, for a general charge of "misconduct" without providing any further details or specificity. The act of three commanding officers escorting a subordinate to the Internal Affairs Office is highly unusual, and was done in an effort to humiliate, demean, and debase the Plaintiff. Based on reason and belief, Plaintiff was being treated in this manner as a Black woman who had engaged in statutorily-protected activity against the Department.

100.    On or around January 28, 2021, the Plaintiff received a phone call from Lt. Ryan to inform the Plaintiff that she was being transferred from the administrative position that she had held for the past eight (8) years to work patrol in the Eastern District as retaliation for the Plaintiff's pending EEOC complaint.

101.    On or around February 7, 2021, the Plaintiff received an email from Lt. John Ferinde informing her that she needed to report to Internal Affairs on February 11, 2021 to attend a meeting with the States Attorney's Office, during a time when the Plaintiff was on medical leave to address the complications sustained from her high risk pregnancy and traumatic childbirth. Lt. Ferinde further indicated that her absence would result in disciplinary action.

102.    On or around February 11, 2021, the Plaintiff attended the meeting at the States Attorney's Office with her criminal attorney, Allen Rombro, and the head attorney of the Public Integrity Bureau of the States Attorney's Office. During the meeting, the Plaintiff

was told that she would not be able to speak or refute any statements in this meeting. The Plaintiff was then accused of soliciting information about the grand jury proceedings during a time when the Plaintiff had been on medical leave and could not, and did not, have any contact with any individual involved in those proceedings. Without any further discourse, the Plaintiff and Mr. Rombro left the meeting.

103.    On or around March 29, 2021, Sergeant Arthur Paige was transferred to the Plaintiff's Unit to replace the Plaintiff's position.

104.    The Plaintiff has consistently been the target of race and sex discrimination, retaliation, pregnancy-related disability discrimination, and a hostile work environment.

105.    More specifically, the Plaintiff faced continuous and relentless harassment during the entirety of her high-risk pregnancy that exacerbated the medical complications that she experienced after giving birth. The Defendant was aware of the Plaintiff's medical status, and yet continued to order her to attend meetings during scheduled doctors' appointments; ordered her to complete tasks that were overly and unreasonably exhaustive to a person in her condition; and ordered her to work unreasonable hours and not provide her reasonable accommodations. The aforementioned misconduct was so egregious and pervasive that it has affected the Plaintiff's mental, emotional, and physical wellbeing in irreparable ways. The complications that the Plaintiff sustained during and after her pregnancy were exacerbated by this continuous and unlawful behavior directed towards her.

106.    Plaintiff was forced to file suit due to the Defendant's unwillingness to remedy their unlawful conduct that has cost Plaintiff significant financial strain as well as emotional distress.

107.	The Defendants' discriminatory and retaliatory practices have been effectuated in violation of federal and state statutes, including Title VII of the Civil Rights Act, Section 1981, the ADA, and FEPA.

## COUNT I

### VIOLATION OF TITLE VII – RACE DISCRIMINATION

108.	Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

109.	A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

110.	Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is African American, a woman, and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff is a qualified police officer, as she has approximately fifteen (15) years on the force and maintained the title of Sergeant. The Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964.

111.	Because of her race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

112.	Defendants' foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

113.     Defendant knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her race.

114.     Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race.

115.     Defendant reprimanded Plaintiff in a way that deprived her of workplace safety and otherwise adversely affected her status as an employee because of her race.

116.     Other employees who were similarly situated, but were non-Hispanic or Caucasian individuals, which is different from the Plaintiff, have been treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

117.     Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

118.     Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

119.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

120.     Further, Defendant's treatment and actions are ongoing.

121.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

122.     Similarly, situated non-Hispanic Caucasian employees were not subjected to the same, similar, or adverse treatment like Plaintiff, and have been treated more favorably

than the Plaintiff with regards to the terms and conditions of employment and workplace conditions.

123.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

124.     Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of her race.

125.     Defendant discriminated against Plaintiff because of her race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

126.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

127.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

128.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

129.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

130.     Baltimore City Police Department must comply with Title VII, but by and through their conduct, have violated Title VII.

## COUNT II

### VIOLATION OF TITLE VII – SEX DISCRIMINATION (GENDER)

131.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

132.     A *prima facie* case of sex discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

133.     Here, the four (4) elements of a *prima facie* case of sex discrimination are met. The Plaintiff is African American, a woman, and is considered a member of a protected class. The Plaintiff is a qualified police officer, as she has approximately fifteen (15) years on the force and maintained the title of Sergeant. The Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII where she was subjected to ongoing sexual harassment, including but not limited to, highly inappropriate and offensive sexual comments.

134.     The above-mentioned actions by the Defendants towards the Plaintiff demonstrates the discriminatory and prejudicial manner in which the Defendants treated the Plaintiff and her lawful claims against them.

135.     Defendant treated Plaintiff less favorably than similarly situated male employees.

136.     Because of her sex, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Title VII.

137.     Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

138.     Defendant knew that Plaintiff was a woman prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of her sex.

139.     Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her sex.

140.     Defendant has limited, segregated, and classified Plaintiff in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee because of her sex.

141.     Other employees who were similarly situated, but members of a class (men) different than Plaintiff, have been treated more favorably than Plaintiff in the terms and conditions of employment.

142.     Plaintiff's sex was a determining factor in Defendant's unlawful conduct toward Plaintiff.

143.     Plaintiff's sex was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

144.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

145.     Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her sex.

146.    Defendant discriminated against Plaintiff because of her sex by engaging in, tolerating, or failing to prevent sex discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

147.    Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

148.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages –including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs –and is entitled to all available legal and equitable remedies.

149.    Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature.

150.    Further, Defendant's treatment and actions were ongoing.

151.    Plaintiff has incurred lost wages, loss of reputation now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

## **COUNT III**

### **VIOLATION OF TITLE VII – SEXUAL HARASSMENT (HOSTILE WORK ENVIRONMENT)**

152.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

153.    When hostile work environment is alleged to have occurred as a result of unlawful discrimination, the Complainant must show that: (1) she belongs to a statutorily

protected class; (2) she was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on her statutorily protected class; (4) the harassment affected a term or condition of employment[2] and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21 (1993).

154.    The actions and conduct of the above-described perpetrators as set forth herein created a sexually hostile, offensive and intimidating work environment and detrimentally affected Plaintiff.

155.    The actions and conduct by the above-described perpetrators as set forth herein were severe and pervasive and based on Plaintiff's sex as a female and constituted discrimination based on sex.

156.    The actions and conduct described herein would have detrimentally affected a reasonable person of the same sex in Plaintiff's position.

157.    Defendant knew or should have known of the sexual harassment described herein. Defendant has failed to address the problems and further failed to implement effective and appropriate measures to stop the sexual harassment.

158.    By failing to conduct a prompt and thorough investigation of Plaintiff's allegations of sexual harassment; failing to redress the sexual harassment of Plaintiff by Lt. Pearson;

---

[2] The phrase "terms, conditions and privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

by consciously failing to protect Plaintiff from sexual harassment within the Department; and by punishing Plaintiff for her complaints of sexual harassment, Defendant exacerbated the sexually hostile work environment suffered by Plaintiff and intentionally discriminated against Plaintiff in violation of Title VII.

159.    Defendant's actions, and failure to act, amounted to sex discrimination under Title VII and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment abrogates the states' Eleventh Amendment sovereign immunity. Title VII, through the 1972 amendment 16 known as the Equal Employment Opportunity Act ("EEOA"), provides an enforcement remedy for equal protection violations of state employees through Section 5 of the Fourteenth Amendment.

160.    As a direct result of Defendant's unlawful acts of sexual harassment, Plaintiff has suffered damages, including but not limited to lost wages and emotional and mental distress.

## COUNT IV

## VIOLATION OF TITLE VII – RETALIATION

161.    Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

162.    Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e–3(a). To that end, an employer may not create or

condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

163.   Here, the Plaintiff faced retaliation for the complaint she submitted internally with the Department, and then externally with the EEOC.

164.   Soon after complaining, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

165.   Defendant subjected Plaintiff to the aforementioned adverse employment actions because of her opposition to the unlawful and discriminatory employment practices of Defendant in violation of Title VII.

166.   Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEOC representative, or otherwise should have known that Plaintiff engaged in the complaint process based on her informal and formal complaint filings.115.The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

167.   Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

168.   Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

169.   Similarly situated employees (no known prior EEOC activity) were not subjected to the same, similar, or any adverse treatment.

170.     Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of Title VII.

171.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

172.     Defendant's unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment.

173.     Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

174.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

175.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

176.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and her injury is permanent in nature. Further, Defendant's treatment and actions were ongoing.

177.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.

178.      Baltimore City Police Department must comply with Title VII, and by and through their conduct, violated the law.

179.      The reasons proffered by Defendants for their unlawful conduct are pretextual and Defendants cannot offer any legitimate reason for their unlawful conduct.

180.      Defendant is directly liable for the discriminatory acts or omissions of its employees while acting within the court and scope of their employment, under the theory of *Respondeat Superior*.

181.      Defendants' actions were intentional, reckless, and malicious.

182.      As a direct and proximate cause of Defendants' conduct alleged throughout this complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages—including but not limited to past and future loss of income, benefits, and career opportunities—and is entitles to all available legal and equitable remedies.

183.      Plaintiff was humiliated, embarrassed, and made to ensure a great amount of pain and suffering. Plaintiff's injury is permanent in nature. Further, Defendants actions were ongoing.

184.      Plaintiff has incurred lost wages, loss of reputation, defamation of character now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

## COUNT V

### VIOLATION OF SECTION 1981

185.      Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

186.      As an African American, Plaintiff is a member of a protected class.

187.     Because of her race (African American), Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Section 1981.

188.     Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiffs employment.

189.     Defendant knew that Plaintiff is an African American prior to the adverse actions described throughout the Complaint and was aware or should have been aware of the discrimination Plaintiff was subjected to because of her race.

190.     Plaintiff has been treated differently and subjected to different terms and conditions of her employment due to her race (African American).

191.     Defendant has limited, segregated, and classified Plaintiff in a way that deprived her of employment opportunities and otherwise adversely affected her status as an employee, because of her race (African American).

192.     Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than Plaintiff in the terms and conditions of employment.

193.     Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

194.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

195.     Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American).

## COUNT VI

### VIOLATION OF THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA)

196.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

197.     Plaintiff is an individual who is protected under the privacy laws stipulated in the Health Insurance Portability and Accountability Act ("HIPAA").

198.     Plaintiff's health information is protected under the privacy laws stipulated in the Health Insurance Portability and Accountability Act.

199.     In March 2020, the Plaintiff was exposed to an individual who was infected with COVID-19.

200.     The Plaintiff's exposure to this deadly virus required her to take COVID-19 leave from work so that she could self-quarantine for the protection of herself and others.

201.     The Defendant requested and demanded documentation and proof that the Plaintiff had indeed been exposed to a person who was infected with COVID-19.

202.     The Defendant's requests violated the Plaintiff's rights to privacy regarding her health information.

203.     The Defendants' conduct in requesting this information was not only unlawful, but the objective was to intimidate and demean the Plaintiff into being subservient and submitting information that she has no obligation to provide.

## COUNT VII

**DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH
DISABILITIES ACT ("ADA")**

204.     Plaintiff incorporates all information and allegations contained in the preceding

paragraphs as if fully set forth herein.

205.     The ADA prohibits discrimination based on disability. *See* 42 U.S.C. § 12101 *et*

*seq*. The ADA requires that covered employers to provide reasonable accommodations to

employees with disabilities.

206.     Plaintiff is an individual who is protected under the Americans with Disabilities

Act ("ADA").

207.     Plaintiff's disability is protected under the accessibility and protection laws

stipulated in the Americans with Disabilities Act.

208.     After giving birth to her child, the Plaintiff suffered severe medical complications

that affected her ability to complete the basic duties of her position.

209.     Due to these complications the Plaintiff returned to work on light duty until her

conditions were treated or were resolved.

210.     The Defendant was aware of her medical complications and her disability status

and did not provide reasonable accommodations during her after her pregnancy.

211.     The Defendant was aware of her medical complications and her disability status

and continued to harass her about her return to full duty status.

212.     The Defendant was aware of her medical complications and her disability status

and yet they interfered with her ability to attend doctor's appointments.

213.     The Defendant used her disability status to harass, demean, degrade, and humiliate

the Plaintiff.

214.     The Plaintiff has suffered irreparable harm and injury as a result of this unlawful misconduct.

## COUNT VIII

**VIOLATION OF MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA")**

215.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

216.     The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 *et seq*. outlaws discrimination in employment based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

217.     Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing, promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions.   Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

218.     Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

219.     The Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American) and sex (female).

## COUNT IX

### PREGNANCY DISCRIMINATION ACT OF 1978 ("PDA")

220.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

221.     The Pregnancy Discrimination Act (PDA) forbids discrimination based on pregnancy when it comes to any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, fringe benefits, such as leave and health insurance, and any other term or condition of employment.

222.     Specifically, section 701 of Title VII of the Civil Rights Act of 1964 was amended to add the new subsection: "(k) The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise…"

223.     The PDA requires that covered employers, such as Defendant, treat pregnant employees fairly and equitably.

224.     Here, Defendant was aware of Plaintiff's pregnancy and her pregnancy-related medical complications.

225.     The Defendant used her pregnancy status to harass, demean, degrade, and humiliate her and Plaintiff has suffered irreparable harm and injury as a result of this unlawful misconduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Sergeant Danika Yampierre, respectfully prays that this Court grant her the following relief:

a.  Enter a declaratory judgement finding that the foregoing actions of Defendant violated Title VII, Section 1981, ADA, HIPPA, and FEPA;

b.  Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c.  Award back pay and compensatory damages in the amount of $10,000,000 (ten-million dollars and zero cents) that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and psychological injury, humiliation, embarrassment; and mental and emotional distress caused by the conduct of the Defendant alleged herein;

d.  Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e.  Order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: May 17, 2021

Respectfully submitted,

By: /s/ Dionna Maria Lewis
Dionna Maria Lewis, Esq.
Bar No. 19486
District Legal Group, PLLC
700 Pennsylvania Ave SE, Suite2098
Washington, D.C.20003
Tel. (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff Danika Yampierre*