IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DANIKA YAMPIERRE,

    *Plaintiff*,

    v.

                         Civil Action No. ELH-21-1209

BALTIMORE POLICE
DEPARTMENT,

    *Defendant*.

**MEMORANDUM OPINION**

In this employment discrimination case, Sergeant ("Sgt.") Danika Yampierre, plaintiff, has sued her employer, the Baltimore Police Department (the "BPD"), alleging that between March 2019 and March 2021 she was "consistently" made the "target of race and sex discrimination," and subjected to retaliation pregnancy-related disability discrimination, and a hostile work environment." ECF 1 (the "Complaint"); *id.* ¶ 104.[1]  Sgt. Yampierre seeks declaratory and injunctive relief as well as "back pay and compensatory damages in the amount of $10,000,000[.]" *Id.* at 44.

The Complaint contains nine counts.  In particular, Sgt. Yampierre lodges five claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*: discrimination on the basis of race (Count I); discrimination on the basis of sex (Count II); "sexual harassment (hostile work environment)" (Count III); retaliation (Count IV), and discrimination on the basis of pregnancy (Count IX).  *Id.* at 28-38, 43.  The Complaint also asserts claims under 42

---

[1] The caption of the Complaint identifies the defendant as "Baltimore City, Maryland; Baltimore Police Department."  ECF 1 at 1.  This could imply that plaintiff has sued both the BPD and Baltimore City.  However, the text of the Complaint refers to the "defendant" in the singular, and elsewhere it makes clear that the BPD is intended as the sole defendant.  *Id.* ¶¶ 15-21.

U.S.C. § 1981 (Count V); the Health Insurance and Portability Accountability Act ("HIPAA"), 42 U.S.C. § 1320d *et seq.* (Count VI); the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (Count VII); and the Maryland Fair Employment Practices Act ("FEPA"), Md. Code (2021 Repl. Vol.), § 20-601 *et seq.* of the State Government Article ("S.G.") (Count VIII).  ECF 1 at 38-42.

Defendant has moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 7.  The motion is supported by a memorandum (ECF 7-1) (collectively, the "Motion") and one exhibit.  ECF 7-2.  Sgt. Yampierre opposes the Motion (ECF 8), accompanied by a memorandum. ECF 8-1.  And, the BPD has replied.  ECF 10.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.      Factual Background[2]

### A.

Sgt. Yampierre, an "African American female," ECF 1, ¶ 14, "has been employed by [the BPD] from August 15, 2006 until present, as a Detective Sergeant."  *Id.* ¶ 22.  Since May 2013, plaintiff has worked in the BPD's "Headquarters/City Hall Security Unit" (the "Unit") and, while serving in this capacity, she has "received consistent and continuous excellent remarks on her performance evaluations . . . ."  *Id.* ¶ 23.

According to plaintiff, by March 2019 "problems" within the Unit had emerged.  *Id.* ¶ 25. Sgt. Yampierre alleges that she experienced difficulty in supervising one of the officers under her

---

[2] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

The Complaint is 44 pages in length.  For the most part, I have presented the facts chronologically as well as topically.

command, Officer Abdulsalam Ajikobi. *See* ECF 1, ¶¶ 25-26. In plaintiff's view, Officer Ajikobi "had a problem taking orders from Sgt. Yampierre because of her gender." *Id.* ¶ 44.

On an unspecified date in March 2019, Officer Ajikobi "had a heated verbal altercation" with Officer Teddy Parris. *Id.* ¶ 26. Thereafter, Officer Parris "informed Plaintiff that Officer Ajikobi was creating a hostile work environment and that he did not want to have any other interactions with Officer Ajikobi going forward." *Id.* Plaintiff asserts that she "attempted to reconcile this issue and noted the altercation." *Id.*

Also in March 2019, Lieutenant ("Lt.") Deanna Effland was "assigned" to the Unit. *Id.* ¶ 24. Although not stated expressly, from context it appears that Lt. Effland was Sgt. Yampierre's supervisor. *See*, *e.g.*, *id.* ¶ 38 (describing Lt. Effland as the "Commander of the Unit"). Plaintiff advised Lt. Effland of her difficulty in supervising Officer Ajikobi. *Id.* ¶ 25. Sgt. Yampierre also informed Lt. Effland that "many of the Unit's issues stemmed from [Officer Ajikobi's] insubordination and noncompliance." *Id.*

On April 23, 2019, Officer Ajikobi had a second "heated verbal altercation with two [BPD] officers," including Officer Parris. *Id.* ¶ 27. Plaintiff claims that she "documented the incident and reported it to Lt. Effland." *Id.* Moreover, Sgt. Yampierre "attempted to schedule mediation between the three officers, however, Officer Ajikobi refused to attend." *Id.* Accordingly, plaintiff "informed Lt. Effland of the steps she took to mediate and resolve this issue and assured Lt. Effland that she would follow up with Officer Ajikobi about possible resolutions." *Id.*

During the weeks that followed, Sgt. Yampierre "waited . . . for Lt. Effland to provide any advice or guidance on how she would like to proceed with this issue," but Lt. Effland failed to provide guidance. *Id.* Meanwhile, plaintiff "continued to receive inquiries from the involved

3

officers about the outcome" of their dispute.  ECF 1, ¶ 27.  Because of Lt. Effland's continued silence, Sgt. Yampierre was unable to "provide any updates or guidance to them . . . ."  *Id.*

On May 3, 2019, plaintiff "reconvened with Lt. Effland regarding the previous incident to inquire about the next steps in the process."  *Id.* ¶ 28.  According to plaintiff, Lt. Effland failed to "diffuse the situation" and, instead, "boasted about how Officer Ajikobi gifted her a unique bottle of wine."  *Id.*  At this juncture, "it became apparent" to plaintiff that Lt. Effland "had no plans to reprimand Officer Ajikobi."  *Id.*

In June 2019, Sgt. Yampierre "attempted to once again inquire with Lt. Effland about any next steps regarding the altercation" involving Officer Ajikobi.  *Id.* ¶ 30.  But, Lt. Effland "again dismissed the Plaintiff and her efforts to find a resolution."  *Id.*  To the contrary, "after speaking with Office Ajikobi, Lt. Effland began working to undermine the Plaintiff and her role as Sergeant in the Unit."  *Id.*  Specifically, Lt. Effland held "private meetings with officers in the Unit, without having Plaintiff, their direct supervisor, present."  *Id.*  Further, Lt. Effland "encouraged officers to skip Plaintiff in the line of command whenever they requested leave or overtime, so that they would go directly to Lt. Effland instead of the Plaintiff."  *Id.*  Lt. Effland also held "private meetings" with another BPD officer, Sgt. Marlon McEntyre, "to discuss the Unit's next phase in an effort to ostracize and alienate the Plaintiff from her coworkers and direct reports."  *Id.*; *see id.* ¶ 97 (indicating Sgt. McEntyre's first name).

On an unspecified date in July 2019, "Lt. Effland was again informed about Officer Ajikobi's continuing insubordinate and dangerous behavior."  *Id.* ¶ 32.[3]  But, rather than

_____

[3] The Complaint does not clarify whether this report stemmed from the previous issues plaintiff experienced with Officer Ajikobi, of which Lt. Effland had already been apprised, or, instead, other conduct.

4

"address[ ] this issue, Lt. Effland connivingly informed Officer Ajikobi that the Plaintiff was targeting him and had an objective to have him removed from the Unit." ECF 1, ¶ 32.

In the interim, around June 2019, "Lt. Effland removed the Plaintiff's duty of organizing and completing the Unit's officer schedules, which had been her responsibility for four (4) years." *Id.* ¶ 31.  Plaintiff asserts that Lt. Effland reserved this responsibility to herself so that she could "schedule herself and officers she favored in the Unit to coveted shift times."  *Id.*

Of import here, plaintiff alleges: "Before Lt. Effland's arrival, Lieutenants were not permitted to work overtime as it drained the budget."  *Id.*  But, after divesting plaintiff of the authority to organize shift schedules, "Lt. Effland approved herself" and officers she favored, including Lt. Brian Pearson, "for overtime shifts."  *Id.*  Additionally, "Lt. Effland altered the schedule to operate on a Monday — Friday week," over plaintiff's objection and "contrary to Departmental policy and practice."  *Id.*

Also in June 2019, plaintiff learned that she was pregnant.  *Id.* ¶ 29.  Sgt. Yampierre "notified her command of her pregnancy" on August 27, 2019, and "specifically mention[ed] that her pregnancy was high-risk so that they could understand the necessity of being able [to] attend doctor's appointments at different times of the day."  *Id.* ¶ 34.[4]   Plaintiff asserts: "With the lingering concern of the statistically high mortality rate of African American women during pregnancy and childbirth, Plaintiff was seeking support and an accommodation for her medical appointments."  *Id.*

---

[4] Sgt. Yampierre does not specify to whom she disclosed her pregnancy.

In August 2019, an unidentified individual "requested" BPD's Internal Affairs Integrity Unit ("Internal Affairs" or "IAD") "to investigate Lt. Effland for misuse of overtime." ECF 1, ¶ 33. Plaintiff maintains that she was not the source of the complaint. *Id.* ¶ 35. But, on August 28, 2019, Lt. Effland received an anonymous phone call, advising her that Sgt. Yampierre had "visited Internal Affairs and filed a complaint against Lt. Effland regarding misuse of overtime and that [plaintiff] had provided a statement detailing these accusations." *Id.*

"Lt. Effland became upset and ordered the Plaintiff into her office to discuss this leaked information . . . ." *Id.* Thereafter, Lt. Effland "proceeded to chastise and berate Plaintiff about why she reported her to Internal Affairs and demanded to know why the Plaintiff had not informed Lt. Effland prior to reporting her, even though the Plaintiff had advised Lt. Effland that she did not file a complaint against her." *Id.* Even so, Lt. Effland "aggressively questioned" plaintiff about her IAD complaint, but plaintiff did not respond. *Id.* Sgt. Yampierre's refusal to respond made Lt. Effland "even more agitated" and she attempted "to intimidate the Plaintiff in an effort to force her to respond." *Id.* Plaintiff informed Lt. Effland that her "conduct was against Departmental policy for whistleblowing . . . ." *Id.*

Thereafter, "Lt. Effland called the Unit's Civilian Director Randolph Reynolds and informed him that a meeting needed to be scheduled between him, Lt. Effland, and the Plaintiff to determine the basis for which the Plaintiff reported Lt. Effland to Internal Affairs." *Id.* ¶ 36. In contravention of "Departmental policy for the protection of employees who engage in (or are perceived to have engaged in) protected activity, Director Reynolds agreed with Lt. Effland and ordered the Plaintiff to meet with him . . . ." *Id.* Plaintiff told Lt. Effland that "she would attend the meeting, but that she would not respond to any inquiries about what, if anything, she reported to Internal Affairs." *Id.*

Sgt. Yampierre "immediately contacted" Sgt. Anthony Faulk of Internal Affairs "to report this incident." ECF 1, ¶ 36. Sgt. Faulk "advised Plaintiff to document this interaction in an administrative report (Form 95) and submit it to Internal Affairs." *Id.* Plaintiff states that she followed Sgt. Faulk's directive. *Id.*

The following day, August 29, 2019, IAD staff "visited Plaintiff's Unit to collect Lt. Effland's Departmental phone so that they could determine who called Lt. Effland and leaked information from the Internal Affairs Integrity Unit to her." *Id.* ¶ 37. This "visibly upset" Lt. Effland. *Id.* At that juncture, Lt. Effland approached plaintiff and another BPD officer and declared: "'I'm having a fucking four-day weekend off.'" *Id.* Lt. Effland then "erase[d] her name from the Overtime post in which she had scheduled herself to work that following weekend" and "demanded that the Plaintiff find her a replacement with less than 24 hours-notice." *Id.* ¶ 38.

Plaintiff responded that it was Lt. Effland's responsibility to find her own replacement. *Id.* But, Lt. Effland asserted that if Sgt. Yampierre failed to find a replacement for her shift, Lt. Effland would "draft Plaintiff to work [her] scheduled overtime hours." *Id.* Moreover, Lt. Effland threatened to alter plaintiff's regularly scheduled shift. *Id.* Sgt. Yampierre advised Lt. Effland that her behavior amounted to an "abuse of discretion and a clear violation of the police officers [sic] FOP contract." *Id.*[5] But, Lt. Effland "reiterated that Plaintiff will be working the new shift to cover her overtime . . . ." *Id.*

Lt. Effland then sent Director Reynolds an email, advising that plaintiff will "cover Lt. Effland's overtime, in lieu of working her regular hours, and that Lt. Brian Pearson will work

---

[5] Sgt. Yampierre alleges that, as a BPD officer and a member of "Baltimore City Lodge No. 3, Fraternal Order of Police ('FOP')," her employment relationship is governed by a collective bargaining agreement (the "CBA"). ECF 1, ¶ 17. However, plaintiff did not provide a copy of the CBA to the Court, nor has plaintiff otherwise specified its terms.

overtime to fill the Plaintiff's regularly scheduled shift." ECF 1, ¶ 38.  And, plaintiff "immediately contacted" IAD "to inform them of this retaliatory behavior." *Id.*  At the direction of IAD, plaintiff promptly filed a report.  *Id.*

The following day, August 30, 2019, Lt. Effland did not report for the overtime shift at issue. *Id.* ¶ 39.  As a result, plaintiff  had "to find a replacement to cover the shift," as "Lt. Effland had abandoned her post without finding a replacement beforehand."  *Id.*   Ultimately, BPD Officer Charles Green volunteered to work Lt. Effland's shift.  *Id.*

However, later that same day, Officer Ajikobi "emailed Lt. Effland claiming that the Plaintiff had 'forced' Officer Green to work past his shift . . . ."  *Id.* ¶ 40.  Lt. Effland sent an email to Officer Green, "advising him to leave his post at City Hall and write a report about how the Plaintiff demanded that he work past his shift."  *Id.*  Officer Green "immediately contacted the Plaintiff to inquire about what he should do."  *Id.*  Plaintiff "advised Officer Green to not leave his post at City Hall and [stated] that she will contact Director Reynolds about Lt. Effland's conduct." *Id.*  Director Reynolds subsequently emailed Lt. Effland, "informing her that no officer would be asked to leave their assigned post to write a report and that if she needed something completed, she needed to inform Director Reynolds and not the individual officer." *Id.*

Lt. Effland subsequently "attempted to charge the Plaintiff with insubordination for not working past her shift to cover for Lt. Effland's abandoned shift . . . ."  *Id.*[6]  Plaintiff "reported the entire incident to IAD and "[l]ater that day, Director Reynolds informed Plaintiff that Lt. Effland would be removed from the Unit due to her behavior and misconduct."  *Id.*

---

[6] The Complaint does not specify the actions taken by Lt. Effland.

On September 3, 2019, Lt. Brian Pearson was "assigned" to the Unit, apparently as Sgt. Yampierre's supervisor.  ECF 1, ¶ 41; *see id.* ¶ 60 (indicating that Lt. Pearson ordered plaintiff to submit reports to him). At that time, Sgt. Yampierre "attended a meeting with Lt. Pearson and Sgt. McEntyre to discuss the ongoing issues in the Unit that were primarily being caused by Officer Ajikobi." *Id.* ¶ 41.  Lt. Pearson "assured" plaintiff and Sgt. McEntyre that "he would investigate these claims further." *Id.*   And, later that day, Lt. Pearson sought to discuss with plaintiff "the basis for Lt. Effland's transfer out of the Unit, since Lt. Effland had told him a different narrative." *Id.*  However, plaintiff "refused to discuss the details of Lt. Effland's transfer since the Internal Affairs investigation was ongoing." *Id.*

Plaintiff asserts that Lt. Pearson met with Officer Ajikobi on September 4, 2019, and "advised him to file" a complaint against plaintiff with the Equal Employment Opportunity Commission ("EEOC") "before she had the opportunity to remove him from the Unit." *Id.* ¶ 42. The following day, plaintiff received a call from Sgt. Freda Arrington, who, according to plaintiff, is associated with the EEOC. *Id.* ¶ 43.  Sgt. Arrington informed plaintiff "that Officer Ajikobi had filed an EEOC complaint against her" and asked plaintiff if she would be "interested in attending mediation." *Id.*  Plaintiff "agreed." *Id.*

Sgt. Arrington held a meeting with plaintiff, Officer Ajikobi, and Sgt. McEntyre on September 6, 2019, in an attempt to "find an amicable solution." *Id.* ¶ 44.  Sgt. Arrington allegedly informed Officer Ajikobi that "his complaint against the Plaintiff was not considered an EEOC case . . . ." *Id.*  During the meeting, Officer Ajikobi "became visibly upset and agitated" because plaintiff "had documentation to refute his claims. *Id.* Officer Ajikobi also stated that he had "only filed an EEOC complaint because Lt. Pearson advised him to," as plaintiff was "working to have [Officer Ajikobi] removed from the Unit." *Id.*   Sgt. Arrington supposedly told Officer Ajikobi

"that his claims were not valid and that he needed to follow orders to prevent future disagreements." ECF 1, ¶ 44. Plaintiff asserts, *id.*: "Based on reason and belief, Officer Ajikobi had a problem taking orders from [plaintiff] because of her gender."

Approximately one week later, on September 13, 2019, Officer Ajikobi "filed a complaint with Internal Affairs alleging the same facts" as set forth in his EEOC complaint. *Id.* ¶ 45. Plaintiff asserts: "Officer Ajikobi filed this complaint in response to Lt. Pearson being told that the EEOC complaint was not valid." *Id.*

According to plaintiff, because Officer Ajikobi had a "close relationship" with Major ("Maj.") Stephanie Lansey, the Commander of IAD, his complaint "was expedited through the system, and [Officer Ajikobi] was able to complete an interview the same day." *Id.* Also on September 13, 2019, Detective Anita Pitts, an officer from Internal Affairs, contacted plaintiff for the purpose of serving her with papers related to Officer Ajikobi's complaint. *Id.*; *see id.* ¶ 64 (specifying Detective Pitts's first name).

Approximately two weeks later, on September 25, 2019, plaintiff attended a meeting with Lt. Pearson, Sgt. McEntyre, and Director Reynolds, at which she and Sgt. McEntyre informed Lt. Pearson and Director Reynolds "of the issues they had been trying to resolve with Officer Ajikobi." *Id.* ¶ 46. Director Reynolds requested documentation to substantiate these assertions. *Id.* On September 30, 2019, plaintiff "emailed all the documentation of Officer Ajikobi's alleged misconduct and insubordination to Lt. Pearson and Director Reynolds." *Id.* ¶ 49. Director Reynolds "replied by thanking [plaintiff] and stating that he will discuss the documents with Lt. Pearson." *Id.*

In the interim, on September 25, 2019, Sgt. Yampierre "submitted a second written notification regarding her pregnancy and the importance of attending her scheduled doctors'

10

appointments." ECF 1, ¶ 47.  Plaintiff claims, *id.*: "Lt. Pearson acknowledged this notification and replied that he supports her, cares about her health, and will ensure that the Unit is covered before she departs for each appointment . . . ."

Plaintiff alleges that in October 2019, while she awaited a decision from Director Reynolds regarding Officer Ajikobi, "Lt. Pearson began sexually harassing the Plaintiff" and another BPD officer, Sgt. Leslie Williams.  *Id.* ¶ 51.  Plaintiff asserts: "Lt. Pearson would often ask the Plaintiff and Sgt. Williams to go out with him after work because he was lonely after his most recent relationship ended." *Id.*[7]  According to plaintiff, both she and Sgt. Williams consistently rejected these advances, but "Lt. Pearson continued to make these requests with increasing pressure."  *Id.* This made plaintiff and Sgt. Williams "extremely uncomfortable every time [Lt. Pearson] interacted with them." *Id.*

On November 3, 2019, Sgt. Williams informed plaintiff that Officer Ajikobi had been charged with insubordination.  *Id.* ¶ 52.  And, on November 8, 2019, while plaintiff was "on a pre-approved vacation," Lt. Pearson sent a text message to plaintiff and to Sg. McEntyre, informing them that "Officer Ajikobi had been transferred out of the Unit to work for his close friend," Maj. Lansey.  *Id.* ¶ 53.  Lt. Pearson stated that he was "'going to pop out of [plaintiff's] birthday cake' . . . to celebrate this news." *Id.*  But, on November 10, 2019, Lt. Pearson advised plaintiff that Officer Ajikobi's transfer had been cancelled, "as a result of the numerous complaints that had been filed against him by the Plaintiff." *Id.* ¶ 54.

During the week of November 18, 2019, Officer Ajikobi allegedly "bypassed the chain of command to schedule a meeting with Director Reynolds and Lt. Pearson directly." *Id.* ¶ 55. Plaintiff asserts that Officer Ajikobi "was upset about his transfer being cancelled and began to

---

[7] Plaintiff does not specify the dates of these interactions.

make false accusations about the Plaintiff in order to provide a retaliatory reason for the complaints filed against him." ECF 1, ¶ 55.

Then, on November 22, 2019, plaintiff "received an email from Director Reynolds stating that he had received information that the Plaintiff was engaging in favoritism      . . . and that from this point forward she would not be responsible for completing the Unit's schedule." *Id.* ¶ 56. Reynolds also "barred" Sgt. Williams from working overtime in the Unit. *Id.* According to plaintiff, "Director Reynolds claimed these changes were not punitive," but instead were implemented with the intent of "creat[ing] a 'good working order' for the Unit." *Id.*

On the same day, Sgt. Yampierre spoke with Lt. Pearson "about the inconsistency in command, and how it did not follow that Officer Ajikobi was able to secure a meeting with Director Reynolds in a short amount of time while the Plaintiff was still waiting to schedule one." *Id.* ¶ 57.[8] Lt. Pearson replied that "he was not involved in the decision that Director Reynolds made about the schedule and that he does not want the Plaintiff to get too upset since she was pregnant." *Id.*

Also on November 22, 2019, plaintiff "drafted an administrative report (Form 95) addressed to Director Reynolds that outlined the hostile work environment that Lt. Pearson had created." *Id.* ¶ 58. In particular, this administrative report "detailed the numerous [instances of]

---

[8] The basis of the assertion that plaintiff was "waiting to schedule" a meeting with Director Reynolds is not immediately apparent. ECF 1, ¶ 57. As mentioned, plaintiff alleges that on September 30, 2019, she had emailed documentation regarding her complaints about Officer Ajikobi to Director Reynolds, and that Director Reynolds replied by advising plaintiff that he would discuss the documentation with Lt. Pearson. *Id.* ¶ 49. But, the Complaint does not state that as of November 22, 2019, plaintiff had submitted a request for a meeting with Director Reynolds that had gone unheeded.

sexual harassment" to which plaintiff had allegedly been subjected by Lt. Pearson, and specified "the need for an immediate resolution." ECF 1, ¶ 58.

Three days later, on November 25, 2019, Lt. Pearson "sent a text message to Plaintiff and Sgt. McEntyre requesting a meeting between the three of them." *Id.* ¶ 59. At a meeting in plaintiff's office, Lt. Pearson "stated the meeting's objective" was to "'clear the air.'" *Id.* Lt. Pearson then "asked the Plaintiff if she was okay, to which the Plaintiff replied, 'I'm good.'" *Id.* But, Lt. Pearson continued to question Sgt. Yampierre, claiming that plaintiff was "not good and demand[ing] to know why." *Id.* According to Sgt. Yampierre, Lt. Pearson sought "to extract a statement from [plaintiff] that could lead to a legitimate complaint against her." *Id.*

Plaintiff indicated to Lt. Pearson that "she was trying to avoid getting upset over something that is out of her control, for the sake of her and her unborn child's health." *Id.* And, plaintiff "reiterated that it is unprofessional for an officer to meet with Director Reynolds without following the protocol, especially while she had been waiting several months to meet with Director Reynolds after submitting substantial documentation regarding Officer Ajikobi's insubordination and conduct towards her." *Id.*

Lt. Pearson also inquired as to when Sgt. Yampierre would "move to light duty or go on maternity leave." *Id.* Plaintiff advised that she intended to work "until her last day of full duty" but her ultimate decision would depend on her health. *Id.* Lt. Pearson told plaintiff that "she would not be able to remain in the Unit if she went on light duty because those positions can only be fulfilled by full duty officers." *Id.* Plaintiff replied that she would then stay on full duty "because she did not want to be transferred from the Unit." *Id.*

On November 26, 2019, Lt. Pearson "wrote the Plaintiff up in retaliation for her submitting her two original complaints to Director Reynolds." *Id.* ¶ 60. But, the suit fails to specify the

13

complaints with which Lt. Pearson took issue.  In context, however, the claim appears to relate to plaintiff's complaints regarding Officer Ajikobi's alleged misconduct, which she had emailed to Director Reynolds.  *See* ECF 1, ¶¶ 46, 49.

On November 27, 2019, plaintiff "received a text message from Lt. Pearson, asking if she had an altercation with a SWAT officer."  *Id.* ¶ 61.  Sgt. Yampierre promptly responded, confirming that "she did have an altercation with a SWAT officer who was insubordinate and failed to obey direct orders from the Plaintiff."  *Id.*[9]  She also "informed Lt. Pearson that she had contacted [the SWAT officer's] command to report the incident."  *Id.* Lt. Pearson replied in a "derogatory and inflammatory tone," stating that plaintiff "needed to draft an administrative report and submit it to him immediately."  *Id.*

Plaintiff claims that this request confused her because "the Commander of SWAT, Captain Joe Jones, had directed her that an administrative report was unnecessary since his officer had been the aggressor."  *Id.*  Captain Jones then allegedly contacted Lt. Pearson to inform him that a report was unnecessary, "but Lt. Pearson dismissed him."  *Id.*  At that juncture, Lt. Pearson "called . . . and asked CSO Corrina Johnson, 'Did Sgt. Yampierre put that report in my mailbox like I asked her to?'" *Id.*

On November 29, 2019, "Director Reynolds wrote Plaintiff up yet again, without basis or justification, two days after Lt. Pearson wrote a complaint against the Plaintiff."  *Id.* ¶ 62.[10] Notably, the Complaint does not indicate that Director Reynolds previously "wrote Plaintiff up," nor does plaintiff clarify the basis of Director Reynold's complaint.  *Id.*

---

[9] The Complaint is devoid of any details regarding this incident.

[10] Plaintiff claims that Lt. Pearson filed a complaint against her on November 26, 2019, three days before Director Reynolds filed his report against plaintiff. ECF 1, ⁋ 60. Thus, plaintiff's contention regarding the timing of Director Reynold's complaint may be erroneous.

Plaintiff received an email from the Human Resources Department on December 2, 2019, "stating that they [sic] had been informed by Director Reynolds that the Plaintiff is pregnant." ECF 1, ¶ 63. Further, "Human Resources informed Plaintiff about the documentation that she needed to submit as quickly as possible" concerning "her pregnancy and projected maternity leave." *Id.* According to Sgt. Yampierre, "Director Reynolds had no right to divulge this information to Human Resources or at all." *Id.* And, plaintiff asserts that Director Reynolds told Human Resources about her pregnancy "in an effort to have her involuntarily transferred from the Unit since the Departmental policy had changed regarding whether officers working light duty could remain" in the Unit. *Id.*

The following day, December 3, 2019, Detective Pitts requested plaintiff "to come to Internal Affairs so that she could be served with trumped up charging papers for 'Disrespecting Lt. Pearson in a meeting on November 25' and also for 'Inappropriate workplace environment.'" *Id.* ¶ 64.[11] Accordingly, one week later, on December 10, 2019, plaintiff "submitted an administrative report (Form 95) that requested a meeting with Director Reynolds." *Id.* ¶ 65. But, she was subsequently advised by Lt. Pearson that Director Reynolds did not want to have a meeting with her. *Id.*

On December 12, 2019, Maj. Lansey "abruptly reassigned the Plaintiff's Internal Affairs case from Detective Pitts to another detective." *Id.* ¶ 66.[12] "Based on reason and belief," plaintiff claims that Maj. Lansey effectuated this reassignment because she "did not have faith that

---

[11] In context, these "charging papers" appear to relate to the administrative complaints that Lt. Pearson filed on November 26, 2019. *See* ECF 1, ¶ 60.

[12] It is unclear whether this investigation pertained to the complaint filed by Lt. Pearson against plaintiff on November 26, 2019, the complaint filed by Director Reynolds on November 29, 2019, or both.

Detective Pitts would provide the Plaintiff with a guilty outcome and wanted to orchestrate a particular negative outcome."  ECF 1, ¶ 66.

Then, on December 16, 2019, Director Reynolds sent an email to plaintiff, Lt. Pearson, and Sgt. McEntyre, "declaring that Lt. Pearson and Sgt. McEntyre are the only supervisors who are permitted to command the Unit." *Id.* ¶ 67.   He stated that "he had mentioned in previous emails that the Plaintiff is not authorized to assist in commanding decisions or perform any of her supervisory duties in the unit, and that any disobedience to this order would result in consequences."  *Id.*  In plaintiff's view, this communication constituted "a direct attack" on her, as she was "more experienced than both commanders . . . ."  *Id.*

Approximately ten days later, on December 26, 2019, Sgt. Yampierre submitted a complaint to IAD, asserting a claim for hostile work environment.  *Id.* ¶ 68.  Notably, plaintiff submitted this complaint by emailing it to Sgt. Faulk, in an attempt "to prevent" Maj. Lansey "from intercepting the claim and making it disappear."  *Id*.  And, on December 31, 2019, plaintiff requested a meeting with Eric Melcanon, the Chief of Staff of the Police Commissioners Office, for the purpose of "report[ing] the discriminatory and retaliatory issues she was experiencing in the workplace . . . ."  *Id.* ¶ 69.  Mr. Melcanon responded by informing plaintiff that "he could not meet with her."  *Id.*

Accordingly, plaintiff asserts that, having "exhaust[ed] all of her administrative remedies to no avail," she submitted "an EEOC complaint against the Baltimore Police Department" on January 9, 2020.  She asserted "race, gender, disability, and family status discrimination as well as sexual harassment and retaliation."  *Id.* ¶ 70.   As discussed, *infra*, plaintiff did not provide the Court with a copy of the EEOC submission.  *Id.*

Soon after, on February 14, 2020, "Plaintiff went out on maternity leave." ECF 1, ¶ 72.[13] Four days later, on February 18, 2020, plaintiff was "contacted by Kimberly Parks," an IAD employee, who "return[ed] her call regarding a complaint that had been lodged against her." *Id.* ¶ 73. Plaintiff does not provide any further detail concerning communications with Ms. Parks.

Six days later, on February 24, 2020, Detective Eric Geddis, assigned to IAD, contacted plaintiff and "inquired to see if she was working." *Id.* ¶ 74. When plaintiff responded that she was not working at that time, Detective Geddis replied by "stat[ing] that he knew she was on leave but would like to know when she would return." *Id.* He also stated that he "wanted to discuss an internal complaint that was lodged against her." *Id.* Detective Geddis denied that this complaint was "related to the complaint she submitted via Sgt. Faulk," as it had been submitted approximately one week earlier, and "alleged that [plaintiff] often came to work late and left early." *Id.* Detective Geddis also claimed that "the complaint had been placed on his desk and he was told to investigate it immediately." *Id.*

"Plaintiff was stunned that she had submitted a complaint over two months [earlier] and had heard nothing, but that a complaint against her was submitted a week ago" and had been "expedited to an investigation." *Id.* In plaintiff's view, Maj. Lansey expedited the complaint against plaintiff "in direct response to the Plaintiff's complaint . . . from December 26, 2019," in which she had complained about a hostile work environment. *Id.*

On February 26, 2020, while plaintiff was still on maternity leave, she was contacted by a third IAD employee, Detective Syreeta Harvin. *Id.* Detective Harvin asked plaintiff whether she

---

[13] On September 25, 2019, plaintiff "wrote an administrative report (Form 95) to have her leave balance audited before she left for maternity leave," as she had noticed that "her paystubs were reflecting inaccurate numbers as to her balances of vacation leave, legacy leave, and sick leave." *Id.* ¶ 48. The discrepancy was reconciled on January 29, 2020, two weeks before plaintiff's maternity leave began. *Id.* ¶ 71.

was working and available to meet, and informed plaintiff that "she had received allegation papers against [plaintiff] that needed to be served as soon as possible." ECF 1, ¶ 75. Plaintiff responded that "she was out on maternity leave and that she did not yet know when she will return." *Id.* Detective Harvin asked plaintiff to "keep her abreast of her return date, as she was feeling internal pressure to resolve this case." *Id.*

Plaintiff also alleges that on an unspecified date in March 2020, she "was exposed to an individual who was infected with COVID-19." *Id.* ¶ 199. As a result, she claims that she was required "to take COVID-19 leave from work so that she could self-quarantine for the protection of herself and others." *Id.* ¶ 200. However, given that plaintiff was already on maternity leave, these allegations are confusing. In any event, Sgt. Yampierre asserts: "Defendant requested and demanded documentation and proof that the Plaintiff had indeed been exposed to a person who was infected with COVID-19." *Id.* ¶ 201. In her view, this conduct "violated the Plaintiff's rights to privacy regarding her health information." *Id.* ¶ 202.

Further, on March 5, 2020, Sgt. Yampierre "horridly gave birth to her child on the sidewalk without any professional medical assistance." *Id.* ¶ 76. She alleges that the delivery was the result of "the exacerbated stress from her work environment and [her] feelings that Defendant was orchestrating a scheme to push her out of the Department . . . ." *Id.* And, on March 13, 2020, plaintiff "underwent emergency surgery to address the medical complications she sustained during childbirth." *Id.* ¶ 77. To address these complications, Sgt. Yampierre underwent two additional surgeries — one on May 15, 2020, and the other on June 16, 2020. *See id.* ¶¶ 79, 81.

In the interim, on March 26, 2020, plaintiff was again contacted by Sgt. Arrington, who sought to discuss with plaintiff "the federal EEOC complaint that the Plaintiff had filed in January 2020." *Id.* ¶ 78. Sgt. Arrington indicated that the BPD "requires a separate internal investigation

[to] be completed." ECF 1, ¶ 78.  However, according to plaintiff, since receiving this update from Sgt. Arrington, she has not "received [any] updates or information regarding this alleged internal investigation." *Id.*

Moreover, on June 15, 2020, the day before plaintiff's third surgery, she was again contacted by Detective Harvin, who stated that Maj. Lansey was "pressuring Detective Harvin's supervisor into obtaining the Plaintiff's return date." *Id.* ¶ 80.  Sgt. Yampierre responded that "she does not yet have a return date due to her prevailing medical complications that she sustained from childbirth." *Id.*

On July 7, 2020, "as a result of the pressure [plaintiff] was feeling by agents of the Defendant, [she] returned to work on light duty." *Id.* ¶ 82.   On the same date, plaintiff was informed by Lt. Gene Ryan that "Director Reynolds directed him to communicate to Plaintiff that she is no longer permitted to park in the parking space that had been designated to her for the past eight (8) years." *Id.* ¶ 83.  However, Lt. Ryan also said that because "he did not have an alternate parking space yet available" for plaintiff, "she can continue to park there until they found a suitable alternate." *Id.*  Plaintiff asserts: "On the days that [she] did not work, Sgt. McEntyre and other officers in the Unit were free to park in what had been her historically assigned parking space, without any repercussions or threat of disciplinary action." *Id.*

Approximately three weeks later, on July 27, 2020, Detective Geddis contacted plaintiff, and she advised him that she had returned to work. *Id.* ¶ 84.  "Detective Geddis then directed the Plaintiff to report to Internal Affairs on July 29, 2020 so that she could be served with the allegation papers." *Id.*  On that date, plaintiff "was served [with] the allegation papers for Notice of Accused." *Id.* ¶ 85.  Sgt. Yampierre does not specify the charges. *Id.*

In August 2020, "Lt. Ryan approached the Plaintiff and informed her that Director Reynolds had been inquiring about when the Plaintiff would return to full duty from light duty." ECF 1, ¶ 86. Plaintiff replied that "she did not yet have an estimated date, due to her severe medical complications that she sustained during childbirth." *Id.* Also in August 2020, Detective Geddis requested that plaintiff "report to Internal Affairs to sign a notification for her statement that she was scheduled to provide on September 3, 2020." *Id.* ¶ 87. However, on August 28, 2020, Detective Geddis sent an email to plaintiff, stating that "her scheduled statement for September 3, 2020 . . . had been cancelled" and that the meeting would be rescheduled. *Id.* ¶ 88.[14]

On October 11, 2020, plaintiff "received her allegations papers via email from Detective Syreeta Harvin . . . ." *Id.* ¶ 90. Plaintiff "was offered the chance to provide a recorded statement over the phone." *Id.* Sgt. Yampierre has not specified the nature of charges raised against her in the "allegation papers." *Id.*

According to plaintiff, on November 18, 2020, she "received a notification that the internal complaint filed by Director Reynolds regarding the Plaintiff's parking spot was deemed 'unfounded.'" *Id.* ¶ 91.[15] Further, plaintiff claims that "the three complaints filed by Lt. Brian Pearson, the Plaintiff's reported harasser, were also not sustained." *Id.*

Director Reynolds informed Lt. Ryan on December 9, 2020, that he intended to "alter[ ] the Plaintiff's permanent Monday — Friday schedule that she had worked for the past eight (8)

---

[14] Plaintiff states that in September 2020, she "was transferred from locator and to a medical locator by order of her command, even though they had been advised against that decision by Lt. Ryan since the Plaintiff was still on light duty due to her pregnancy complications." ECF 1, ¶ 89. However, plaintiff does not explain the terms "locator" or "medical locator." *Id.* Nor does she indicate how this assignment differed from her previous assignment, if at all.

[15] As best the Court can determine, the assertion pertains to Sgt. Yampierre's allegation that on November 29, 2019, "Director Reynolds wrote Plaintiff up . . . without basis or justification." ECF 1, ¶ 62.

years" and would instead "plac[e] her in a leave group with rotating shifts and days off . . . ." ECF 1, ¶ 92. Plaintiff claims that Lt. Ryan disagreed with Director Reynold's decision, on the ground that "Sgt. McEntyre was retiring, and Plaintiff would be the only remaining supervisor in the Unit." *Id.*

The following day, Sgt. Brian Frazier "ordered Plaintiff to report to Internal Affairs to discuss another complaint lodged against her." *Id.* ¶ 93. Upon plaintiff's arrival at IAD, "she was escorted into a private meeting" with Sgt. Frazier and Lt. Sean Mahoney. *Id.* Lt. Mahoney informed plaintiff that "superior commanders, such as Maj. Stephanie Lansey did not react favorably to the 'not sustained' findings of the previous complaints, and that they were going to resubmit the charges in an effort to receive a different result." *Id.*

Accordingly, Lt. Mahoney and Sgt. Frazier asked Sgt. Yampierre "to sign a verbal letter that detailed these previous charges as 'not sustained.'" *Id.*[16] When plaintiff declined to do so, Lt. Mahoney cautioned plaintiff that although "she would face no repercussions for refusing to sign the letter, . . . her refusal would provide ammunition for other charges." *Id.* Nevertheless, Sgt. Yampierre "wrote 'refused' on the signature line on the letter." *Id.*

Two days later, on December 11, 2020, Lt. Sharon Talley "ordered the Plaintiff to move her vehicle from her parking spot." *Id.* ¶ 94. According to Lt. Talley, "this order came directly from Director Reynolds," and Director Reynolds also warned that if plaintiff "refused to move her vehicle, he would have it towed." *Id.* Consequently, plaintiff "complied with this order." *Id.* Thereafter, "Sgt. McEntyre . . . began parking in that space without repercussions." *Id.*

Sgt. Yampierre also alleges that on December 29, 2020, "Internal Affairs forwarded the Plaintiff's 2019 internal complaint to the States [sic] Attorney's Office in an effort to secure

---

[16] The Complaint does not shed light on the meaning of "a verbal letter."

criminal charges against [her]." ECF 1, ¶ 95.[17]  In plaintiff's view, this action constituted "direct retaliation for [her] refusal to sign the verbal letter about the resubmission of charges."  *Id.*

During the week of January 4, 2021, Sgt. Yampierre contacted Detective Geddis "to receive an update on the status of her case, as it would be expiring within 30 days."  *Id.* ¶ 96. Detective Geddis advised that the case was "still pending review by the Commanders."  *Id.*  This response prompted plaintiff to inquire as to "how the case is pending review without the Plaintiff having completed an interview first."  *Id.*  But, Detective Geddis could not provide plaintiff with any further information, as the case "had been forwarded up the chain and was no longer his responsibility."  *Id.*

The following week, five out of the ten detectives in the Unit, including Sgt. McEntyre and Officer Ajikobi, received "Grand Jury summons to testify in a filed case against the Plaintiff."  *Id.* ¶ 97.  Notably, each of these officers had previously been "reprimanded" by Sgt. Yampierre.  *Id.* In contrast, plaintiff asserts that the officers who had not been summoned all held "favorable opinions of the Plaintiff" and would provide "accurate retelling[s] of the issues presented that demonstrate the Plaintiff in the proper, lawful light."  *Id.*

Plaintiff claims that "the summoned officers appeared for their grand jury testimony" on January 19, 2021.  *Id.* ¶ 98.  However, she does not provide the outcome of the grand jury proceedings.

On January 28, 2021, after Sgt. Yampierre had arrived home from work, "she was ordered back to the Unit," despite the fact that she had informed Lt. Ryan that "she had a doctor's appointment that she needed to attend."  *Id.* ¶ 99.  Accordingly, plaintiff "cancelled her doctor's

---

[17] Plaintiff does not specify whether her reference to the "2019 internal complaint" pertains to her complaint against Lt. Pearson or her multiple complaints against Lt. Effland.

appointment at the last minute and returned to Police Headquarters . . . ." ECF 1, ¶ 99.  Upon her arrival, plaintiff was met by Lt. Ryan and two other BPD officers.  *Id.*  The "three commanders escorted" plaintiff to IAD "to inform the Plaintiff that she was being suspended for a general charge of 'misconduct' without providing any further details or specificity." *Id.*  In plaintiff's view, the "act of three commanding officers escorting a subordinate to the Internal Affairs Office is highly unusual" and it "was done to humiliate, demean, and debase" her.  *Id.* Plaintiff claims she was treated in this manner because she is "a Black woman who had engaged in statutorily-protected activity against the Department."  *Id.*

On the same date, Lt. Ryan called Sgt. Yampierre and informed her that she "was being transferred from the administrative position that she had held for the past eight (8) years to work patrol in the Eastern District . . . ."  *Id.* ¶ 100.  In plaintiff's view, this transfer was retaliatory, in response to the EEOC complaint that she had filed.  *Id.* ¶ 103.  However, the Complaint does not clarify whether plaintiff was transferred in lieu of being suspended, or if the transfer was rendered effective upon the completion of a suspension.  Nor does Sgt. Yampierre plead the date on which the transfer was effective.  In any event, on March 29, 2021, Sgt. Arthur Paige was transferred to the Unit as plaintiff's replacement.  *Id.*

In the interim, on February 7, 2021, plaintiff received an email from Lt. John Ferinde indicating that plaintiff "needed to report to Internal Affairs on February 11, 2021 to attend a meeting with the States Attorney's Office . . . ."  *Id.* ¶ 101.  Plaintiff stresses that, at the time she received this message, she was on "medical leave to address the complications sustained from her high risk pregnancy and traumatic childbirth." *Id.*[18] But, Lt. Ferinde indicated that failure to attend this meeting would result in disciplinary action.  *Id.*  Therefore, plaintiff "attended the meeting at

---

[18] Plaintiff does not indicate the date that her medical leave commenced.

the States Attorney's Office with her criminal attorney, Allen Rombro, and the head attorney of the Public Integrity Bureau of the States Attorney's Office." ECF 1, ¶ 102.

During the meeting, plaintiff "was told that she would not be able to speak or refute any statement" and then she was "accused of soliciting information about the grand jury proceedings . . . ." *Id.* However, according to plaintiff, the alleged solicitation occurred "during a time when [she] had been on medical leave and could not, and did not, have any contact with any individual involved in those proceedings." *Id.* "Without any further discourse, the Plaintiff and Mr. Rombro left the meeting." *Id.*

**B.**

As mentioned, Sgt. Yampierre asserts that she filed a "complaint with the Baltimore Field Office of the [EEOC] on January 9, 2020, alleging race (African American) discrimination, sex (female), sexual harassment, disability, and retaliation." *Id.* ¶ 8; see *id.* ¶ 70. However, as noted, she did not submit a copy of her EEOC complaint.

According to defendant, plaintiff's "claims are entirely predicated upon [an] EEOC Charge of Discrimination . . . that she filed on May 11, 2020," and, "upon [defendant's] information and belief," it is "the only Charge of Discrimination that Plaintiff filed . . . ." ECF 7-1 at 2. The BPD attached a copy of this "Charge of Discrimination" to the Motion. *See* ECF 7-2 (the "Charge"). Notably, plaintiff does not dispute the BPD's contentions concerning the Charge, nor does she call into question the authenticity of the Charge. Therefore, I shall assume that the "complaint with the Baltimore Field Office of the [EEOC] on January 9, 2020," pertains to the Charge submitted by the BPD. ECF 1, ¶ 8.

The Charge is a form, with areas for a complainant to explain the allegations. On the form, plaintiff checked the boxes indicating that she was claiming retaliation as well as discrimination

24

on the basis of race and sex. *See* ECF 7-2 at 1. Further, she specified that the alleged discrimination took place between August 28, 2019 and April 30, 2020. And, she also checked the box for "Continuing Action." *Id.*

In the narrative portion of the Charge, plaintiff stated, *id.*:

I.     I began my employment with the above-named Respondent on August 15, 2006 as a Police Officer Trainee. I am currently employed as a Detective Sergeant under the supervision of Lt. Gene Ryan and Lt. Brian Pearson. Between approximately August 28, 2019 and September 3, 2019, other Black employees and I were subjected to harassment by Lt. Deanna Effland (White) when she demanded we disclose what we told Internal Affairs about her possible overtime violations, while similarly-situated White employees were not harassed. Beginning on or about September 3, 2019 and continuing to present, I have been subjected to pregnancy-related harassment in the form of Lt. Pearson repeatedly asking when I was going on light duty and in the form of false accusations made against me. On November 22, 2019 and November 25, 2019, Lt. Pearson made false allegations against me which led to administrative / disciplinary investigations being initiated against me. Beginning on or about November 22, 2019, I was excluded from weekly debriefing meetings and emails, and many of my administrative job duties were taken away. On or about December 27, 2019, I complained to Internal Affairs about pregnancy discrimination by Lt. Pearson and race discrimination by Lt. Effland, but no corrective actions were taken. On February 24, 2020 and February 26, 2020, while on maternity leave, I was subjected to harassment when I was notified I had been charged with arriving late and leaving early and charged with a parking complaint.

II.    No reasonable explanation has been provided for Respondents [sic] actions.

III.   I believe I have been discriminated against because of my race (Black) with respect to harassment and my sex (Female-Pregnancy) with respect to harassment, exclusion from meetings and emails, and removal of job duties, and retaliated against for engaging in protected activity with respect to harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended.

According to Sgt. Yampierre, on March 8, 2021, "the Department of Justice ('DOJ') issued Plaintiff a Right-to-Sue Letter." ECF 1, ¶ 9. This suit followed on May 17, 2021.

25

## II.    Standard of Review

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect

statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam).   But, "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).   As the Fourth Circuit recently reiterated, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, ___ F. App'x ___, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).   If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555.   "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678.   Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).   However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*,

478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

To resolve a Rule 12(b)(6) motion, the question for the court is whether the plaintiff has stated a plausible claim for relief. *Twombly*, 550 U.S. at 570. With regard to a discrimination claim under Title VII, a plaintiff is not required to plead a prima facie case of discrimination. *McCleary-Evans v. Md. Dep't of Transportation*, 780 F.3d 582, 584-85 (4th Cir. 2015), *cert. denied*, 557 U.S. 1138 (2016); *see Felder v. MGM National Harbor, LLC*, ___ Fed. App'x ___, 2022 WL 2871905, at *1 (4th Cir. July 21, 2022) (per curiam). "Instead, a plaintiff must allege sufficient facts 'to satisfy the elements of a cause of action created by [the applicable] statute.'" *Felder*, 2022 WL 2871905, at * 1 (quoting *McCleary-Evans*, 780 F.3d at 585) (alteration in *Felder*). Therefore, to survive a motion to dismiss, a plaintiff must "plausibly allege" discriminatory conduct because of her protected status, such as race or sex. *Felder*, 2022 WL 2871905, at *1; *see* 42 U.S.C. § 2000e-2(a)(1)

In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the prima facie case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) "is an evidentiary standard, not a pleading requirement." Further, the Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to

dismiss." *Swierkiewicz*, 534 U.S. at 511.  Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ."  *Id.* at 515.

However, as the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544.  *See Littlejohn v. Cty. of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent."  *Id.* at 309.  On the other hand, in *Twombly* the Court said that a plaintiff must "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of Twombly is applicable in "'all civil actions' . . . ."  *Iqbal*, 556 U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]"  *See Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 747-48 (4th Cir. 2017) ("While a plaintiff need not plead a prima facie case to survive a motion to dismiss, a Title VII complaint is still subject to dismissal if it does not meet the ordinary pleadings standard under *Twombly* and *Iqbal*." (internal citations omitted)); *see also Holloway v. Maryland*, 32 F.4th 293, 298-99 (4th Cir. 2022); *McCleary*, 780 F.3d at 584; *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).

In other words, at the motion to dismiss stage the question "is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII 'above a speculative level.'"  *Bing v. Brivo Sys.*,

*LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (quoting *Coleman*, 626 F.3d at 190). To that end, reference to the prima facie case informs a court's evaluation of a motion to dismiss. *See Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003); *Young*, 108 F. Supp. 3d at 314; *see also Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1300-01 (N.D. Cal. 2020) ("When a plaintiff does not plead a prima facie case, courts still look to the elements of the prima facie case 'to decide, in light of judicial experience and common sense, whether the challenged complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'") (citation omitted). However, the Fourth Circuit has "cautioned that 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable'. . . ." *Felder*, 2022 WL 2871905, at *1 (quoting *Woods*, 855 F.3d at 652).

Ordinarily, at the Rule 12(b)(6) stage, courts do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint as well as the

'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). The court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir.

2015).  In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods*, 855 F.3d at 642; *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As mentioned, defendant appended a copy of the Charge to the Motion.  *See* ECF 7-2.  "In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions."  *Campbell v. Mayorkas*, 3:20-cv-697-MOC, 2021 WL 2210895, at *1 n.3 (W.D.N.C.

July 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C.
2018)). Thus, I may consider the Charge in resolving the Motion.

Notably, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint
by way of her opposition briefing. *See, e.g.*, *De Simone v. VSL Pharmaceuticals*, 36 F.4th 518,
531 (4th Cir. 2022) (recognizing that, generally, new arguments cannot be raised in a reply brief);
*Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o
litigant is exempt from the well-established rule 'that parties cannot amend their complaints
through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc.
v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank,
N.A.*, DKC-3058, 2016 WL 3570274 at *3 (D. Md. July 1, 2016) (declining to consider declaration
attached to brief opposing motion to dismiss because, among other things, it included allegations
not alleged in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating
that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use
of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc.*,
770 F. Supp. at 1068 ("'[I]t is axiomatic that the complaint may not be amended by the briefs in
opposition to a motion to dismiss'") (quoting *Car Carriers, Inc.*, 745 F.2d 1101 at 1107).

### III.    Discussion

Plaintiff lodges a bevy of claims. As noted, she asserts discrimination under Title VII on
the basis of race (Count I), sex (Count II), and pregnancy (Count IX), as well as "sexual harassment
(hostile work environment)" (Count III) and retaliation (Count IV). ECF 1 at 28-38. In addition,
she asserts claims for discrimination on the basis of race, in violation of 42 U.S.C. § 1981 (Count
V); violation of HIPAA (Count VI); discrimination based on disability, in violation of the ADA

(Count VII); and discrimination on the basis of race and sex, in violation of the FEPA (Count VIII).  *Id.* at 38-43.

With the exception of Count VI and Count VII, the claims in the Complaint fail to specify on which of plaintiff's numerous factual allegations they rely.  Consequently, the Court has been left to guess which of plaintiff's allegations are implicated by which of her assorted claims.

In any event, defendant argues that some of plaintiff's Title VII claims are subject to dismissal for failure to exhaust and on the ground that they are untimely.  ECF 7-1 at 7-13.  Further, to the extent that these claims are not barred by administrative prerequisites, the BPD argues that they do not amount to violations of Title VII.  *Id.* at 14-20.  With regard to plaintiff's ADA claim, the BPD maintains that plaintiff did not exhaust her administrative remedies and that, even if plaintiff had exhausted her claim, the assertions set forth in the Complaint, taken as true, do not indicate that plaintiff had a qualifying disability, let alone that BPD failed to provide her with a reasonable accommodation for any such disability.  ECF 7-1 at 21-22.

As to plaintiff's remaining claims, the BPD maintains that they are fatally deficient.  With respect to plaintiff's claim arising under 42 U.S.C. § 1981, defendant asserts that it is improper because the BPD is a State entity, and when "'suit is brought against a state actor, § 1983 is the exclusive federal remedy for violation of the rights guaranteed in § 1981.'"  *Id.* at 22 (quoting *Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995)).  Moreover, the BPD argues that Sgt. Yampierre may not advance a claim for a violation of HIPAA because this statute does not confer a private right of action.  ECF 7-1 at 22-23.  Further, defendant argues that it is entitled to sovereign immunity with respect to plaintiff's claim for violation of FEPA (*id.* at 23-24) and, in the alternative, the claim fails because plaintiff has not alleged compliance with the notice requirement

set forth in the Local Government Tort Claims Act ("LGTCA"), Md. Code (2020 Repl. Vol., 2021 Supp.), § 5-301 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."). *Id.* at 24 n.3.

I shall address each contention, in turn.

### A.  Title VII Claims

Regarding plaintiff's Title VII claims, defendant maintains that they are subject to dismissal for failure to exhaust and, in any event, plaintiff's allegations do not amount to violations of federal antidiscrimination law.  ECF 7-1 at 7-20.  I begin with a review of the general principles undergirding Title VII.

### 1. General Principles

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. This proscription is "often referred to as the 'disparate treatment' (or 'intentional discrimination') provision . . . ." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015).  The Supreme Court has referred to discrimination based on one of the five characteristics specified above as "status-based discrimination."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013).    And, "terms, conditions or privileges of employment" is "an expansive concept."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).

As mentioned, plaintiff need not plead a prima facie claim of discrimination under Title VII to survive a Rule 12(b)(6) motion.  But, reference to the elements of a claim is helpful to assess whether she has stated a plausible claim.

To state a discrimination claim under Title VII, the plaintiff generally must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc.*, *Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012)); *see Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018).

Section 701(k) of Title VII contains the Pregnancy Discrimination Act ("PDA"), enacted by Congress in 1978.  The PDA amended Title VII's definition of sex discrimination to include employment discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions[.]"  42 U.S.C. § 2000e(k).  The PDA provides that "women affected by pregnancy . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  42 U.S.C. § 2000e(k).  And, "'a claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII.'"  *DeJarnette v. Corning*, 133 F.3d 293, 297 (4th Cir. 1998) (quoting *Boyd v. Harding Academy*, 88 F.3d 410, 413 (6th Cir.1996)).

Title VII also prohibits an employer from discrimination against an employee for "participating in a Title VII proceeding or opposing an employer's discriminatory practices." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *see* 42 U.S.C. § 2000e-3; *McIver v. Bridgestone Americas, Inc.*, ___F.4th ___, 2022 WL 3036053, at *8-9 (4th Cir. Aug. 2, 2022). In 42 U.S.C. § 2000e-3, it states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter [Title VII], or

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *See*, *e.g.*, *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021); *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021); *Kitlinski v. United States Dep't of Justice*, 994 F.3d 224, 232 (4th Cir. 2021); *Evans v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F.3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

To state a prima facie case for retaliation, a plaintiff must allege "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'" *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted); *see McIver*, 2022 WL 3036053, at *8; *Sempowich*, 19 F.4th at 653; *Roberts*, 998 F.3d at 122; *Kitlinski*, 994 F.3d at 232; *Strothers*, 895 F.3d at 327; *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016); *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 F. App'x 146, 151 (4th Cir. 2017); *Foster v. Univ of Maryland-Eastern Shore*, 787 F.3d 243, 250 (4th Cir. 2015); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005).

And, Title VII also provides a right of action for employees who are subjected to a hostile work environment on the basis of their membership in a protected class. To state a *prima facie* claim for hostile work environment under Title VII, the plaintiff must allege that there was: "'(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race[, color, sex, religion, or protected activity]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions

37

of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli*, 648 F.3d at 220).

However, before filing suit under Title VII, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union,* 491 U.S. 164 (1989), *superseded on other grounds by* 42 U.S.C. § 1981(b); *see also Cowgill v. First Data Technologies, Inc.*, ___ F.4th ___, 2022 WL 2901043, at *10 (4th Cir. July 22, 2022); *McCray v. Md. Dep't of Trans.*, 662 F. App'x 221, 224 (4th Cir. 2016); *Bryant v. Bell Atlantic, Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). To do so, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of "the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e–5(e)(1); *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004).  This period is extended to 300 days in a deferral state, such as Maryland.  *See Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *4, n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols.*, Inc., 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F App'x 256 (4th Cir. 2008).

Moreover, "a complainant is entitled to a 'right-to-sue' notice 180 days after the charge is filed." *Fort Bend Cty. v. Davis*, ___U.S.___, 139 S. Ct 1843, 1847 (2019) (citing § 20003-5(f)(1); 29 CFR § 1601.28.)  "And within 90 days following such notice, the complainant may commence a civil action against the allegedly offending employer."  *Fort Bend Cty*. 139 S. Ct. at 1847 (citing § 2000e-5(f)(1)).

Nevertheless, exhaustion under Title VII is not jurisdictional.  It is, instead, a "claim-processing rule [ ] that must be timely raised to come into play."  *Fort Bend Cty.*, 139 S. Ct. at 1846, 1850.  Although a defendant may waive arguments related to administrative exhaustion, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6).  *See*

*Kenion v. Skanska USA Bldg., Inc.*, RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Fort Bend Cty.*).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, it advances the "twin objectives" of "protecting agency authority in the administrative process and promoting efficiency in the resolution of claims." *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks, alterations, and citation omitted). It "'ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible.'" *Cowgill*, 2022 WL 2901043, at *10 (citation omitted). If an employee fails to exhaust her administrative remedies, she is generally barred from filing suit. *See*, *e.g.*, *Miles*, 429 F.3d at 491; *Bryant*, 288 F.3d at 132.

Moreover, the administrative exhaustion process has substantive effect. Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims named in the administrative charge. *See* 42 U.S.C. § 2000e–5(f)(1); *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012); *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). Thus, "when the claims in [the] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred." *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508). To illustrate, the Fourth Circuit has stated that a "'claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.'" *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 161 (4th Cir. 2018) (quoting *Chacko*, 429 F.3d at 509) (ellipsis in *Nnadozie*).

That said, the EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination[.]'" *Miles*, 429 F.3d at 491 (citation omitted); *see Chacko*, 429 F.3d at 512. And, because "EEOC charges often are not completed by lawyers," the Fourth Circuit has instructed courts to "construe them liberally." *Chacko*, 429 F.3d at 509; *see Sydnor*, 681 F.3d at 594 ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs."). Thus, a federal court may hear a claim that was not presented to the EEOC so long as it is "'reasonably related'" to the plaintiff's EEOC charge "'and can be expected to follow from a reasonable administrative investigation . . . .'" *Sydnor*, 681 F.3d at 594 (quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000)); *see also Cowgill*, 2022 WL 2901043, at *10; *Stewart*, 912 F.3d at 705.

### 2. Analysis

As mentioned, defendant challenges plaintiff's various Title VII claims on three grounds. First, the BPD maintains that the lion's share of plaintiff's allegations were omitted from the Charge and thus are subject to dismissal for failure to exhaust. ECF 7-1 at 7-11. Second, the BPD asserts that insomuch as plaintiff's claims are predicated on events that took place after the date on which Sgt. Yampierre filed the Charge, they are untimely, as plaintiff failed to "file a new Charge of Discrimination within 300 days after the allegedly discriminatory acts occurred." *Id.* at 12. And, to the extent that Sgt. Yampierre's contentions are not procedurally barred, the BPD claims that plaintiff has failed to state a plausible claim for relief under Title VII.

### a. Discrimination (Count I, Count II, Count IX)

As mentioned, the Complaint encompasses claims for discrimination on the basis of race (Count I), sex (Count II) and pregnancy (Count IX). With respect to Count I, Sgt. Yampierre

asserts that she was "reprimanded . . . in a way that deprived her of workplace safety and otherwise adversely affected her status as an employee because of her race." ECF 1, ¶ 115. And, according to plaintiff, "[o]ther employees who were similarly situated, but were non-Hispanic or Caucasian individuals," were "treated more favorably than the Plaintiff with regards to the terms and conditions of employment and workplace conditions." *Id.* ¶ 116.[19]

Regarding plaintiff's claim for sex discrimination, Sgt. Yampierre alleges that she "suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII where she was subjected to ongoing sexual harassment, including but not limited to, highly inappropriate and offensive sexual comments." ECF 1, ¶ 133. She also asserts that she was "subjected to different terms and conditions of her employment due to her sex." *Id.* ¶ 139.

And, as to Count IX, Sgt. Yampierre maintains that the BPD "was aware of Plaintiff's pregnancy and her pregnancy-related medical complications." *Id.* ¶ 224. She asserts: "Defendant used her pregnancy status to harass, demean, degrade, and humiliate her and [she] has suffered irreparable harm and injury as a result of this unlawful misconduct." *Id.* ¶ 225.

Given the generalized manner in which these claims have been drafted, the Court cannot determine which of plaintiff's factual allegations are implicated by her different claims. Thus, I shall analyze these claims together, beginning with the issue of exhaustion.

---

[19] Plaintiff does not specifically identify any of the "[o]ther employees" who were treated more favorably than her. ECF 1, ¶ 116.

**i.**

The Charge was filed on May 11, 2020.  ECF 7-2 at 1.[20]  As to BPD's exhaustion argument, I am satisfied that plaintiff has exhausted her claims for discrimination on the basis of race, sex, and pregnancy, at least in part.

Plaintiff clearly checked the box for race and sex discrimination on the Charge.  *Id.*  She also indicated that she was subjected to discriminatory conduct between August 28, 2019 and April 30, 2020.  *Id.*  In the narrative portion of the Charge, plaintiff claimed that Lt. Effland "demanded [plaintiff and other Black employees] disclose what [they] told Internal Affairs about her possible overtime violations, while similarly-situated White employees were not harassed."  *Id.*  Moreover, the Charge reflects that plaintiff was "subjected to pregnancy-related harassment in the form of Lt. Pearson repeatedly asking when [she] was going on light duty and in the form of false accusations . . . ."  *Id.*  The Charge also provides that while Sgt. Yampierre was on maternity leave, she "was subjected to harassment" when she was notified of the various internal complaints that had been filed against her.  *Id.* at 1-2.

To be sure, the Complaint describes conduct between August 2019 and April 2020 that was omitted from the Charge, such as the internal complaints filed against plaintiff by Ofc. Ajikobi.  *See* ECF 1, ¶¶ 43-45.  But, the relevant allegations set forth in the Complaint are not so unrelated from the assertions delineated in the Charge that they could not have been expected to be uncovered by a reasonable investigation.  Indeed, the Charge states that Lt. Pearson harassed plaintiff by advancing "false accusations . . . against [her]."  ECF 7-2 at 1.  And, the Complaint

---

[20] As mentioned, plaintiff also alleges that she first filed a complaint for discrimination on January 9, 2020.  ECF 1, ¶ 8.  And, the Court is obliged to "accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi*, 930 F.3d at 605.

asserts that Lt. Pearson first attempted to do so by advising Ofc. Ajikobi "to file an EEOC complaint against [Sgt. Yampierre] before she had the opportunity to remove him from the Unit." ECF 1, ⁋ 41.

Moreover, plaintiff drafted the narrative portion of the Charge without the assistance of counsel. As a lay person, she is not expected to enumerate every detail of the alleged discriminatory conduct. Thus, in my view, plaintiff's discrimination claims are not entirely barred by exhaustion. *See Stewart*, 912 F.3d at 705 (explaining that "the 'scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge . . . .'") (quoting *Hill v. W. Elec. Co.*, 672 F.2d 381, 390 n.6 (4th Cir. 1982)).

The BPD also points out that the Complaint encompasses an array of factual allegations that are barred by limitations. ECF 7-1 at 11. As mentioned, to properly exhaust a claim for discrimination, Sgt. Yampierre was required to file a charge of discrimination with the EEOC within 300 days of "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see Garnes*, 2018 WL 276425, at *4 (explaining that the period of time to file a charge of discrimination is 300 days in Maryland). And, in this case, the Charge was filed on May 11, 2020. ECF 7-2 at 1. Thus, in the BPD's view, exhaustion bars plaintiff's discrimination claims to the extent that they rely on conduct that occurred more than 300 days before May 11, 2020, *i.e.*, before July 16, 2019.

Further, the BPD notes that the Complaint presents allegations that post-date the Charge. Because plaintiff failed to file a new Charge pertaining to incidents that occurred after May 11, 2020, the BPD posits that plaintiff may not pursue discrimination claims based on these incidents. ECF 7-1 at 12.

Plaintiff checked the box on the Charge for "Continuing Action."  *See* ECF 7-2 at 1.  She rejects the BPD's position, arguing that all of her allegations "are in fact subject to the continuing violation doctrine."  ECF 8-1 at 6.

In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), an African American former employee of Amtrak, filed suit under Title VII, alleging racial discrimination and retaliation.  He claimed that he had been subjected to various discrete discriminatory and retaliatory acts, and had also experienced a racially hostile work environment.  *Id.* at 104.  The plaintiff filed a charge with the EEOC, alleging that he was "'consistently harassed and disciplined more harshly than other employees on account of his race.'"  *Id.* at 105.  But, many of the alleged discriminatory events about which the plaintiff complained took place outside of Title VII's 300-day time period for filing a charge with the EEOC.  *Id.* at 106.

Amtrak filed a motion for summary judgment as to all of the events that took place before the filing period, which the district court granted.  *Id.*  The Ninth Circuit reversed, applying the continuing violation doctrine.  *Id.* at 106-07.  That court determined that a plaintiff may sue as to claims that were filed with the EEOC outside of the period established by Title VII if the claims were part of a series of related acts; some of the acts took place within the limitations period; and the plaintiff shows that there is a systematic policy or practice of discrimination, part of which operated within the limitations period.  *Id.* at 107.  In the view of the Ninth Circuit, each of plaintiff's three Title VII claims (*i.e.*, discrimination, hostile work environment, and retaliation) was sufficiently related to the post-limitations conduct to establish a continuing violation.  *Id.* at 107-08.  The Supreme Court reversed in part and affirmed in part.

With respect to plaintiff's claims for discrete discriminatory and retaliatory acts, the Supreme Court stated that a party "must file a charge within either 180 or 300 days of the date of

the act or lose the ability to recover for it." *Id.* at 110.   The Court explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113.   Notably, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.*   The Court went on to define actions that qualify as discrete, stating, *id.* at 114:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice."  Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period.[ ]

However, the *Morgan* Court affirmed the Ninth Circuit as to plaintiff's claim for hostile work environment.  *Id.* at 115.   The Court observed that, unlike discrete acts, hostile work environment claims occur "over a series of days or perhaps years . . . ." *Id.*   And, the Court observed that, with respect to hostile work environment claims, "a single act of harassment may not be actionable on its own." *Id.*   Thus, as to a hostile work environment claim, the Court concluded, *id.* at 117: "It does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period."   The Court continued, *id.*: "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.[ ]"   The Court reasoned, *id.*: "It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold . . . that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations . . . ."   Thus, "the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id.* at 118.

At bottom, *Morgan* made clear that a Title VII plaintiff raising claims of "discrete discriminatory or retaliatory acts must file his charge within the appropriate time period . . . ." *Id.* at 122. Here, the Charge was filed on May 11, 2020. ECF 7-2 at 1. Therefore, as to her discrimination claims, plaintiff may not rely on alleged discriminatory conduct that occurred more than 300 days before the Charge was filed, or, in other words, before July 16, 2019.

But, *Morgan* did not directly address whether a plaintiff must file a supplemental charge with the EEOC to bring a claim in federal court for discriminatory or retaliatory treatment that occurs after a plaintiff has filed her initial EEOC charge. And, to my knowledge, the Fourth Circuit has not conclusively ruled on this issue.

Nonetheless, as Judge Chasanow recently observed: "Post-*Morgan*, the trend in federal courts of appeals has been to hold that discrimination claims," such as plaintiff has asserted here, "must be exhausted by a subsequent EEOC charge or to refrain from deciding." *Brooks*, 2021 WL 4339194, at *6; *see Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 673-74 (8th Cir. 2006) (requiring exhaustion of post-charge claims for discrete acts of disparate treatment); *Conner v. Ill. Dep't of Natural Resources*, 413 F.3d 675, 680 (7th Cir. 2005) (dismissing claim for disparate treatment predicated on post-charge conduct for failure to exhaust because "[t]here was no way for the EEOC to undertake preliminary investigation" with respect to this claim "as contemplated by Title VII's statutory design"); *Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003) (explaining that the principle announced in *Morgan* is "equally applicable ... to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint") (emphasis in original); *Phillips v. Caris Life Sciences, Inc.*, 715 F. App'x 365, 369 (5th Cir. 2017) (finding that plaintiff's allegedly discriminatory termination constituted "a discrete event for which a claimant must file a supplemental charge or amend the original EEOC charge"); *see also EEOC v. Joe's*

*Stone Crabs, Inc.*, 296 F.3d 1265, 1272 n.5 (11th Cir. 2002) (observing that "Title VII requires a charge to be filed after the alleged unlawful employment practice occurred" and that "occurred means that the practice took place or happened in the past") (internal quotation marks and citations omitted).

Further, "[c]ourts in this district assume that discrimination claims must be exhausted by a later charge." *Brooks*, 2021 WL 4339194, at *6 (citing *Sharpe v. Prince George's Cnty.*, TDC-17-3799, 2021 WL 928177, at *10 (D. Md. Mar. 11, 2021) and *Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *6 (D. Md. Jan. 3, 2018)).   Thus, in light of *Morgan* and its progeny, plaintiff's three discrimination claims may not rely upon allegations that occurred prior to July 16, 2019, or after the Charge was filed on May 11, 2020.

## ii.

The BPD also challenges plaintiff's various discrimination claims on the ground that they are substantively deficient.  According to the BPD, plaintiff has failed to allege any facts that, if proven, would establish that she suffered an adverse employment action.  *Id.* at 16-18.  Further, the BPD asserts that Sgt. Yampierre has not adequately asserted that the alleged events were the result of discriminatory animus.  *Id.* at 14-16.

As illustrated above, to survive a motion to dismiss, a claim for discrimination need not establish a prima facie case.  But, such a claim must allege facts "'that plausibly state a violation of Title VII 'above a speculative level.'"  *Bing*, 959 F.3d at 617 (quoting *Coleman*, 626 F.3d at 190).  And, review of the elements of a prima facie claim, which were set forth above, are helpful in assessing whether plaintiff has stated a plausible claim.

To begin, "the existence of some adverse employment action is required" for a plaintiff to prevail on a Title VII discrimination claim.  *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th

Cir. 2007); *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Holland*, 487 F.3d at 219 (cleaned up). It is an action that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 337, 321 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also Laird*, 978 F.3d at 893 ("For a discrimination claim, the plaintiff must show that her employer took an action that adversely 'affect[ed] employment or alter[ed] the conditions of the workplace.'") (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) ("*Burlington Northern*")); *Booz-Allen & Hamilton, Inc.*, 368 F.3d at 376 (recognizing that examples of adverse employment action include decrease in compensation, change in job title, "'level of responsibility, or opportunity for promotion'") (quoting *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999)).

At bottom, an adverse action must have a "significant detrimental effect" on an employee. *Boone*, 178 F.3d at 256; *see Lee v. Mattis*, PX-17-2836, 2018 WL 3439261, at *9 (D. Md. July 18, 2018) (concluding that plaintiff sufficiently plead an adverse employment action where she alleged that "she received an unreasonable workload and deadlines, including an excessive amount of overtime, and was forbidden from telecommuting or taking any time off from work") (internal quotation marks omitted).

Sgt. Yampierre's claims are not a model of clarity. But, at bottom, they center on the alleged mistreatment to which plaintiff was subjected by BPD officers, including Lt. Effland, Lt. Pearson, Maj. Lansey, and Director Reynolds. Nonetheless, as the BPD posits, much of the conduct described in the Complaint simply does not amount to an adverse employment action.

For instance, plaintiff claims that she was reprimanded by Lt. Effland and Lt. Pearson. Specifically, plaintiff claims that when Lt. Effland learned that IAD had opened an investigation into Lt. Effland's alleged abuse of overtime shifts, she "chastise[d] and berate[d] plaintiff." *Id.* ¶ 35.  In a similar vein, Sgt. Yampierre indicates that after she had "an altercation with a SWAT officer," Lt. Pearson chastised her in a "derogatory and inflammatory tone" and instructed that "she needed to draft an administrative report and submit it to him immediately." *Id.* ¶ 61.

However, being reprimanded by a supervisor does not, on its own, amount to an adverse employment action, so long as the reprimand does not lead to a "significant change in employment status[.]" *Hoyle*, 650 F.3d at 321; *see Hinton v. Virginia Union University*, 185 F. Supp. 3d 807, 819 (E.D. Va. 2016) ("[T]he Fourth Circuit and its district courts have hewed to the view that neither oral or written reprimands constitute the sort of adverse employment action cognizable under Title VII unless plaintiff also alleges that the reprimand has potential collateral consequences that rise to the level of an adverse employment action.").

Indeed, even an incident of yelling by an employer generally does not rise to the level of an adverse employment action.  *See, e.g.*, *Guluma v. DeJoy*, DLB-20-3588, 2022 WL 1642261, at *5-6 (D. Md. May 24, 2022) (finding that the plaintiff's allegation that a supervisor "yelled [the plaintiff's] name loudly and was more critical of him than other workers" was insufficient to state a claim for discrimination); *Vedula v. Azar*, TDC-18-0386, 2020 WL 5500279, at *8 (D. Md. Sept. 11, 2020) ("[I]ncidents of yelling at an employee at a meeting and refusing to address employment-related complaints generally do not 'rise to the level of an adverse employment action for Title VII purposes.'") (quoting *Munday v. Waste. Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997)); *see also Adams v. Anne Arundel Cty. Pub. Schools*, 789 F.3d 422, 431 (4th Cir. 2015) ("upbraiding" of assistant principal by principal not adverse action when not linked to any

material change in conditions of employment); *Blount v. Dep't of Health and Human Services*, 400 F. Supp. 2d 838, 842 (D. Md. 2004) ("[D]isparaging remarks made by a supervisor do not state an adverse employment action.");

In this case, there is no indication that plaintiff suffered any consequences as a result of either supervisor's reprimands. ECF 1, ¶¶ 35, 61. Indeed, Lt. Effland was ultimately "removed from the Unit due to her behavior and misconduct." *Id.* ¶ 40. In my view, these particular allegations cannot support plaintiff's claims of discrimination.

Additionally, Sgt. Yampierre complains that Lt. Pearson and Director Reynolds pressured her to assume a light duty assignment, which would have allegedly required her to transfer from the Unit. *Id.* ¶¶ 59, 63. In particular, Lt. Pearson "inquired about when [Sgt. Yampierre would] move to light duty or go on maternity leave." *Id.* ¶ 59. When plaintiff replied that she intended to "work until her last day of full duty," contingent upon the condition of her health, Lt. Pearson "informed the Plaintiff that she would not be able to remain in the Unit if she went on light duty because those positions [could] only be fulfilled by full duty officers." *Id.* Further, plaintiff claims that Director Reynolds improperly disclosed her pregnancy status to the BPD's Human Resources Department, "in an effort to have her involuntarily transferred from the Unit since the Departmental policy had changed regarding whether officers working light duty could remain in that specific Unit." *Id.* ¶ 63.

But, plaintiff does not allege that she actually sought to obtain a light duty assignment in the weeks leading up to her maternity leave and was denied or otherwise made to transfer out of the Unit to obtain such an assignment. Lt. Pearson's assertion regarding the consequences that plaintiff would face by working a light duty assignment in advance of her maternity leave does not itself qualify as an adverse employment action. Nor did plaintiff plead any facts to support a claim

that Director Reynolds altered the terms and conditions of plaintiff's employment when he disclosed plaintiff's pregnancy status.   Indeed, plaintiff failed to plead any facts to show that a transfer for the purposes of attaining a light duty assignment necessarily would have been tantamount to an adverse employment action. *See Vedula*, 2020 WL 5500279, at *8 (explaining that "[a] change to a new or different job assignment at the same salary level that is 'less appealing to the employee' or that causes 'modest stress not present in the old position,'" cannot, on its own, constitute an adverse employment action).

Further, plaintiff alleges that she was subjected to harassment when BPD officers, including Ofc. Ajikobi (*id.* ¶¶ 42-46); Lt. Pearson (*id.* ¶¶ 60, 64); and Director Reynolds (*id.* ¶ 62), lodged internal complaints against her.   And, according to plaintiff, Maj. Lansey "abruptly reassigned the Plaintiff's Internal Affairs case from Detective Pitts to another detective," in the hopes of "orchestrat[ing] a particular negative outcome." *Id.* ¶ 66.   Sgt. Yampierre also claims that she was notified about several of these complaints while she was on maternity leave (*id.* ¶¶ 73-75), which exacerbated her underlying medical conditions and caused her to give birth prematurely and in a public setting. *Id.* ¶ 76.

Ultimately, however, the internal complaints filed against plaintiff do not amount to an adverse employment action for the purpose of a disparate treatment claim under Title VII. Although "'conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment.'" *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 598 (D. Md. 2011) (quoting *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 737 n.6 (D. Md. 2009)).   Thus, courts have found that a claim for "disparate investigation" is insufficient to state a claim for discrimination under Title VII where the plaintiff failed to allege also "that the investigation resulted in some form of employment injury

. . . ." *Jenkins v. Balt. City Fire Dep't*, 862 F. Supg. 2d 427, 446 (D. Md. 2012), *aff'd*, 419 F. App'x 192 (4th Cir. 2013) (per curiam).   And, given the limited allegations that plaintiff properly exhausted for purposes of her discrimination claims, Sgt. Yampierre has failed to allege that she suffered an adverse employment as a result of the internal complaints filed against her.  Thus, in my view, her discrimination claims may not rest on the internal complaints filed against her.

On the other hand, Sgt. Yampierre also contends that Director Reynolds revoked her supervisory responsibilities.  *Id.* ¶¶ 56, 67. In particular, plaintiff claims that on November 22, 2019, Director Reynolds sent her an email advising her that "she would not be responsible for completing the Unit's schedule." *Id.* ¶ 56.  And, soon thereafter, on December 16, 2019, Director Reynolds sent another email to plaintiff, reminding her that she could not "assist in commanding decisions or perform any of her supervisory duties in the unit . . . ." *Id.* ¶ 67.  As mentioned, the "loss of job title or supervisory responsibility" may constitute an adverse action.  *Boone*, 178 F.3d at 255.  Thus, I am satisfied, for present purposes, that Director Reynold's actions qualify as an adverse employment action for the purpose of stating a claim for discrimination.

But, defendant also challenges plaintiff's discrimination claims on the ground that she has failed to allege facts that "demonstrate discrimination based on Plaintiff's race, gender, or pregnancy." ECF 7-1 at 14.  The BPD maintains that "Plaintiff blindly concludes that any conduct of co-workers, subordinates, and superiors with [whom] she disagrees must be discriminatory." *Id.* at 15.  And, according to BPD, this kind of "rank speculation is palpably insufficient to survive dismissal." *Id.*

Defendant's contention is well taken.  Plaintiff has not offered any grounds from which the Court could discern that Director Reynolds acted based on a discriminatory animus in revoking plaintiff's supervisory responsibilities.  She has neither gestured towards any actions that could

plausibly be construed to be discriminatory, nor has she presented the Court with any specific examples of similarly-situated employees who were treated differently by Director Reynolds. Thus, "[r]ather than drawing a reasonable inference, [the court] would have to 'speculate' to 'fill in the gaps'" with respect to Director Reynolds's decision-making, and "to disregard the reason" given to Sgt. Yampierre for the loss of her supervisory responsibilities. *Bing*, 959 F.3d at 618 (quoting *McCleary-Evans*, 780 F.3d at 585).   In this light, plaintiff's allegation pertaining to the loss of her supervisory duties simply does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *McCleary-Evans*, 780 F.3d at 585 (quoting *Iqbal,* 56 U.S. at 678).

In light of the foregoing, I am persuaded that plaintiff has not adequately pleaded facts that, if proven, would establish claims for race discrimination (Count I) or pregnancy discrimination (Count IX).   Therefore, I shall grant the Motion with respect to Count I and Count IX, without prejudice and with leave to amend.

As mentioned, in Count II plaintiff alleges that she was subjected to sexual harassment by Lt. Pearson during the fall of 2019.  ECF 1, ¶¶ 51, 54.  And, she clams that this treatment was sufficiently severe and pervasive such that it impacted the "terms and conditions of [her] employment."  *Id.* ¶ 141.  Typically, such allegations generally support a claim for sexual harassment or a sexually offensive hostile work environment, as plaintiff has set forth in Count III, discussed *infra*.  But, sexual harassment is a species of sex discrimination.  *See Meritor Sav. Bank*, 477 U.S. at 65-66 (recognizing sexual harassment as a form of sex discrimination).   In my view, the allegations support a claim for sex discrimination, as set forth in Count II.[21]

---

[21]  Arguably, to the extent that Count II is predicated on alleged sexual harassment, it is duplicative of Count III.  *See Bermudez v. Cty. of New York*, 783 F. Supp. 2d 560, 590 (S.D.N.Y. 2011) (dismissing sex discrimination claims predicated on sexual harassment where plaintiff also

Further, as I explain in greater detail below, I am persuaded that these allegations were properly exhausted by the Charge and that the alleged conduct is, at least for present purposes, sufficiently severe and pervasive, such that dismissal would be inappropriate.  Thus, I shall allow plaintiff's claim for sex discrimination to proceed to the extent it is predicated on plaintiff's allegations of sexual harassment by Lt. Pearson.

However, plaintiff has not otherwise pleaded facts that, if proven, would show that she was subjected to an adverse employment action that was animated by a discriminatory motive. Therefore, her claim for sex discrimination is deficient.  Nonetheless, I shall also afford plaintiff the opportunity to amend Count II to address the deficiencies identified herein.

### b.  Sexual Harassment (Hostile Work Environment) (Count III)

Count III alleges "sexual harassment (hostile work environment)."  The claim appears to be rooted in the alleged sexual harassment to which plaintiff was subjected by Lt. Pearson in the fall of 2019.  ECF 1, ¶ 51.  Plaintiff contends that she was subjected to a "sexually hostile, offensive and intimidating work environment [that] detrimentally affected Plaintiff."  *Id.* ¶ 154.   And, she claims that "the actions and conduct . . . . were severe and pervasive and based on Plaintiff's sex as a female and constituted discrimination based on sex."  *Id.* ¶ 155.

The BPD contends that Count III is subject to dismissal for failure to exhaust, as "the Charge "is utterly devoid of any reference or examples of sexual harassment that would constitute a hostile work environment."  ECF 7-1 at 19.  Further, defendant asserts that these allegations "do not constitute a hostile work environment, as they are neither severe nor pervasive."  *Id.*

---

pleaded claims for hostile work environment); *see also Brooks v. FedEx Supply Chain, Inc.*, 3:19-CV-00014, 2019 WL 1746264, at *5 (S.D. Ill. Apr. 18, 2019); *Cockrell v. Greene County Hosp. Bd.*, 7:17-cv-00333-LSC, 2018 WL 1627811, at *6 (N.D. Ala. Apr. 4, 2018).  But, the BPD has not challenged Count II on that basis.

I begin with the issue of exhaustion. As mentioned, plaintiff checked the box indicating that she was claiming sex discrimination, and she indicated that the Charge encompassed discriminatory conduct that occurred between August 28, 2019 and April 30, 2020. ECF 7-2 at 1. Plaintiff also claimed that the conduct was part of a "Continuing Action." *Id.* However, in the Charge, plaintiff does not expressly allege that she was subjected to sexual harassment by Lt. Pearson. Accordingly, the BPD posits that Sgt. Yampierre failed to exhaust a claim for sexual harassment as she "fail[ed] to mention any sexual harassment or a hostile work environment" in the Charge. ECF 7-1 at 9. As I have noted, the contention is wide of the mark.

To be sure, the Charge does not expressly reference the sexual harassment to which plaintiff was allegedly subjected, as described in the Complaint. But, because the Charge was not drafted by a lawyer, I must construe it liberally. *See Chacko*, 429 F.3d at 509. And, the Charge asserts that plaintiff was subjected to "pregnancy-related harassment" by Lt. Pearson in September 2019 and November 2019. ECF 7-2 at 1. This was during the same time frame when, according to the Complaint, Lt. Pearson began to sexually harass plaintiff. ECF 1, ¶ 51. Thus, the crux of plaintiff's contentions in both the Charge and the Complaint boil down to an assertion that during the fall of 2019, Lt. Pearson repeatedly harassed plaintiff based on her sex.

As I see it, the assertions on which Count III relies are reasonably related to the assertions set forth in the Charge such that they could be "'expected to follow from a reasonable administrative investigation.'" *Sydnor*, 681 F.3d at 594 (quoting *Smith*, 202 F.3d at 247). Therefore, to the extent plaintiff's claim is predicated on Lt. Pearson's alleged sexual harassment of plaintiff, it is not barred by exhaustion.

The BPD also challenges the legal sufficiency of plaintiff's claim for sexual harassment. *See* ECF 7-1 at 18-20. As noted above, to state a prima facie claim for hostile work environment

under Title VII, the plaintiff must allege that there was: "'(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race[, color, sex, religion, or protected activity]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli*, 648 F.3d at 220); *see McIver*, 2022 WL 3036053, at *5.

The first element, unwelcome conduct, "is not a high hurdle." *Strothers*, 895 F.3d at 328. The Fourth Circuit has explained that "an employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer." *Id.* at 328-29. Moreover, "the nature of the conduct may indicate whether or not the conduct is unwelcome." *Id.* at 329.

As to the second element of a hostile work environment claim, the plaintiff must allege that she was harassed or otherwise discriminated against "because of" her protected class. *Smith*, 202 F.3d at 242 (citing *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 142 (4th Cir. 1996)). The plaintiff may satisfy this burden by showing that, "but for" her protected class, she would not have suffered discrimination. *Id.* In general, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [the plaintiff's protected class], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).

As to the third element, defendant maintains that plaintiff's sexual harassment claim is subject to dismissal because the harassment that she allegedly experienced was not sufficiently "severe or pervasive" so as to trigger liability under Title VII. ECF 7-1 at 18-20. A hostile work environment exists under Title VII when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult . . . .'" *Boyer-Liberto*, 786 F.3d at 281 (some quotations and citation omitted) (quoting *Jordan v. Alternative Resources Corp.*, 458 F.3d 332,

339 (4th Cir. 2006)); *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *McIver*, 2022 WL 3036053, at *5; *Nnadozie*, 730 F. App'x at 158.  The Fourth Circuit has stated that the plaintiff must allege that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22).

The "severe or pervasive" requirement has both subjective and objective components. *Harris*, 510 U.S. at 21-22; *see McIver*, 2022 WL 3036053, at *5; *EEOC v. Cent. Wholesalers Inc.*, 573 F.3d 167, 175 (4th Cir. 2009).   And, "[w]hether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998)); *see Irani v. Palmetto Health*, 767 F. App'x 399, 416 (4th Cir. 2019) (per curiam); *Nnadozie*, 730 F. App'x at 158.  However, the plaintiff does not need to demonstrate that the work environment is "'psychologically injurious.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22).  The "ultimate inquiry is whether the conduct is so 'extreme' that it 'amount[s] to a change in the terms and conditions of employment.'" *McIver*, 2022 WL 3036053, at *5 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (alteration in *McIver*).

"Viable hostile work environment claims often involve repeated conduct . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Morgan*, 536 U.S. 115-17); *see Irani*, 767 F. App'x at 416.  But, "an 'isolated incident[ ]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto*, 786 F.3d at 277 (alterations in original) (citation omitted).

Moreover, the "status of the harasser is also a 'significant factor' to be considered; harassment by a supervisor tends to be more serious . . . ." *McIver*, 2022 WL 3036053, at *6 (citation omitted).  In *Boyer-Liberto*, 786 F.3d at 278, the Court stated: "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals."  (Citation omitted) (alteration in *Boyer-Liberto*).  *See also EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'") (citation omitted); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

However, the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII."  *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted).   And, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotation marks and citations omitted); *see also Boyer-Liberto*, 786 F.3d at 294.  Similarly, "complaints premised on nothing more than 'rude treatment by [coworkers]', 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII.'"  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (internal citations omitted); *see Nnadozie*, 730 F. App'x at 161-62.  Indeed, Title VII does not constitute "a general civility code."  *Oncale*, 523 U.S. at 80.

The determination as to severe or pervasive is not, and "'by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Moreover, "[n]o single factor is dispositive, as [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23 and *Oncale*, 523 U.S. at 81-82) (internal citations and quotation marks omitted). The objective determination requires the court to "'look[ ] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the] employee's work performance.'" *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 304 (4th Cir. 2019) (quoting *Harris*, 510 U.S. at 23).

Without question, courts in this Circuit have consistently declined to find that a hostile work environment exists where the plaintiff's allegations, taken as true, merely describe an unpleasant workplace or inappropriate interaction. *See*, *e.g.*, *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (positioning a magnifying glass over a plaintiff's crotch and giving him a congratulatory kiss at his wedding receiving line was "tasteless and inappropriately forward" but not sufficiently severe or pervasive); *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 308 (D. Md. 2015) (explaining that general allegations that a supervisor disrespected plaintiff, frequently yelled at the plaintiff, refused to provide plaintiff with resources made available to male colleagues, and ignored plaintiff's calls and messages, were insufficient to sustain a hostile work environment claim); *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521 (D. Md. 2015) (hostile work environment claim dismissed based on two discrete incidents where coworker "exposed his

chest and made inappropriate body movements towards [the plaintiff]" and told the plaintiff that she looked "like a piece of candy") (internal quotation marks omitted), *aff'd as modified*, 659 F. App'x 744 (4th Cir. 2016) (per curiam).  But, the relevant conduct may occur over a period of time.  *McIver*, 2022 WL 3036053, at *6.  A "series of separate acts . . . collectively constitute one 'unlawful employment practice.'"  *Id.* (citation omitted).

Plaintiff alleges that Lt. Pearson repeatedly asked her "to go out with him after work because he was lonely after his most recent relationship ended," and he persisted even after she informed him that she did not want to do so.  ECF 1, ¶ 51.  Additionally, she claims that she rejected Lt. Pearson's advances, but he "continued to make these requests with increasing pressure," which made her "extremely uncomfortable." *Id.*

And, although not stated expressly, it appears that Lt. Pearson supervised plaintiff.  *See id.* ¶ 47 (indicating that plaintiff submitted a notification concerning her pregnancy to Lt. Pearson); *id.* ¶ 61 (ordering plaintiff to submit an administrative report to him).  As mentioned, courts have found that where an employee is harassed by a supervisor, as opposed to a coworker, the harassment is regarded as more severe because a supervisor can pose "a threat to [a plaintiff's] employment conditions in a way that a co-worker could not."  *Harris v. Mayor & City of Balt.*, 797 F. Supp. 2d 671, 682 (D. Md. 2011); *see Edwards v. Murphy-Brown, LLC*, 760 F. Supp. 2d 607, 629 (E.D. Va. 2011) (instructing that courts should consider "the relative positions of the harasser and the victim," as "[o]ften, in sexual harassment claims, the harasser is in a position of power or seniority relative to the victim.") (citing *Fairbrook Med. Clinic, P.A.,* 609 F.3d at 329).

In sum, at the motion to dismiss stage, I must construe the allegations in the light most favorable to the plaintiff for the purpose of determining whether they amount to a plausible claim for relief.  In other words, "[t]o survive a motion to dismiss, a complaint must simply contain

factual allegations that 'raise a right to relief above the speculative level, thereby nudging [the] claim[ ] across the line from conceivable to plausible.'" *Hately v. Watts*, 917 F.3d 770, 782 (4th Cir. 2019) (quoting *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011)); *see Felder,* 2022 WL 2871905, at *1 (stating that "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable'. . . .") (citing *Woods*, 855 F.3d at 652; *Arsenault v. Dep't of Public Safety and Correctional Servs.*, RDB-20-0988, 2020 WL 7694472, at *5 (D. Md. Dec. 28, 2020) (distinguishing evaluation of a hostile work environment at the motion to dismiss stage and summary judgment); *see also Ali v. Dist. of Columbia*, 697 F. Supp. 2d 88, 92 (D.D.C. 2010) (denying motion to dismiss a discrimination claim even if "it is unlikely that [the plaintiff's] claims of discrimination will ultimately prove meritorious" because the plaintiff "said enough to continue past this stage of the proceedings").

Accordingly, I shall deny the Motion with respect to Count III. *See Bermudez*, 783 F. Supp. 2d at 584 (finding alleged sexual harassment was sufficient to survive a motion to dismiss where supervisor "repeatedly invited [employee] to his house, made comments about her body, expressed romantic feelings towards her in person and over the phone, and repeatedly expressed a desire to 'hug' her" and, in one instance, "engaged in a sexually explicit gesture in front of [the employee]").

### d.  Retaliation (Count IV)

Sgt. Yampierre alleges that she "faced retaliation for the complaint she submitted internally with the Department, and then externally with the EEOC." ECF 1, ¶ 163.  Further, she claims that she "was subjected to unlawful conduct and adverse actions" as "alleged throughout this Complaint." *Id.* ¶ 164.  In keeping with plaintiff's other Title VII claims, however, Sgt. Yampierre failed to provide any clarification as to which of her allegations pertain to her retaliation claim.

Even so, Count IV clearly pertains to the alleged retaliatory treatment to which plaintiff was subjected after she filed internal complaints regarding Lt. Effland. *See id.* ¶¶ 36-45. She also alleges that after she filed an internal complaint concerning Lt. Pearson's alleged sexual harassment, Lt. Pearson and Director Reynolds each submitted internal complaints against plaintiff, and thereafter altered various conditions of plaintiff's employment. *See id.* ¶¶ 56-68, 73-75, 83-89. When the complaints of Lt. Pearson and Director Reynolds were found to be without merit, IAD referred one of Sgt. Yampierre's internal complaints to the States Attorney's Office, apparently to prompt a criminal investigation of plaintiff. *See id.* ¶¶ 91-97. Plaintiff also complains that she was transferred out of her Unit, in retaliation for filing the Charge. *See id.* ¶¶ 70, 99-100.

As discussed, the BPD challenges plaintiff's retaliation claim for failure to exhaust, as the Charge failed to mention many of the BPD officers named in the Complaint, such as Officer Ajikobi or Director Reynolds. ECF 7-1 at 7-11. Further, BPD claims that, relevant to the "new factual incidents occurring from May 2020 to March 29, 2021," Sgt. Yampierre "failed to file a Charge of Discrimination about any of these incidents," and thus "the majority of [plaintiff's] claims would of course be time-barred." *Id.* at 12.

Notably, plaintiff marked the box on the Charge for retaliation. See ECF 7-2 at 1. And, as I have described above, the Charge reasonably relates to the alleged retaliatory conduct to which plaintiff was subjected between July 2019 and May 2020.

To be sure, some of the conduct set forth in the Complaint occurred after the Charge was filed. However, as plaintiff contends, the post-Charge conduct of which she complains reasonably relates to the allegations contained in the Charge. *See* ECF 8-1 at 6.

As set forth above, a plaintiff may not assert for the first time in federal court discrimination claims based on conduct that transpired after the relevant charge of discrimination was filed with the EEOC.  However, the Fourth Circuit has determined that a plaintiff  "'*may* raise for the first time in federal court the claim that her employer retaliated against her'" following the submission of a charge for discriminatory conduct.  *Brooks*, 2021 WL 4339194, at *7 (quoting *Hentosh v. Old Dominion*, 767 F.3d 413, 416 (4th Cir. 2014)) (emphasis added).   According to the Fourth Circuit, this is "the inevitable corollary of [the] generally accepted principle" that federal courts may consider claims "reasonably related to" the allegations in the administrative charge.  *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992).  "Practically, it also responds to the fact that if a plaintiff faced retaliation for filing an initial EEOC claim, she would 'naturally be gun shy about inviting further retaliation by filing a second charge complaining about the first retaliation.'"  *Hentosh,* 767 F.3d at 417 (quoting *Nealon*, 958 F.2d at 590).

Thus, the Fourth Circuit has instructed that a plaintiff may advance a retaliation claim that is predicated on the "continuation of the retaliation she alleged in the charge."  *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 304 (4th Cir. 2009), *abrogated on other grounds by Fort Bend Cty.*, 139 S. Ct. at 1848.  The Court explained that the "'practical concerns'" that "justif[y] excusing the plaintiff from filing an additional EEOC charge apply with equal force when the claimed retaliation is a continuation of the treatment alleged in the charge before the court."  *Jones*, 551 F.3d at 304. (quoting *Nealon*, 958 F.2d at 590).

Moreover, "the alleged retaliatory act can even be a 'discrete act' such as 'termination,' and exhaustion still is not required, provided the claim 'relates back' to the administrative charge." *Bales v. Md. Judiciary/Administrative Office of the Courts*, JFM-15-03293, 2016 WL 6879902, at *9 (D. Md. Nov. 22, 2016) (quoting *Jones*, 551 F.3d at 303).  In other words, following *Jones*, the

63

exhaustion analysis regarding post-charge retaliatory acts "looks primarily to whether an employer was put on notice [of] the claims and allows those claims reasonably related to the original charge, and those developed by reasonable investigation of that charge." *Brooks*, 2021 WL 4339194, at *9 (cleaned up).

Plaintiff expressly alleged in her suit that her transfer to "patrol in the Eastern District" amounted to "retaliation for [her] pending EEOC complaint." ECF 1, ¶ 100.  The exhaustion requirement applicable to Title VII does not preclude plaintiff from bringing a retaliation claim based on this assertion. *See Brown v. Hartshorne Public Sch. Dist. No. 1,* 864 F.2d 680, 682 (10th Cir.1988) ("[A]n act committed by an employer in retaliation for the filing of an EEOC complaint is reasonably related to that complaint, obviating the need for a second EEOC complaint.").

As mentioned, the Complaint also encompasses other allegations that BDP officers retaliated against plaintiff for filing a complaint against Lt. Pearson.  *See* ECF 1, ¶¶ 91, 93, 95-98. These assertions also relate to the contentions set forth in the Charge, as they indicate that Sgt. Yampierre was subjected to retaliation as a result of the internal complaint against Lt. Pearson that was put at issue by the Charge.  *Compare* ECF 7-2 at 1-2 *with* ECF 1, ¶¶ 73-75, 93.  Although the assertions set forth in the Complaint describe discrete, retaliatory events that are not mentioned in the Charge, these events arguably amount to a "continuation of the retaliation [plaintiff] alleged in the charge." *Jones*, 551 F.3d at 304.   Accordingly, these post-charge allegations are not barred by Title VII's administrative requirements.

Alternatively, the BPD contends that Count IV fails to state a plausible claim for relief. ECF 7-1 at 14-18.  Again, to plead a prima facie case for retaliation, a plaintiff must allege "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the

employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'" *Okoli*, 648 F.3d at 223 (citation omitted).

"In the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *Navy Fed. Credit Union*, 424 F.3d at 406; *see McIver*, 2022 WL 3036053, at *9; *Netter*, 908 F.3d at 937. "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (citation omitted). And, "[c]omplaints raised through internal company procedures are recognized as protected activity." *Roberts*, 998 F.3d at 122. As the Fourth Circuit has said, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citation omitted); *see Laughlin*, 149 F.3d at 259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."). But, "for an employee's activity to constitute protected 'opposition,' she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, and (2) that her conduct in opposition was reasonable." *Netter*, 908 F.3d at 937-38; *see McIver*, 2022 WL 3036053, at *9.

65

The second element is that of an "adverse action." In general, an adverse employment action is one that adversely affects the terms, conditions, or benefits of employment. *Roberts*, 998 F.3d at 122. However, in *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.) In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.*; *see also Burlington Northern*, 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."); *Barnes v. Charles Cty. Pub. Schools*, 747 F. App'x 115, 119 (4th Cir. 2018) (per curiam) ("An adverse action need not affect the terms and conditions of employment" in a retaliation claim.). Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision." *Strothers*, 895 F.3d at 327.

Nevertheless, there must be "some direct or indirect impact on an individual's employment . . . ." *Adams*, 789 F.3d at 431. So, "retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68).

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray*, 909 F.3d at 667. In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist*, 671 F. Supp. 2d at 738 (quoting *Burlington Northern*, 548 U.S. at 68). Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019). But "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions. *Boone*, 178 F.3d at 255.

Judge Grimm of this Court has explained: "Even with this lower bar [for retaliation], none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an Attendance Warning,' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (internal citations omitted); *see also, e.g.*, *Draughn v. Wormuth*, RDB-20-3625, 2021 WL 5742236, at *8 (D. Md. Dec. 1, 2021); *Kelly v. Berryhill*, RDB-18-0049, 2019 WL 1300816, at *5 (D. Md. Mar. 20, 2019); *Lockley v. Town of Berwyn Heights*, JFM-14-825, 2015 WL 5334256, at *11 (D. Md. Sept. 11, 2015). But, the Fourth Circuit has also ruled that "a letter of warning did amount to an adverse action because [plaintiff's supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination." *Barnes*, 747 F. App'x at 119.

To establish causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani*, 767 F. App'x at 421. The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249. This requirement of but-for causation imposes a higher burden on a plaintiff than the mixed-motive requirement in Title VII's antidiscrimination provision. *See Foster*, 787 F.3d at 249-50.

Nevertheless, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335; *CSRA*, 12 F.4th at 417. Indeed, "very little evidence of a causal connection is required to establish a prima facie case of retaliation." *Roberts*, 998 F.3d at

127 (4th Cir. 2021) (citing *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012)); *see CSRA*, 12 F.4th at 417.  As the Fourth Circuit explained in *Foster*, 787 F.3d at 250-52, "*Nassar* [did] not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim," because it did not require establishing but-for causation at the prima facie stage, and but-for causation is already required at the pretext stage.

"A plaintiff may attempt to demonstrate that a protected activity caused an adverse action [at the prima facie stage] 'through two routes.'"  *Roberts*, 998 F.3d at 123 (quoting *Johnson v. United Parcel Service, Inc.*, 839 F. App'x 781, 783-84 (4th Cir. 2021)); *see CSRA*, 12 F.4th at 417. "A plaintiff may establish the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity.'"  *Roberts*, 998 F.3d at 123 (citing *Johnson*, 839 F. App'x at 783-84; *Lettieri v. Equant Inc*., 478 F.3d 640, 650 (4th Cir. 2007) (recognizing that relevant evidence may be used to establish causation)).  Or, a plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity."  *Johnson*, 839 F. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).

To be sure, "temporal proximity suffices to show a causal relationship."  *Sempowich*, 19 F.4th at 654.  In *Strothers*, 895 F.3d at 335-36, the Court said:  "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity."  *See also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.") (citing *Dowe*, 145 F.3d at 657)).

For the temporal route, there naturally must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501. Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)).

Moreover, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

But, as indicated, temporal proximity is not the sole avenue to establish causation. *CSRA*, 12 F.4th at 417. Rather, temporal proximity is one of two paths to show causation. As noted, the other path contemplates "the existence of facts" indicative of an adverse action that occurred "'because of the protected activity.'" *Roberts*, 998 F.3d at 123 (citation omitted).

BPD does not contest that plaintiff adequately pleaded that she engaged in protected activity. Nor could it do so, as it is well established that filing internal complaints and submitting a charge of discrimination with the EEOC constitute protected activity within the meaning of Title VII. *See Roberts*, 998 F.3d at 122; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 273 (4th Cir. 2001).

However, as earlier indicated, BPD challenges plaintiff's retaliation claim on the ground that the allegations set forth in the Complaint, taken as true, do not show that Sgt. Yampierre was subjected to an adverse action within the meaning of Title VII.  It notes that the "Complaint makes clear that [plaintiff] was never demoted, she did not lose benefits, she suffered no loss in pay or rank, and she was never terminated."  ECF 7-1 at 16.

Indeed, much of the conduct in the Complaint, such as plaintiff's loss of her parking spot and the change in plaintiff's weekly work schedule, are insufficient to constitute an adverse action.  *See* ECF 1, ¶¶ 83, 89, 92, 100.  Rather, such conduct amounts to no more than "petty slights or minor annoyances."  *Burlington Northern*, 548 U.S. at 68.

Regarding the revocation of plaintiff's parking spot, plaintiff provides that she had parked in this space for a period of eight years.  ECF 1, ¶ 83.  But, she does not indicate how, or in what ways, the decision to revoke the use of the parking space had a substantial impact on her, beyond inconvenience.  In the absence of such contentions, it cannot serve as a predicate adverse action for plaintiff's retaliation claim.  *Accord Leach v. Nat'l R.R. Passenger Corp.*, 128 F. Supp. 3d 146, 157 (D.D.C. 2015) (finding that, within the context of resolving a discrimination claim, the employer's "refusal to permit [the plaintiff] to park in the same highly coveted parking space as some of her white, male coworkers" did not amount to an adverse action, as it did not cause a "significant change in [the plaintiff's] employment status") (internal quotation marks and citation omitted).

The Complaint also asserts that plaintiff's schedule was changed, such that she was required to work "rotating shifts . . . ."  ECF 1, ¶ 92.  But, courts have indicated that a change in an employee's schedule does not amount to an adverse action, at least in the absence of an allegation that the change had a detrimental effect on the employee.  *See Melendez v. Bd. of Educ.*

70

*for Montgomery Count*y, 711 F. App'x 685, 688 (4th Cir. 2017) (per curiam) (finding change in plaintiff's schedule insufficient to support disparate treatment, in light of plaintiff's failure to explain how the change had a "significant detrimental effect" on her) (quoting *James*, 368 F.3d at 375); *White v. City of Annapolis*, JFM-13-1330, 2015 WL 5009853, at *16-17 (D. Md. Aug. 21, 2015).  Plaintiff has not alleged a detrimental effect.  Therefore, plaintiff's schedule change does not amount to an adverse action within the ambit of Title VII.

Likewise, plaintiff's contention that the BPD failed to investigate her complaint against Lt. Pearson does not amount to an adverse action under Title VII.  *See* ECF 1, ¶ 74.  This is because, broadly speaking, the "failure to investigate an internal complaint cannot be considered retaliatory" because it "leaves an employee no worse off than before the complaint was filed."  *Daniels v. United Parcel Serv., Inc.,* 701 F.3d 620, 640 (10th Cir. 2012); *accord Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (noting that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint"); *Malcolm v. Ass'n of Supervisors and Administrators of Rochester*, 17-CV-6878L, 2021 WL 4867006, at *3 (W.D.N.Y. Oct. 19, 2021) ("[C]ourts in this Circuit have consistently concluded that an employer's failure to investigate a plaintiff's complaint of discrimination does not constitute an adverse employment action for purposes of a disparate treatment claim."); *Jones v. Balt. City Bd. of Comm'r*, ADC-18-3002, 2021 WL 147033, at *6 (D. Md. Jan. 14, 2021) (similar).  In the absence of any allegation that the BPD's failure to investigate plaintiff's complaint caused plaintiff to suffer any "demonstrable harm," such as making it "more difficult for her to pursue her claims with the EEOC or otherwise assert her rights," BPD's failure to investigate plaintiff's complaint against Lt. Pearson does not qualify as an adverse action.  *Daniels*, 701 F.3d at 640-41.

On the other hand, the allegations pertaining to plaintiff's reassignments could, when viewed in the light most favorable to plaintiff, amount to an adverse action.  As a general matter, "'[a]cts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects' may be considered adverse actions, although 'a mere inconvenience or an alteration of job responsibilities will not suffice.'"  *Thorn*, 766 F. Supp. 2d at 601 (quoting *Colie v. Carter Bank & Trust, Inc.*, 3:09–cv–00086, 2010 WL 4274735, at *10 (W.D. Va. Oct. 28, 2010)).

Plaintiff has not provided any details regarding her reassignment "from locator and to a medical locator" (ECF 1, ¶ 89), or transfer to a patrol post, or the degree to which reassignment adversely impacted plaintiff.  Nonetheless, given the early stage of this suit, I must draw all reasonable inferences in favor of plaintiff.  And, in this light, I decline to say whether these reassignments could have imposed a significant detrimental effect on the terms and conditions of plaintiff's employment.  *Cf. Corbitt v. Baltimore Police Dep't*, 2022 WL 846209, at *13 (D. Md. Mar. 22, 2022) ("At this early stage in litigation, the Court is unable to make any definitive ruling on . . . fact-specific questions.").  Accordingly, I am persuaded that Count IV may proceed to the extent it is predicated on plaintiff's reassignment to work as a "medical locator" and subsequent transfer to a patrol post.

Further, as discussed in greater detail above, plaintiff alleges that she was retaliated against when she was deprived of her supervisory responsibilities within the Unit.  ECF 1, ¶¶ 56, 67.  The "loss of job title or supervisory responsibility" can constitute an adverse action.  *Boone*, 178 F.3d at 255.  Thus, Director Reynold's actions qualify as an adverse action so as to state a claim for retaliation.

Sgt. Yampierre also complains that Lt. Pearson retaliated against her for filing an internal complaint against Lt. Effland, in the form of encouraging Officer Ajikobi to lodge complaints against plaintiff with the BPD and the EEOC. ECF 1, ¶¶ 36, 41-49. She also claims that Lt. Pearson and Director Reynolds retaliated against her for complaining about Lt. Pearson by filing administrative complaints against her, which, according to plaintiff, set in motion a series of events that ultimately caused the Baltimore City States Attorney's Office to open a criminal investigation into plaintiff's conduct. *See id.*, ¶¶ 73-75, 91, 93, 95-98.

Defendant maintains that these claims do not amount to adverse actions because "[a]s much as Plaintiff wants them to be, internal administrative charges and investigations are not *per se* adverse employment actions." ECF 7-1 at 17. Relying on *Settle v. Baltimore Cty.*, 34 F. Supp. 2d 969, 992 (D. Md. 1999), the BPD points out that this Court has explained that "'if a disciplinary investigation is reasonably rooted in articulable facts justifying such an investigation, neither inconvenience nor emotional anxiety on the employee's part will constitute an employment injury sufficient to render the investigation itself an adverse employment action independently cognizable under Title VII.'" ECF 7-1 at 17-18.

Indeed, as I previously found, the internal complaints lodged against Sgt. Yampierre cannot support her various discrimination claims. As to the claim for retaliation, however, the BPD's contention misses the mark. First, *Settle*, 34 F. Supp. 2d at 992, considered whether the initiation of an internal investigation could amount to an adverse action within the context of resolving a claim for disparate treatment. It does not necessarily follow that initiating an internal investigation could not qualify as an adverse action to support a claim for retaliation, as "the definition of 'adverse action' in the retaliation context is broader than the definition of 'adverse employment action' in the disparate treatment context." *Fulmore v. City of Greensboro*, 834 F. Supp. 2d 396,

73

417 n. 17 (M.D.N.C. 2011) (citing *Burlington Northern,* 548 U.S. at 67).  Indeed, the Fourth

Circuit has previously intimated that the initiation of an internal investigation could serve as the

requisite adverse action to establish a plausible retaliation claim.  *See Hetzel v. County of Prince*

*William,* 89 F.3d 169, 171–72 (4th Cir. 1996) (providing that initiating an internal investigation

could "possibly constitute adverse retaliatory action").

Second, taking the assertions set forth in the Complaint as true, plaintiff's claim is not

limited to the BPD's internal investigations.  Rather, plaintiff asserts that after IAD concluded that

the complaints of Lt. Pearson and Director Reynolds were baseless (ECF 1, ¶ 91), two BPD officers

met with plaintiff and asked her to "sign a verbal letter that detailed these . . . charges as 'not

sustained.'"  *Id.* ¶ 93.  When Sgt. Yampierre refused to comply with the directive, IAD "forwarded

the Plaintiff's 2019 internal complaint to the States Attorney's Office in an effort to secure criminal

charges against the Plaintiff."  *Id.* ¶ 95.  Thereafter, a grand jury was empaneled to consider the

merits of bringing criminal charges against Sgt. Yampierre.  *Id.* ¶¶ 97-98.

To be sure, as the BPD observes (ECF 10 at 8), the allegations provided in the Complaint

do not provide the Court with a holistic picture of the actions taken by Internal Affairs and the

criminal investigation that followed.  For instance, the Complaint fails to identify whether the

grand jury returned an indictment against plaintiff and, if so, on what  charges and the results of

any subsequent prosecution.  Nonetheless, plaintiff's assertions, credited as true, are sufficient to

plead a plausible claim for retaliation.

Indeed, a reasonable factfinder could determine that the prospect of a criminal investigation

would likely "dissuade[ ] a reasonable worker' from engaging in protected activity."  *Strothers*,

895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68); *accord Udd v. City of Phoenix*,

CV-18-1616-PHX-DWL, 2020 WL 1536326, at \*17 (D. Ariz. Mar. 31, 2020) (finding that the

74

initiation of a failed criminal investigation could qualify as an adverse action to state a retaliation claim under Title VII). And, the BPD have not offered any case law to the contrary. In sum, given the circumstances attendant here, the initiation of internal and criminal investigations are sufficiently serious to qualify as an adverse action.

Finally, the BPD argues that plaintiff's retaliation cannot proceed because she has not alleged any facts that, if proven, would show a causal relationship between her protected activity and the aforementioned adverse actions. ECF 7-1 at 15. I disagree.

As illustrated in detail above, a plaintiff may satisfy the causation aspect of a retaliation claim where protected activity was followed soon after by an adverse action. *See Sempowich*, 19 F.4th at 654 (noting that "temporal proximity suffices to show a causal relationship"). In this case, plaintiff has pleaded that she engaged in numerous instances of protected activity, such as preparing and filing various internal complaints against several BPD officers. *See* ECF 1, ¶¶ 38, 40, 48, 58, 68, 70, 93. And, in each instance, plaintiff's protected activity was followed soon after by an adverse action. *Id.* ¶¶ 42, 45, 60, 62, 95, 97. Further, plaintiff has alleged sufficient facts that, if proven, could be construed to establish these actions were animated by retaliatory intent. *See id.* ¶¶ 60, 62, 93, 95, 99, 173. At the motion to dismiss stage, I am satisfied that this is sufficient to state a claim for retaliation.

Therefore, I shall deny the Motion as to Count IV, to the extent it is predicated on a job transfer, the loss of supervisory duties, the initiation of internal investigations of plaintiff, and any criminal investigation that followed. I shall otherwise grant the Motion as to plaintiff's claim for retaliation. However, I shall also afford plaintiff an opportunity to amend Count IV to address the deficiencies identified herein.

### B.  Section 1981 (Count V)

In Count V, plaintiff asserts a claim for violation of 42 U.S.C. § 1981.  *See* ECF 1, ¶¶ 185-95.  In relevant part, § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens[.]"  42 U.S.C.  § 1981(a).  Among other things, "§ 1981 . . . prohibits discrimination in employment on the basis of race."  *Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir. 2006); *see Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination . . . on the basis of race."); *Nnadozie*, 730 F. App'x at 156.

Under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g., Nieves v. Barlett*, ___ U.S. ___, 139 S. Ct. 1715, 1721 (2019); *Filarsky v. Delia*, 566 U.S. 377, 383 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

Defendant argues that plaintiff's claim must be brought under § 1983, not § 1981.  *See* ECF 7-1 at 21-22.  Indeed, in *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), the Supreme Court stated: "We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,'

provides for the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Id*. at 735.[22] Following *Jett*, however, Congress "amended § 1981 through the Civil Rights Act of 1991 . . . to add the following provision: 'The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.'" *Stout v. Reuschling*, TDC-14-1555, 2015 WL 1461366, at *6 (D. Md. Mar. 27, 2015) (quoting 42 U..S.C. § 1981(c)).

The Fourth Circuit has since found that the enactment of § 1981(c) did not "alter the holding of *Jett*," as "'the § 1983 requirement that plaintiffs show an official policy or custom of discrimination also controls in § 1981 actions against state entities.'" *Stout*, 2015 WL 1461366, at *6 (quoting *Dennis*, 55 F.3d at 156); *see also Lewis v. Robeson Cty.*, 63 F. App'x 134, 138 (4th Cir. 2003) (same); *Farmer v. Ramsay*, 43 F. App'x 547, 553 n.8 (4th Cir. 2002) (observing that a plaintiff suing a state or municipal actor "has no cause of action based on § 1981 independent of § 1983"); *Windsor v. Bd. of Educ. of Prince George's Cty*., TDC-14-2287, 2016 WL 4939294, at *12 (D. Md. Sept. 13, 2016); *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 541-44 (D. Md. 2008). Further, in *Dennis*, 55 F.3d 147 n.1, the Fourth Circuit said that "the correct reading of the amendment" can be found in a decision from the District Court for the Southern District of New York. (Citing *Phillippeaux v. N. Cent. Bronx Hosp*., 871 F. Supp. 640 (S.D.N.Y. 1994)). In *Phillippeaux*, 871 F. Supp. at 655, the district court explained that *Jett* instructs only that "(1) there is no vicarious liability for municipalities under Section 1981, and (2) municipal liability for public officials' violations of Section 1981 must be found under Section 1983" in accordance with the analysis set forth by the Supreme Court in *Monell v. Dep't of Soc. Servs*., 436 U.S 658 (1978).

---

[22] "State actor" in this context refers more broadly to state action, whether by "state or municipal entities." *Stout v. Reuschling*, TDC-14-1555, 2015 WL 1461366, at *6 (D. Md. Mar. 27, 2015).

Briefly, a § 1983 suit by an individual against a state for money damages is barred by state sovereign immunity, embodied in the Eleventh Amendment. *See Quern v. Jordan*, 440 U.S. 332, 345 (1979). But, the weight of authority in this District holds that, although the BPD is a state entity for purposes of Maryland law, it is a municipal entity for purposes of § 1983. *See, e.g.*, *Earl v. Taylor*, CCB-20-1355, 2021 WL 4458930, at *3 (D. Md. Sept. 29, 2021); *Lucero v. Early*, GLR-13-1036, 2019 WL 4673448, at *4 (D. Md. Sept. 25, 2019); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28, 2019); *Fish v. Mayor and City of Balt.*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003); *Alderman v. Balt. Police Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997).

Sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta by and through Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)). Indeed, as judges of this court have consistently explained in the cases cited above, the BPD does not enjoy Eleventh Amendment sovereign immunity for purposes of a § 1983 claim. This is because it is "sufficiently concerned with local matters, independently funded, interconnected with local government, and autonomous from state government . . . ." *Earl*, 2021 WL 4458930, at *3. To the contrary, BPD is a "person" subject to suit under § 1983. *See*, *e.g.*, *Fish*, 2018 WL 348111, at *3.

The Supreme Court determined in *Monell*, 436 U.S. 658, that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government resulting in a violation of the plaintiff's rights. *Id.* at 690-91. The *Monell* Court explained that,

"when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). But, liability attaches "only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665-683). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691; *Canton*, 489 U.S. at 392; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 446, 451 (4th Cir. 2004); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*,

___ U.S. ___,  138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984).  In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation."  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Moore v. Howard Cty. Police Dep't*, CCB-10-1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).  "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Bd. of Comm'rs of Bryan Cty*., 520 U.S. at 403-04.

 "An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'"  *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted).  In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Notably, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a custom or usage with the force of law.'"  *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003).  A policy or

custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 F. App'x at 799.  In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that to establish a *Monell* claim the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*).  Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230.  Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as

a "policy or custom" actionable under § 1983.  *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

However, pursuant to *Monell*, "'municipal liability may [also] be imposed for a single decision by municipal policymakers under appropriate circumstances.'"  *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (alteration added)).  "To hold a municipality liable for a single decision (or violation), the decisionmaker must possess 'final authority to establish municipal policy with respect to the action ordered.'"  *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur*, 475 U.S. at 481).  Thus, liability under § 1983 accrues to a municipality only if the governing body of the municipality "retain[s] final review authority" over the "personnel decision."  *Love-Lane*, 355 F.3d at 782.   In other words, it is insufficient that if the relevant decisionmaker has "discretionary authority in purely operational aspects of government.'"  *Lane*, 660 F. App'x at 197 (quoting *Spell*, 824 F.2d at 1386).

"'[W]hether a particular official has final policymaking authority is a question of state law.'"  *Starbuck v. Williamsburg James City County Sch. Bd.*, 28 F.4th 529, (4th Cir. 2022) (quoting *Jett*, 491 U.S. at 737 (alteration in Starbuck).  *Accord Hunter v. Town of Mocksville, N.C.*, 897 F.3d 538, 555 (4th Cir. 2018) ("'The question of who possesses final policymaking authority is one of state law.'") (quoting *Riddick*, 238 F.3d at 523).  For instance, "power to make policy may be granted by legislative enactment or through delegation by someone who does possess such authority."  *Fuller v. Carilion Clinic*, 382 F. Supp. 3d 475, 492 (W.D. Va. 2019) (citing *Pembaur*, 475 U.S. at 482).

In this case, the Complaint plainly falls short of stating a claim under *Monell*.  To be sure, plaintiff provides that there exists "widespread violations, the targeting of African Americans, and a culture of retaliation," and suggests that plaintiff's case should be understood against that

backdrop.  ECF 1, ¶ 1.  But, plaintiff does not otherwise plead facts to show that her experience in the BPD was rooted in a broader, institutional problem.

Plaintiff also alleges that a number of high-ranking BPD officers played a role in the discriminatory and retaliatory manner in which she was treated.  For instance, Sgt. Yampierre asserts that Director Reynolds, "the Unit's Civilian Director" (*id.* ¶ 36), divested plaintiff of her authority for "completing the Unit's schedule."  *Id.* ¶ 56.

But, Sgt. Yampierre has not alleged that any of these officials were decisionmakers with "'final authority to establish . . . policy with respect to the action[s] ordered.'"  *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur*, 475 U.S. at 481).  Indeed, to the extent any of the relevant BPD officials wielded such authority, the conduct described in the Complaint does not to amount to anything more than "'episodic exercises of discretion in the operational details of government.'"  *Semple*, 195 F.3d at 712 (citations omitted).  Plaintiff has not made any argument to the contrary. Therefore, I shall dismiss Count V, with prejudice.

### C.  HIPAA (Count VI)

Count VI asserts a claim for violation of HIPAA.  ECF 1, ¶¶ 196-203.  In particular, plaintiff claims that in March 2020, she was exposed to an individual who had contracted COVID-19.  *Id.* ¶ 199.  Thereafter, she sought to take leave from work "so that she could self-quarantine for the protection of herself and others."  *Id.* ¶ 200.[23]  Nonetheless, defendant unlawfully "requested and demanded documentation and proof that the Plaintiff had indeed been exposed" to COVID-19.  *Id.* ¶ 201.  In plaintiff's view, this request "violated the Plaintiff's rights to privacy regarding her health information."  *Id.* ¶ 202.

_____

[23] The contention appears to be at odds with other allegations set forth in the Complaint. Specifically, plaintiff asserts that her maternity leave began on February 14, 2020, and ended on July 7, 2020.  *See* ECF 1, ¶¶ 72, 82.

To be sure, HIPAA, 42 U.S.C. § 1320d *et seq.* establishes standards and regulations to protect the privacy and accuracy of medical records. "HIPAA provides that '[a] person who knowingly . . . discloses individually identifiable health information to another person' without authorization shall be fined, imprisoned, or both." *Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir. 2021) (quoting 42 U.S.C. § 1320d-6(a)(3), (b) (alteration in *Payne*)).

But, HIPAA does not create a private cause of action. *Atkinson-Bush v. Balt. Wash. Med. Ctr.*, Inc., BEL-10-2350, 2011 WL 2216669, at *3 (D. Md. May 25, 2011), *aff'd*, 585 F. App'x 161 (4th Cir. 2014) (per curiam); *see also Dodd v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010) ("HIPAA does not create a private right of action."); *Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006). As the Fourth Circuit explained, "HIPAA does not expressly allow for a private cause of action but delegates enforcement authority to the Secretary of the Department of Health and Human Services." *Payne*, 998 F.3d at 660.

Accordingly, Count VI is subject to dismissal, with prejudice. *See Dunbar v. Biedlingmaier*, DKC-20-0738, 2021 WL 3129310, at *3 (D. Md. Jul. 23, 2021) ("Given that HIPAA does not allow for private enforcement, Plaintiffs' HIPAA claims . . . must be dismissed.").

### D. ADA (Count VII)

Sgt. Yampierre has alleged a claim for disability discrimination arising under the ADA. ECF 1, ¶¶ 204-14. She asserts that, "[a]fter giving birth to her child, the Plaintiff suffered severe medical complications that affected her ability to complete the basic duties of her position." *Id.* ¶ 208. As a result of these complications, plaintiff "returned to work on light duty until her conditions were treated or were resolved." *Id.* ¶ 209. Further, plaintiff alleges that the BPD "was aware of her medical complications and her disability status and did not provide reasonable

accommodations during [and] after her pregnancy."  *Id.* ¶ 210.  She also claims that defendant "continued to harass her about her return to full duty status" and "interfered with her ability to attend doctor's appointments."  *Id.* ¶¶ 211-12.   And, Sgt. Yampierre maintains that defendant "used her disability status to harass, demean, degrade, and humiliate" her.  *Id.* ¶ 213.

The BPD contends that the ADA claim is subject to dismissal for failure to exhaust.  ECF 7-1 at 7-10.  Moreover, the BPD argues that the suit does not state a plausible claim for violation of the ADA.  ECF 7-1 at 20-21; ECF 10 at 11-13.   Sgt. Yampierre counters that her ADA claim does not exceed the scope of the Charge, and she maintains that she has stated a plausible claim for relief, as the complications she suffered from her pregnancy amounted to a qualifying disability within the meaning of the ADA, and the BPD failed to accommodate her disability.  ECF 8-1 at 3-4, 10-13.

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." § 12101(b)(2).  The ADA contains five titles: Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions.

Notably, plaintiff does not specify the ADA Title on which her ADA claim is based. However, it appears that plaintiff's claim rests on Title I of the ADA.

Title I prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); *see also Cowgill*, 2022 WL 2901043, at *5 (stating that 42

U.S.C. § 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability); *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) ("The ADA makes it unlawful for covered employers to 'discriminate against a qualified individual on the basis of disability.'").  A "qualified individual" is defined as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

The ADA's definition of "disability" is set forth in 42 U.S.C. § 12102.  Its primary meaning is "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."  *Id.* § 12102(1)(A).  "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," *id.* § 12102(2)(A), as well as "the operation of . . . major bodily function[s]."  *Id.* § 12102(2)(B).  Even if a person does not have a disability under the primary definition, the person will still be considered to have a disability if she has "a record of such an impairment," *id.* § 12102(1)(B),or is "regarded as having such an impairment." *Id.* § 12102(1)(C).

Notably, unlawful discrimination under Title I of the ADA "can include the failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . .'"  *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (quoting 42 U.S.C. § 12112(b)(5)(A)); *see Cowgill*, 2022 WL 551913, at *5.  However, the employer "can demonstrate that the accommodation would impose an undue hardship" on its business.  *Id.* § 12112(b)(5)(A).  *See Cowgill*, 2022 WL 2901043, at *5.

To establish a prima facie case for failure to accommodate, an employee must show: (1) she was an individual with a disability within the meaning of the ADA; (2) the employer had notice

of her disability; (3) with reasonable accommodation, she could perform the essential functions of the position; and (4) the employer refused to make such accommodations. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001); *see also Stephenson v. Pfizer*, 641 F. App'x 214, 219 (4th Cir. 2016); *Wilson*, 717 F.3d at 345.

Of import here, Title I adopts the administrative exhaustion requirement found in Title VII. *See Nelson v. Emergent BioSolutions Inc.*, DLB-20-3541, 2022 WL 991395, at *4 (D. Md. Mar. 31, 2022) (observing that the Fourth Circuit has held that "the ADA incorporates Title VII's enforcement procedures, including the administrative exhaustion requirement"). Thus, an employee must file an administrative charge of discrimination before proceeding to federal court. *See* 42 U.S.C. § 12117(a); *see also Sydnor*, 681 F.3d at 593. Further, under Title I of the ADA, a plaintiff must commence a court action within ninety days of receipt of the notice of right to sue from the EEOC. *See* 42 U.S.C. § 12117; *see also Cepada v. Bd. of Educ. of Balt. Cty.*, WDQ-10-0537, 2010 WL 3824221, at *3 (D. Md. Sept. 27, 2010) ("[T]he 90-day [limitations] period begins on the date the claimant receives the right-to-sue letter.").

The BPD argues that plaintiff's ADA claim is barred by exhaustion, as "her EEOC Charge never listed 'Disability' as a basis of her alleged discrimination." ECF 7-1 at 10. Moreover, it asserts that "Plaintiff's Charge of Discrimination never signaled that she would later assert an ADA claim in her lawsuit," as it is "bereft of any detail that would prompt an investigation into claims of ADA discrimination." *Id.*

I agree. In short, the Charge cannot plausibly be read to lodge a claim for failure to accommodate a disability. Significantly, plaintiff did not check the box for disability on the Charge. *See* ECF 7-2 at 1. To be sure, the Charge makes plain that plaintiff was pregnant. *Id.* at 1-2. But, it does not necessarily follow that such an assertion would indicate that plaintiff suffered

from a qualifying disability.  Federal courts have held, with near unanimity, that generally "'pregnancy is not a 'disability' under the ADA.'"  *Genovese v. Hartford Health and Fitness Club, Inc.*, WMN-13-217, 2013 WL 2490270, at *5 n.3 (D. Md. June 7, 2013) (quoting *Wenzlaff v. NationsBank*, 940 F. Supp. 889, 890 (D. Md. 1996)); *accord Kande v. Dimensions Health Corp.*, GJH-18-2306, 2020 WL 7054771, at *4 (D. Md. Dec. 2, 2020); *Saah v. Thumel*, RDB-15-2425, 2017 WL 491221, at *6 (D. Md. Feb. 7, 2017).

On the other hand, the EEOC's Enforcement Guidance ("Guidance" or "E.G.") states that "some impairments of the reproductive system may make a pregnancy  more difficult and thus necessitate certain physical restrictions to enable a full term pregnancy."  Enforcement Guidance: Pregnancy    Discrimination    and    Related    Issues    (June    25,    2015), https://www.eeoc.gov/laws/guidance/pregnancy_guidance.cfm (citations omitted).  Accordingly, "courts have consistently found that, while pregnancy alone is insufficient to state a claim under the ADA, complications related to pregnancy may be found to be impairments that substantially limit a major life activity such that they constitute disabilities."  *Kande*, 2020 WL 7054771, at *4 (collecting cases); *see*, *e.g.*, *Spees v. James Marine, Inc., et al.*, 617 F.3d 380, 398-99 (6th Cir. 2010) (deferring to EEOC's interpretive guidelines; finding that an incompetent cervix meets the pre-amended AMA  definition of disability).  But, the Charge provides no indication that plaintiff told her employer of her high risk status.  Indeed, plaintiff wanted to remain in her unit, even if it meant no light duty.  *Cf. Sillah v. Burwell*, 244 F. Supp. 3d 499, 508 (D. Md. 2017) (finding that plaintiff exhausted a claim for failure to accommodate where plaintiff alleged in an administrative complaint that "she informed her supervisor 'that [her] pregnancy was high risk and [she] needed to limit [her] physical activity at work and limit [herself] to desk duty'" and when the plaintiff

"communicated her doctor's instructions to her supervisor and she received no response") (alterations in *Sillah*).

Even assuming that plaintiff's reference to her pregnancy could be sufficient to indicate that she suffered from a disability within the meaning of the ADA, the Charge is devoid of any suggestion that plaintiff requested an accommodation for her disability, let alone that defendant refused to provide Sgt. Yampierre with any such accommodation.  Indeed, the assertions set forth in the Charge establish only that plaintiff was "subjected to pregnancy-related harassment . . . ." ECF 7-2 at 1.  And, as the Fourth Circuit has previously explained, a plaintiff's fails to exhaust a discrimination claim where the EEOC charge alleges one basis of discrimination and the pleading that follows seeks to introduce another basis of discrimination. *See Chacko*, 429 F.3d at 509; *Evans*, 80 F.3d at 963.

In sum, the mere mention of plaintiff's pregnancy in the Charge is insufficient to indicate that Sgt. Yampierre requested and was denied a reasonable accommodation for pregnancy-related complications.  Thus, plaintiff's ADA claim is barred for failure to exhaust.  I shall dismiss Count VII, with prejudice.

### E.  FEPA (Count VIII)

Count VIII of the Complaint is brought under FEPA.  According to Sgt. Yampierre, BPD's conduct amounts to a violation of FEPA, as it was "intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American) and sex (female)."  ECF 1, ¶ 219.

FEPA is the State law analogue to the federal employment discrimination statutes.  *See Lowman v. Maryland Aviation Admin.*, JKB-18-1146, 2019 WL 133267, at *4 (D. Md. Jan. 8, 2019) (recognizing that FEPA "'is the state analogue of Title VII'") (citation omitted).  Maryland

courts "'traditionally seek guidance from federal cases in interpreting [it].'" *Eubanks v. Mercy Medical Center, Inc.*, WDQ-15-513, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015) (brackets added) (quoting *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 481, 914 A.2d 735, 742 (2007)) (construing former Article 49B of the Maryland Code).

However, as defendant argues (ECF 7-1 at 24 n.3), Count VII is subject to dismissal, without prejudice, because plaintiff did not plead compliance with the notice requirements of the LGTCA, C.J. § 5-301 *et seq*.

The LGTCA is contained in Title 5, Subtitle 3 of the Courts and Judicial Proceedings Article of the Maryland Code. It provides, *inter alia*, that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." C.J. § 5-303(b)(1). "With the enactment of the LGTCA, the [Maryland] Legislature sought to provide 'a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.'" *Rios v. Montgomery County*, 157 Md. App. 462, 475-76, 852 A.2d 1005, 1012 (2004) (quoting *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 466 (1995)), *aff'd,* 386 Md. 104, 872 A.2d 1 (2005).

Section 5-304 of the LGTCA provides that "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim . . . is given within 1 year after the injury." C.J. § 5-304(b)(1). The notice must "be in writing and shall state the time, place, and cause of the injury." C.J. § 5-304(b)(2). Notice "shall be given in person or by certified mail, return receipt requested, bearing a postmark from the United States Postal Service, by the claimant or the representative of the claimant." C.J. § 5-304(c)(1).

Where applicable, "notice is a condition precedent to the right to maintain an action for damages, and compliance with the notice provision should be alleged in the complaint as a substantive element of the cause of action." *Renn v. Bd. of Comm'rs of Charles Cty*, 352 F. Supp. 2d 599, 603 (D. Md. 2005). In *Hansen v. City of Laurel*, 420 Md. 670, 25 A.3d 122 (2011), the Maryland Court of Appeals said: "A plaintiff must not only satisfy the notice requirement strictly or substantially, but also plead such satisfaction in his/her complaint. If a plaintiff omits this step, he or she is subject to a motion to dismiss, for instance, based on a failure to state a claim upon which relief can be granted." *Id*. at 694, 25 A.3d at 137.

The BPD is included in the list of local governments that falls within the ambit of the LGTCA. *See* C.J. § 5-301(d)(21). And, contrary to plaintiff's assertion that the LGTCA does not apply to her suit (ECF 8-1 at 15), courts have consistently enforced the LGTCA's notice requirements in the context of employment discrimination claims. *See, e.g.*, *Bozarth v. Md. Dep't of Educ.*, DLB-19-3615, 2021 WL 1225448, at *8 (D. Md. Mar. 31, 2021); *Edwards v. Montgomery College*, TDC-17-3802, 2018 WL 4899311, at *7-9 (D. Md. Oct. 9, 2018); *Young v. Housing Auth. of Balt. City*, MJG-17-713, 2017 WL 5257127, at *6 (D. Md. Nov. 13, 2017).

Without question, "strict compliance with the notice provisions of the LGTCA is not always required; substantial compliance may suffice." *Renn*, 352 F.Supp.2d at 603 (internal quotation marks and citations omitted). Substantial compliance is satisfied "[w]here the purpose of the notice requirements is fulfilled, but not necessarily in a manner technically compliant with all of the terms of the statute." *Id*. (internal quotation marks and citations omitted). In the context of employment discrimination, some courts have held that notice of an EEOC charge constitutes substantial compliance, at least if notice is provided to defendant by the LGTCA deadline and the charge provides "the identity of the claimant, the time and place of the event, the nature of the

claim, and the Plaintiff's intent to pursue litigation." *Nelson v. City of Crisfield*, L-10-1816, 2010 WL 4455923, at *2 (D. Md. Nov. 5, 2010).

Plaintiff did not plead compliance with the LGTCA notice provision in her Complaint. And, she does not advance any argument to the contrary. *See* ECF 8-1 at 15. On this ground, under applicable Maryland law, the FEPA claim is also subject to dismissal. However, this dismissal is likewise without prejudice, as plaintiff may plead compliance in an Amended Complaint.

Notably, defendant contends that it has sovereign immunity as to plaintiff's FEPA claim, because Maryland has not waived its Eleventh Amendment immunity as to FEPA claims. ECF 7-1 at 23-24. Plaintiff's briefing regarding sovereign immunity misunderstands the legal principles at issue, asserting only that, as a general matter, FEPA claims may be brought against public employers, and fails to engage in defendant's arguments. ECF 8-1 at 15.

Because plaintiff's FEPA claim is subject to dismissal for failure to plead compliance with the LGTCA, it is unnecessary to consider the implications of this complicated question. If plaintiff files an Amended Complaint, and continues to assert a FEPA claim, defendant may of course renew its sovereign immunity argument.[24]

---

[24] Without engaging in an extended discussion of sovereign immunity, I pause to note an issue that defendant failed to address. FEPA generally provides: "The State, its officers, and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under [FEPA]." S.G. § 20-903. Defendant's contention is premised on the Fourth Circuit's ruling in *Pense v. Maryland Department of Public Safety and Correctional Services*, 926 F.3d 97 (4th Cir. 2019). In that case, the Fourth Circuit concluded that because S.G. § 20-903 "does not 'specify the State's intention to subject itself to suit in *federal court*,' [this] provision cannot be read to waive the State's Eleventh Amendment immunity." *Pense*, 926 F.3d at 102 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985)) (emphasis in *Pense*). Asserting that the BPD "is considered an arm of the State for the purpose of State law claims," defendant argues that, under *Pense*, the BPD enjoys immunity from FEPA claims in federal court. ECF 7-1 at 23.

In sum, I shall grant the Motion as to Count VIII.  But, I shall grant leave for plaintiff to file an Amended Complaint as to her FEPA claim.

## IV.    Conclusion

Accordingly, I shall deny the Motion in part and I shall grant it in part.  In particular, I shall grant the Motion with respect to Count V (42 U.S.C. § 1981),  Count VI (HIPAA), and Count VII (ADA) and dismiss those claims with prejudice.  Moreover, I shall grant the Motion and dismiss plaintiff's claims as set forth in Count I (Race Discrimination), Count VIII (FEPA), and Count IX (pregnancy discrimination), without prejudice and with leave to amend.

Regarding Count II (Sex Discrimination), I shall deny the Motion to the extent it is predicated on the sexual harassment to which plaintiff was allegedly subjected.  I shall otherwise grant the Motion with respect to Count II, without prejudice and with leave to amend.

With respect to Count IV (Retaliation), I shall deny the Motion to the extent that it relies on the plaintiff's transfer, the loss of her supervisory duties, the initiation of the internal investigations about plaintiff, and the criminal investigation that followed.  The Motion shall otherwise be granted with respect to Count IV, without prejudice and with leave to amend.

Further, I shall deny the Motion with respect to Count III (Sexual Harassment (Hostile Work Environment)).

---

But, *Pense* determined that Maryland had not waived its Eleventh Amendment immunity for FEPA claims, and concerned a state agency that the parties agreed enjoyed Eleventh Amendment immunity as a general matter.  *See* 926 F.3d at 100-02.  However, as discussed above, although the BPD is a state agency under state law, it is *not* considered a state agency for Eleventh Amendment purposes.  Thus, at first glance, the holding in *Pense* would appear to be of minimal relevance to this case.  And, looking purely at state law for the purpose of a state law claim, S.G. § 20-903 would seem to have waived the BPD's sovereign immunity.

An Order follows.


Date: August 18, 2022                                    _____/s/_____

                                                        Ellen L. Hollander
                                                        United States District Judge