IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DANIKA YAMPIERRE,

    *Plaintiff*,

    v.

BALTIMORE POLICE
DEPARTMENT,

    *Defendant*.

Civil Action No. ELH-21-1209

**MEMORANDUM OPINION**

In this employment discrimination case, Sergeant ("Sgt.") Danika Yampierre, plaintiff, asserts a host of claims against the Baltimore Police Department (the "BPD"), defendant. The claims are predicated on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*; the Maryland Fair Employment Practices Act ("FEPA"), Maryland Code (2021 Repl. Vol., 2022 Supp.), § 20-601 of the State Government Article ("S.G."); the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; and the Pregnancy Discrimination Act of 1978 ("PDA"). *Id.* at 63.[1]

The Second Amended Complaint is the operative pleading. ECF 24 (the "SAC").[2] Sgt. Yampierre seeks declaratory and injunctive relief, "back pay and compensatory damages in the amount of $10,000,000," and attorney's fees and costs. *Id.* at 67.

---

[1] In the 68-page lawsuit (ECF 24), plaintiff does not provide a citation to the FMLA or the PDA.

[2] Plaintiff has erroneously labeled ECF 24 as the First Amended Complaint. The original Complaint is docketed at ECF 1. And, plaintiff filed a "First Amended Complaint" on September 8, 2022, docketed at ECF 13. The SAC (ECF 24) was filed on January 12, 2023.

Defendant has moved to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF 25. The motion is supported by a memorandum (ECF 25-1) (collectively, the "Motion"), and seven exhibits. ECF 25-5 to ECF 25-8; ECF 26-1 to ECF 26-3 (under seal). Plaintiff opposes the Motion (ECF 32), supported by a memorandum. ECF 32-1 (collectively, the "Opposition"). Defendant replied. ECF 35.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I. Procedural Background

Yampierre's original Complaint, filed on May 17, 2021, contained nine counts. *See* ECF 1. In particular, Sgt. Yampierre lodged five claims under Title VII: discrimination on the basis of race (Count I); discrimination on the basis of sex (Count II); "sexual harassment (hostile work environment)" (Count III); retaliation (Count IV); and discrimination on the basis of pregnancy (Count IX). *Id.* at 28-38, 43. The original Complaint also asserted claims under 42 U.S.C. § 1981 (Count V); the Health Insurance and Portability Accountability Act ("HIPAA"), 42 U.S.C. § 1320d *et seq.* (Count VI); the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.* (Count VII); and the Maryland Fair Employment Practices Act, S.G. § 20-601 *et seq.* (Count VIII). ECF 1 at 38-42.

Defendant moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 7. By Memorandum Opinion (ECF 11) and Order (ECF 12) of August 18, 2022, I dismissed Counts I, VIII, and IX, without prejudice. I denied the motion as to Count II, to the extent that it was based upon plaintiff's allegations of sexual harassment, but otherwise granted the motion as to Count II, without prejudice. I denied the motion as to Count III. And, I denied the motion as to Count IV, to the extent that it was predicated on plaintiff's job transfer, the loss of supervisory

2

duties, the initiation of internal investigations about plaintiff, and any criminal investigation that followed.  But, I otherwise granted the motion as to Count IV, without prejudice, and I granted the motion, with prejudice, as to Counts V, VI, and VII. As to Counts I, II, IV, VIII, and IX, I granted plaintiff leave to amend.

Plaintiff filed a "First Amended Complaint" on September 8, 2022. ECF 13. Shortly thereafter, on October 24, 2022, the parties filed a "joint motion to stay proceedings," pending plaintiff's anticipated receipt of a right to sue letter from the U.S. Equal Employment Opportunity Commission ("EEOC"). *See* ECF 17. I granted the motion to stay. ECF 18. The SAC followed on January 12, 2023.  ECF 24.

The SAC contains eight counts. *See* ECF 24. Specifically, plaintiff has lodged five claims under Title VII: discrimination on the basis of race (Count I); discrimination on the basis of sex (Count II); sexual harassment (hostile work environment) (Count III); retaliation (Count IV); and discrimination on the basis of pregnancy (Count VI). She also asserts a claim of interference (Count VII) and retaliation (Count VIII) in violation of the FMLA, as well as a claim under the FEPA (Count V).

Defendant has moved to dismiss all but Count III of the SAC, pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  ECF 25.  Count III is not in issue.

## II.  Factual Background[3]

Sgt. Yampierre, an "African American female," ECF 24, ¶ 14, "has been employed by [the BPD] from August 15, 2006 until present, as a Detective Sergeant."  *Id.* ¶ 22.  Since May 2013,

---

[3] The Memorandum Opinion of August 18, 2022 (ECF 11) contains a detailed factual summary.  To the extent relevant, I incorporate that factual summary here.  *See id*. at 2–25.  For the most part, I present the facts chronologically as well as topically.

plaintiff has worked at the BPD's "Headquarters/City Hall Security Unit" (the "Unit")[4] and, while serving in this capacity, she has "received consistent and continuous excellent remarks on her performance evaluations . . . ." *Id.* ¶ 23. She asserts that she has "consistently been the target of race and sex discrimination, retaliation, pregnancy disability and workplace hostility." *Id.* ¶ 104. Moreover, she complains that she was denied twelve weeks of FMLA leave in 2020. *Id.* ¶ 109. Further, she complains that she was wrongfully accused of medical leave abuse, and was harassed in regard to a line-of-duty injury and other medical issues. *Id.* ¶110; *see also id.* ¶¶ 113-117, 123.

Sgt. Yampierre recounts that she experienced difficulty in supervising one of the officers under her command, Officer Abdulsalam Ajikobi. *See id.* ¶¶ 25-27. In particular, on an unspecified date in March 2019, Officer Ajikobi "had a heated verbal altercation" with Officer Teddy Parris. *Id.* ¶ 26. Thereafter, Officer Parris "informed Plaintiff that Officer Ajikobi was creating a hostile work environment and that he did not want to have any other interactions with Officer Ajikobi going forward." *Id.* Plaintiff asserts that she "attempted to reconcile this issue . . . ." *Id.*

Also in March 2019, Lieutenant ("Lt.") Deanna Effland was "assigned" to the Unit. *Id.* ¶ 24. From the context, it appears that Lt. Effland was Sgt. Yampierre's supervisor. *See, e.g., id.* ¶ 38 (describing Lt. Effland as the "commander of the unit"). Plaintiff advised Lt. Effland of her difficulty in supervising Officer Ajikobi. *Id.* ¶ 25. She also informed Lt. Effland that "many of the unit's issues stemmed from [Officer Ajikobi's] insubordination and noncompliance." *Id.*

---

As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

[4] Plaintiff does not capitalize the word "unit." Therefore, when I quote from her submissions, I do not capitalize the word.

On or about April 23, 2019, Officer Ajikobi had a second "heated verbal altercation with two [BPD] officers," including Officer Parris. *Id.* ¶ 27. Plaintiff claims that she "documented the incident and reported it to Lt. Effland." *Id.* Moreover, she asserts that she "attempted to schedule mediation between the three officers, however, Officer Ajikobi refused to attend." *Id.* Accordingly, plaintiff "informed Lt. Effland of the steps she took to mediate and resolve this issue and assured Lt. Effland that she would follow up with Officer Ajikobi about possible resolutions." *Id.*

During the weeks that followed, Sgt. Yampierre "waited . . . for Lt. Effland to provide any advice or guidance on how she would like to proceed with this issue," but Lt. Effland failed to provide guidance. *Id.* Meanwhile, plaintiff "continued to receive inquiries from the involved officers about the outcome" of their dispute. *Id*.

"On or around May 3, 2019, Plaintiff reconvened with Lt. Effland regarding the previous incident to inquire about the next steps in the process." *Id.* ¶ 28. According to plaintiff, Lt. Effland failed to "diffuse [sic] the situation" and, instead, "boasted about how Officer Ajikobi gifted her a unique bottle of wine." *Id.* According to plaintiff, Lt. Effland "had no plans for how to reprimand Officer Ajikobi." *Id.*

In June 2019, Sgt. Yampierre "attempted to once again inquire [of Lt. Effland] about any next steps regarding the altercation[s]" involving Officer Ajikobi. *Id.* ¶ 30. But, Lt. Effland again "dismissed the Plaintiff and her efforts to find a resolution." *Id.* To the contrary, "after speaking with Office Ajikobi, Lt. Effland began working against the Plaintiff and her role as Sergeant in her unit." *Id.* Specifically, Lt. Effland held "private meetings with officers in the unit, without having Plaintiff, their direct supervisor, present." *Id.* Further, Lt. Effland "encouraged officers to skip the line of command whenever they request leave or overtime, so that they would go directly to

Lt. Effland instead of the Plaintiff." *Id.* Lt. Effland also held "private meetings" with another BPD officer, Sgt. Marlon McEntyre, "to discuss the unit's next phase in an effort to ostracize and alienate the Plaintiff from her coworkers." *Id.*; *see id.* ¶ 97 (stating Sgt. McEntyre's first name).

On an unspecified date in July 2019, "Lt. Effland was again informed about Officer Ajikobi's continuing insubordinate and dangerous behavior." *Id.* ¶ 32.[5] But, rather than "address[ ] this issue, Lt. Effland informed Officer Ajikobi that the Plaintiff was targeting him and had an objective to have him removed from the unit." *Id.* ¶ 32.

In the interim, around mid June 2019, "Lt. Effland relinquished the Plaintiff's duty of organizing and completing the unit's officer schedules, which had been her responsibility for four (4) years." *Id.* ¶ 31. Plaintiff asserts that Lt. Effland reserved this responsibility to herself so that she could "schedule herself and officers she favored in the unit to coveted shift times." *Id.*

Of import here, plaintiff alleges: "Before Lt. Effland's arrival, Lieutenants were not permitted to work overtime as it drained the budget." *Id.* But, after divesting plaintiff of the authority to organize shift schedules, "Lt. Effland approved herself" and officers she favored, including Lt. Brian Pearson, "for overtime shifts." *Id.* Additionally, "Lt. Effland altered the schedule to operate on a Monday–Friday week," over plaintiff's objection and "contrary to Departmental policy and practice." *Id.*

Also in June 2019, plaintiff learned that she was pregnant. *Id.* ¶ 29. On August 27, 2019, she "notified her immediate supervisors Lt. Deanna Effland and Lt. Brian Pearson of her pregnancy" and she "specifically mention[ed] the high risks associated with her pregnancy so that they could understand the necessity of her being able [to] attend doctor's appointments at different

---

[5] The SAC, like the Complaint, does not clarify whether this report pertained to the plaintiff's previous difficulties with Officer Ajikobi, of which Lt. Effland had already been apprised, or, instead, other conduct.

times of the day." *Id.* ¶ 34.   Plaintiff explains that in May 2013, she "was diagnosed with a line of duty high blood pressure injury that placed her in a high risk category for pregnancy." *Id.*

In August 2019, an unidentified individual "requested" BPD's Internal Affairs Integrity Unit ("Internal Affairs" or "IAD") "to investigate Lt. Effland for misuse of overtime." *Id*. ¶ 33. Plaintiff maintains that she was not the source of the complaint. *Id.* ¶ 35.  But, on August 28, 2019, Lt. Effland received an anonymous phone call, advising her that Sgt. Yampierre had "visited Internal Affairs and filed a complaint against Lt. Effland regarding misuse of overtime and that [plaintiff] had provided a statement detailing these accusations." *Id.*

"Lt. Effland became upset and ordered the Plaintiff into her office to discuss this leaked information . . . ." *Id.*  Thereafter, Lt. Effland "proceeded to chastise and berate Plaintiff about why she reported her to Internal Affairs and demanded to know why the Plaintiff had not informed Lt. Effland prior to reporting her, even though the Plaintiff had advised Lt. Effland that she did not file a complaint against her." *Id.*  Even so, Lt. Effland "aggressively question[ed]" plaintiff about the IAD complaint.  *Id.*  Sgt. Yampierre's refusal to respond allegedly made Lt. Effland "even more agitated" and she attempted "to intimidate the Plaintiff in an effort to encourage a response." *Id.*

Thereafter, "Lt. Effland called the unit's Civilian Director Randolph Reynolds and informed him that a meeting needed to be scheduled between him, Lt. Effland, and the Plaintiff to determine the basis for which the Plaintiff reported Lt. Effland to Internal Affairs."  *Id.* ¶ 36. Plaintiff asserts that "this action [was] against department policy as the Plaintiff engaged in protected activity."  *Id.*  "However, Director Reynolds agreed with Lt. Effland and ordered the Plaintiff to meet with him . . . ."  *Id.*  Plaintiff told Lt. Effland that "she would attend the meeting, but that she would not respond to any inquiries about what she reported to Internal Affairs."  *Id.*

Sgt. Yampierre "immediately contacted" Sgt. Anthony Faulk of Internal Affairs "to report this interaction." *Id*. "Sgt. Faulk advised Plaintiff to document this interaction in an administrative report and submit it to Internal Affairs . . . ." *Id*. Plaintiff states that she followed Sgt. Faulk's directive. *Id.*

The following day, August 29, 2019, IAD staff "visited Plaintiff's unit to collect Lt. Effland's departmental phone so that they could determine who called Lt. Effland and leaked information from the Internal Affairs Integrity Unit to her." *Id.* ¶ 37. Lt. Effland was "visibly upset" with plaintiff. *Id.* At that juncture, Lt. Effland approached plaintiff and another BPD officer and declared: "'I'm having a fucking four-day weekend off.'" *Id.* Lt. Effland then "erase[d] her name from the Overtime post in which she had scheduled herself to work that following weekend" and "demanded that the Plaintiff find her a replacement with less than 24 hours-notice." *Id.* ¶ 38.

Plaintiff responded that it was Lt. Effland's responsibility to find her own replacement. *Id.* However, "[i]n a clear effort to retaliate against the Plaintiff," Lt. Effland stated that, if Sgt. Yampierre failed to find a replacement for her shift, "Lt. Effland would draft the Plaintiff to work Lt. Effland's scheduled overtime hours." *Id.* Moreover, Lt. Effland threatened to alter plaintiff's regularly scheduled shift, which had been 7:00 a.m. to 3:00 p.m. for the past eight years, to 2:00 p.m. to 10:00 p.m. *Id.* Sgt. Yampierre advised Lt. Effland that her behavior amounted to an "abuse of discretion and a clear violation of the police officers [sic] FOP contract." *Id.*[6] But, Lt. Effland "reiterated that Plaintiff will be working the new shift to cover her overtime . . . ." *Id.*

---

[6] Yampierre alleges that, as a BPD officer and a member of "Baltimore City Lodge No. 3, Fraternal Order of Police ('FOP')," her employment relationship is governed by a collective bargaining agreement (the "CBA"). ECF 24, ¶ 17. However, plaintiff did not provide a copy of the CBA to the Court, nor has plaintiff otherwise specified its terms.

Lt. Effland then sent an email to Director Reynolds, advising that plaintiff will "cover Lt. Effland's overtime, in lieu of working her regular hours, and that Lt. Brian Pearson will work overtime to fill the Plaintiff's regularly scheduled shift." *Id.* ¶ 38. Plaintiff "immediately contacted" IAD "to inform them of this retaliatory behavior." *Id.* At the direction of IAD, plaintiff promptly filed a report. *Id.*

The following day, August 30, 2019, Lt. Effland did not report for her assigned overtime shift, which she had previously "scheduled for herself." *Id.* ¶ 39. As a result, plaintiff had "to find a replacement to cover the shift," as "Lt. Effland had abandoned her post without finding a replacement beforehand." *Id.* Ultimately, BPD Officer Charles Green "volunteered . . . to cover Lt. Effland's vacant shift." *Id.*

Later that day, Lt. Effland sent an email to Officer Green, "advising him to leave his post at City Hall and write a report about how the Plaintiff demanded that he work past his shift." *Id.* ¶ 40. Officer Green "immediately contacted the Plaintiff to inquire about what he should do." *Id.* Plaintiff "advised Officer Green to not leave his post at City Hall and [stated] that she will contact Director Reynolds about Lt. Effland's conduct." *Id.* Director Reynolds subsequently emailed Lt. Effland, "informing her that no officer would be asked to leave their assigned post to write a report and that if she needed something completed, she needed to inform Director Reynolds and not the individual officer." *Id.*

Lt. Effland subsequently "attempted to charge the Plaintiff with insubordination for not working past her shift to cover for Lt. Effland's abandoned shift." *Id.*[7] Plaintiff "reported the

---

[7] Like the Complaint, the SAC does not specify the actions taken by Lt. Effland.

entire incident" to IAD and "[l]ater that day, Director Reynolds informed Plaintiff that Lt. Effland would be removed from the unit due to her behavior and misconduct." *Id.*

On September 3, 2019, Lt. Brian Pearson was "assigned" to the Unit "to replace Lt. Effland." *Id.* ¶ 41. At that time, Sgt. Yampierre "attended a meeting with Lt. Pearson and Sgt. McEntyre to discuss the ongoing issues in the Unit that were primarily being caused by Officer Ajikobi." *Id.* Lt. Pearson "assured" plaintiff and Sgt. McEntyre "that he would investigate these claims further." *Id.* And, later that day, Lt. Pearson sought to discuss with plaintiff "the basis for Lt. Effland's transfer out of the unit, since Lt. Effland had told him a different narrative." *Id.* However, plaintiff "refused to discuss the details of Lt. Effland's transfer since the Internal Affairs investigation was ongoing." *Id.*

Plaintiff asserts that Lt. Pearson met with Officer Ajikobi on September 4, 2019, and "advised him to file" a complaint against plaintiff with the EEOC "before she had the opportunity to remove him from the unit." *Id.* ¶ 42. The following day, plaintiff received a call from Sgt. Freda Arrington, who, according to plaintiff, is associated with the EEOC. *Id.* ¶ 43. Sgt. Arrington informed plaintiff "that Officer Ajikobi had filed an EEOC complaint against" her and asked plaintiff if she would be "interested in attending mediation." *Id.* Plaintiff "agreed." *Id.*

Plaintiff, Officer Ajikobi, Sgt. Arrington, and Sgt. McEntyre attended a mediation on September 6, 2019, to find an "amicable solution." *Id.* ¶ 44. Sgt. Arrington informed Officer Ajikobi that "his complaint against the Plaintiff was not considered an EEOC case . . . ." *Id.* During the meeting, Officer Ajikobi "became visibly upset and agitated" because plaintiff "had documentation to refute his claims." *Id.* Officer Ajikobi also stated that "he had only filed an EEOC complaint because Lt. Pearson advised him to," because plaintiff was "working to have

[Officer Ajikobi] removed from the unit." *Id.* Sgt. Arrington allegedly told Ajikobi "that his claims were not valid and that he needed to follow orders to prevent future disagreements." *Id.*

Approximately one week later, on September 13, 2019, Officer Ajikobi "filed a complaint with Internal Affairs alleging the same facts" as set forth in his EEOC complaint. *Id.* ¶ 45. Plaintiff asserts that "Officer Ajikobi filed this complaint in response to Lt. Pearson being told that the EEOC complaint was not valid." *Id.*

According to plaintiff, because Officer Ajikobi had a "close relationship" with Major ("Maj.") Stephanie Lansey, the Commander of IAD, his complaint "was expedited through the system, and [Officer Ajikobi] was able to complete an interview the same day." *Id.* Also on September 13, 2019, Detective Anita Pitts, from IAD, contacted plaintiff for the purpose of serving her with the complaint and other papers related to Officer Ajikobi's complaint. *Id.*; *see id.* ¶ 64 (specifying Detective Pitts's first name).

Approximately two weeks later, on September 25, 2019, plaintiff attended a meeting with Lt. Pearson, Sgt. McEntyre, and Director Reynolds, at which she and Sgt. McEntyre informed Lt. Pearson and Director Reynolds "of the issues they had been trying to resolve with Officer Ajikobi." *Id.* ¶ 46. Director Reynolds requested documentation to substantiate these assertions. *Id.* On September 30, 2019, plaintiff "emailed all the documentation of Officer Ajikobi's alleged misconduct and insubordination to Lt. Pearson and Director Reynolds." *Id.* ¶ 49. Director Reynolds "replied by thanking [plaintiff] and stating that he will discuss the documents with Lt. Pearson." *Id.* However, plaintiff asserts that Director Reynolds never "followed up with her." *Id.*

In the interim, on or around September 25, 2019, Sgt. Yampierre "submitted a second written notification regarding her pregnancy and the importance of her attending her scheduled doctors' appointments." *Id.* ¶ 47. Plaintiff claims, *id.*: "Lt. Pearson acknowledged this notification

and replied that he supports her, cares about her health, and will ensure that the unit is covered before she departs for each appointment."

Plaintiff alleges that in October 2019, while she awaited a decision from Director Reynolds regarding Officer Ajikobi, "Lt. Pearson began sexually harassing the Plaintiff" and another BPD officer, Sgt. Leslie Williams. *Id.* ¶ 51. Plaintiff asserts: "Lt. Pearson would often ask the Plaintiff and Sgt. Williams to go out with him after work because he was lonely after his most recent relationship ended." *Id.*[8] According to plaintiff, both she and Sgt. Williams consistently rejected these advances, but "Lt. Pearson continued to make these requests with increasing pressure." *Id.* Plaintiff and Sgt. Williams were "extremely uncomfortable every time [Lt. Pearson] interacted with them." *Id.*

On November 3, 2019, Sgt. Williams informed plaintiff that Officer Ajikobi had been charged with insubordination. *Id.* ¶ 52. And, on November 8, 2019, while plaintiff was "on a pre-approved vacation," Lt. Pearson sent a text message to plaintiff and to Sgt. McEntyre, informing them that "Officer Ajikobi had been transferred out of the unit to work for his close friend," Maj. Lansey. *Id.* ¶ 53. Lt. Pearson stated that he was "'going to pop out of [plaintiff's] birthday cake' to celebrate this news." *Id.* But, on November 10, 2019, Lt. Pearson advised plaintiff that Officer Ajikobi's transfer had been "canceled as a result of the numerous complaints that had been filed against him by the Plaintiff." *Id.* ¶ 54.

During the week of November 18, 2019, Officer Ajikobi allegedly "bypassed the chain of command to schedule a meeting with Director Reynolds and Lt. Pearson directly." *Id.* ¶ 55. Plaintiff asserts that Officer Ajikobi "was upset about his transfer being canceled and began to

---

[8] Plaintiff does not specify the dates of these interactions.

make false accusations about the Plaintiff in order to provide a retaliatory reason for the complaints filed against him." *Id.*

Then, on November 22, 2019, plaintiff "received an email from Director Reynolds stating that he had received information that the Plaintiff was engaging in favoritism . . . and that from this point forward she would not be responsible for completing the unit's schedule." *Id.* ¶ 56. Reynolds also "barred" Sgt. Leslie Williams from working overtime in the Unit. *Id.* According to plaintiff, "Director Reynolds claimed these changes were not punitive," but instead were implemented with the intent "to create a 'good working order' for the unit." *Id.*

On the same day, Sgt. Yampierre spoke "with Lt. Pearson about the inconsistency in command, and how it did not follow that Officer Ajikobi was able to secure a meeting with Director Reynolds in a short amount of time while the Plaintiff was still waiting to schedule one." *Id.* ¶ 57.[9] Lt. Pearson replied that "he was not involved in the decision that Director Reynolds made about the schedule and that he does not want the Plaintiff to get too upset due to her pregnancy." *Id.*

Also on or around November 22, 2019, plaintiff "drafted an administrative report addressed to Director Reynolds that outlined the hostile work environment that Lt. Pearson had created." *Id.* ¶ 58. In particular, this administrative report "detailed the numerous [instances of] sexual

---

[9] As mentioned, plaintiff alleges that on September 30, 2019, she had emailed documentation regarding her complaints about Officer Ajikobi to Director Reynolds and, in reply, Director Reynolds advised plaintiff that he would discuss the documentation with Lt. Pearson. ECF 24, ¶ 49. Plaintiff states that Director Reynolds never "followed up with her." *Id.*

The basis of the assertion that plaintiff was "waiting to schedule" a meeting with Director Reynolds is not immediately apparent. *Id.* ¶ 57. The SAC does not state that as of November 22, 2019, plaintiff had submitted a request for a meeting with Director Reynolds that had gone unheeded.

harassment" to which plaintiff had allegedly been subjected by Lt. Pearson, and specified "the need for an immediate resolution." *Id*.

A few days later, on November 25, 2019, Lt. Pearson sent a text message to plaintiff and to Sgt. McEntyre, requesting "a meeting between the three of them after having read her complaint to Director Reynolds." *Id.* ¶ 59.  At a meeting in plaintiff's office, on an unspecified date, Lt. Pearson "stated that the meeting's objective" was to "'clear the air.'" *Id.*  Lt. Pearson "asked the Plaintiff if she was okay, to which the Plaintiff replied, 'I'm good.'" *Id.*  But, Lt. Pearson continued to question Sgt. Yampierre, claiming that plaintiff was "not good and demanding to know why." *Id.*  According to Sgt. Yampierre, Lt. Pearson sought "to extract a statement from [plaintiff] that could lead to a legitimate complaint against her." *Id.*

Plaintiff indicated to Lt. Pearson that "she was trying to avoid getting upset over something that is out of her control, for the sake of her and her child's health." *Id.*  She "reiterated that [it] is unprofessional for an officer to be able to meet with Director Reynolds without following the protocol, especially while she had been waiting several months to meet with Director Reynolds after submitting substantial documentation regarding Officer Ajikobi's insubordination." *Id.*  According to plaintiff, "Sgt. McEntyre advised Lt. Person to leave Plaintiff alone because she was six months pregnant and his pressure and attempts to aggravate her were causing undue stress." *Id*.

After the meeting, Lt. Pearson inquired as to when Sgt. Yampierre would "move to light duty or go on maternity leave." *Id.*  Plaintiff responded that she intended to work "until her last day of full duty" but her ultimate decision would depend on her health.  *Id.*  Lt. Pearson told plaintiff that "she would not be able to remain in the unit if she went on light duty because those

positions can only be fulfilled by full duty officers." *Id.* Plaintiff replied that she would then stay on full duty "because she did not want to be transferred from the unit." *Id.*

On November 26, 2019, Lt. Pearson "wrote the Plaintiff up in retaliation for her submitting her two original complaints to Director Reynolds, baselessly asserting that she had engaged in insubordination, inappropriate workplace conduct, conduct unbecoming of a police officer, discourtesy, and neglect for not signing off on overtime slips for Ofc. Edward Gorwell." *Id.* ¶ 60. But, on November 18, 2020, IAD found the charges "'not sustained'." *Id.*

Then, on November 27, 2019, plaintiff "received a text message from Lt. Pearson, asking if she had an altercation with a SWAT officer." *Id.* ¶ 61. Sgt. Yampierre promptly responded, confirming that "she did have an altercation with a SWAT officer who was insubordinate and failed to obey direct orders from the Plaintiff." *Id.* She also "informed Lt. Pearson that she had contacted [the SWAT officer's] command to report the incident." *Id.* Lt. Pearson replied in a "derogatory and inflammatory tone," stating that plaintiff "needed to draft an administrative report and submit it to him immediately." *Id.*

Plaintiff claims that this request "confused" her because "the Commander of SWAT, Captain Joe Jones, had directed her that an administrative report was unnecessary since his officer had been the aggressor." *Id.* Captain Jones then allegedly contacted Lt. Pearson to inform him that a report was unnecessary, "but Lt. Pearson dismissed him." *Id.* At that juncture, Lt. Pearson "called . . . and asked CSO[10] Corrina Johnson, 'Did Sgt. Yampierre put that report in my mailbox like I asked her to?'" *Id.*

"On or around November 29, 2019, Director Reynolds wrote Plaintiff up yet again for insubordination two days after Lt. Pearson wrote a complaint against the Plaintiff for parking in

---

[10] The SAC does not define the abbreviation "CSO."

her assigned parking spot, despite Plaintiff having already written and submitted a report at Lt. Pearson's direction." *Id.* ¶ 62.[11]  Plaintiff states that "Director Reynolds' write up indicated that Plaintiff's car was blocking the free flow of traffic, despite the fact that Plaintiff had been assigned that parking spot the entire time she had been with the unit without any prior issues." *Id.*  And, "[a]fter Plaintiff was denied access to the parking spot, Sgt. McEntyre and other subordinates of Plaintiff were allowed to park in the same spot without any repercussions or threats to have their vehicles towed." *Id.*  According to plaintiff, "Director Reynold's [sic] complaint was deemed 'unfounded' on November 18, 2020 after investigation by BPD Internal Affairs." *Id.*

Plaintiff received an email from the "Human Resources Department" on or around December 2, 2019, "stating that they [sic] had been informed by Director Reynolds that the Plaintiff is pregnant." *Id.* ¶ 63.  Further, "Human Resources informed the Plaintiff of the documentation that she needed to submit as quickly as possible." *Id.*  According to plaintiff, Director Reynolds told Human Resources about her pregnancy "in an effort to have her involuntarily transferred from the unit since the departmental policy had changed regarding whether officers working light duty can remain in the unit." *Id.*

The following day, December 3, 2019, Detective Pitts asked plaintiff to come to Internal Affairs "so that she could be served with charging papers for 'Disrespecting Lt. Pearson in a meeting on November 25' and also for 'Inappropriate workplace environment.'" *Id.* ¶ 64.[12]  Accordingly, one week later, on December 10, 2019, plaintiff "submitted an administrative report that requested a meeting with Director Reynolds." *Id.* ¶ 65.  But, she was subsequently advised

---

[11] Plaintiff claims that Lt. Pearson filed a complaint against her on November 26, 2019, three days before Director Reynolds filed his report against plaintiff.  ECF 24, ⁋ 60.

[12] In context, these "charging papers" appear to relate to the administrative complaints that Lt. Pearson filed on November 26, 2019.  *See* ECF 24, ¶ 60.

by Lt. Pearson that Director Reynolds did not want to have a meeting with her, and that "he had instructed Lt. Pearson to handle it, effectively forcing Plaintiff to address her complaints about Lt. Pearson to Lt. Pearson himself." *Id.*

On December 12, 2019, Maj. Lansey "abruptly reassigned the Plaintiff's Internal Affairs case from Detective Pitts to another detective." *Id.* ¶ 66.[13]  Plaintiff asserts that Maj. Lansey "did not have faith that Detective Pitts would provide the Plaintiff with a guilty outcome." *Id*.

Then, on or around December 16, 2019, Director Reynolds sent an email to plaintiff, Lt. Pearson, and Sgt. McEntyre, "declaring that Lt. Pearson and Sgt. McEntyre are the only supervisors who are permitted to command the unit." *Id.* ¶ 67.   He stated that "he had mentioned in previous emails that the Plaintiff is not authorized to assist in commanding decisions or perform any of her supervisory duties in the unit, and that any disobedience to this order would result in consequences." *Id.*  In plaintiff's view, this communication constituted "a direct attack" on her, as she was "more experienced than either commander . . . ." *Id.*

Approximately ten days later, on or around December 26, 2019, Sgt. Yampierre submitted a complaint to IAD, asserting a claim for hostile work environment. *Id.* ¶ 68.  Notably, plaintiff submitted this complaint by emailing it to Sgt. Faulk, in an attempt "to prevent" Maj. Lansey "from intercepting the claim and making it disappear." *Id*.  Plaintiff states that, "[d]espite a response from Sgt. Faulk indicating that he had received her complaint, no investigation was ever carried out." *Id*.

On or around December 31, 2019, plaintiff requested a meeting with Eric Melcanon, the Chief of Staff of "the Police Commissioners Office," with respect to "her Hostile Work

---

[13] It is unclear whether this investigation pertained to the complaint filed by Lt. Pearson against plaintiff on November 26, 2019, the complaint filed by Director Reynolds on November 29, 2019, or both.

Environment claim." *Id.* ¶ 69.  Melcanon responded by informing plaintiff that "he could not meet with [her]." *Id.*

Accordingly, plaintiff asserts that on or around January 9, 2020, after "exhausting all of her administrative remedies to no avail," she submitted "an EEOC pre-Charge inquiry against the Baltimore Police Department for race, gender, disability, and family status discrimination as well as sexual harassment and retaliation." *Id.* ¶ 70.

As discussed, *infra*, plaintiff did not provide the Court with a copy of the EEOC submission. The BPD attached a copy of the "Charge of Discrimination" to its original motion to dismiss.  *See* ECF 7-2 (the "Charge").   Notably, plaintiff does not dispute the BPD's contentions concerning the Charge, nor does she call into question the authenticity of the Charge.

The Charge is a form, with areas for a complainant to explain the allegations.  On the form, plaintiff checked the boxes indicating that she was claiming retaliation as well as discrimination on the basis of race and sex.  *See id*. at 1.  Further, she specified that the alleged discrimination took place between August 28, 2019 and April 30, 2020.  And, she also checked the box for "Continuing Action."  *Id.*

In the narrative portion of the Charge, plaintiff stated, *id.*:

I. I began my employment with the above-named Respondent on August 15, 2006 as a Police Officer Trainee.  I am currently employed as a Detective Sergeant under the supervision of Lt. Gene Ryan and Lt. Brian Pearson. Between approximately August 28, 2019 and September 3, 2019, other Black employees and I were subjected to harassment by Lt. Deanna Effland (White) when she demanded we disclose what we told Internal Affairs about her possible overtime violations, while similarly-situated White employees were not harassed. Beginning on or about September 3, 2019 and continuing to present, I have been subjected to pregnancy-related harassment in the form of Lt. Pearson repeatedly asking when I was going on light duty and in the form of false accusations made against me. On November 22, 2019 and November 25, 2019, Lt. Pearson made false allegations against me which led to administrative / disciplinary investigations being initiated against me. Beginning on or about November 22, 2019, I was excluded from

weekly debriefing meetings and emails, and many of my administrative job duties were taken away. On or about December 27, 2019, I complained to Internal Affairs about pregnancy discrimination by Lt. Pearson and race discrimination by Lt. Effland, but no corrective actions were taken. On February 24, 2020 and February 26, 2020, while on maternity leave, I was subjected to harassment when I was notified I had been charged with arriving late and leaving early and charged with a parking complaint.

II.     No reasonable explanation has been provided for Respondents [sic] actions.

III.    I believe I have been discriminated against because of my race (Black) with respect to harassment and my sex (Female-Pregnancy) with respect to harassment, exclusion from meetings and emails, and removal of job duties, and retaliated against for engaging in protected activity with respect to harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended.

On January 24, 2020, plaintiff and her husband were approved for Family and Medical Leave "for the birth of a child and/or care of a newborn child." *See* ECF 26-1 at 2; ECF 26-2 at 2. And, on February 14, 2020, "Plaintiff went out on maternity leave." ECF 24, ¶ 72.[14] Four days later, on February 18, 2020, plaintiff was "contacted by Kimberly Parks," an IAD employee, who "return[ed] her call regarding a complaint that had been lodged against her by Lt. Pearson." *Id.* ¶ 73. And, according to plaintiff, "Lt. Pearson attempted to back-date his complaint to cover the period from September 2019 to January 6, 2019, so that his complaint would precede Plaintiff's EEOC inquiry on January 9, 2020."

Six days later, on February 24, 2020, Detective Eric Geddis, a member of IAD, contacted plaintiff and "inquired to see if she was working." *Id.* ¶ 74. When plaintiff responded that she was not working at that time, Detective Geddis replied by "stat[ing] that he knew she was on leave

---

[14] On September 25, 2019, plaintiff "wrote an administrative report (Form 95) to have her leave balance audited before she left for maternity leave," as she had noticed that "her paystubs were reflecting inaccurate numbers as to her balances of vacation leave, legacy leave, and sick leave." ECF 24, ¶ 48. The discrepancy was reconciled on January 29, 2020, two weeks before plaintiff's maternity leave began. *Id.* ¶ 71.

but would like to know when she would return." *Id.* He also stated that he "wanted to discuss an internal complaint lodged against her." *Id.* Detective Geddis denied that this complaint was "related to the complaint she submitted via Sgt. Faulk," as it had been submitted approximately one week earlier, and "alleged that [plaintiff] often came to work late and left early." *Id.* Detective Geddis also claimed that "the complaint had been placed on his desk and he was told to investigate it immediately." *Id.*

Plaintiff asserts that she "was stunned that she had submitted a complaint over two months [earlier] and had heard nothing, but that a complaint against her was submitted a week" earlier and had been "expedited to investigation." *Id.* In plaintiff's view, Maj. Lansey expedited the complaint against plaintiff "in direct response to the Plaintiff's complaint . . . from December 26, 2019," in which she had complained about a hostile work environment. *Id.*

On February 26, 2020, while plaintiff was still on maternity leave, she was contacted by yet another IAD employee, Detective Syreeta Harvin. *Id.* ¶ 75. Detective Harvin asked plaintiff whether she "was working and available to meet," and informed plaintiff that "she had received allegation papers against [plaintiff] that needed to be served as soon as possible." *Id.* Plaintiff responded that "she was out on maternity leave and that she did not yet know when she will return." *Id.* Detective Harvin asked plaintiff to "keep her abreast of her return date, as she was feeling internal pressure to resolve this case." *Id.*

On March 5, 2020, Sgt. Yampierre "gave birth to her child on the sidewalk without any professional medical assistance," an event she alleges was "brought on by the stress caused by the hostile work environment and the constant harassment, discrimination, and retaliation she was experiencing." *Id.* ¶ 76. And, on March 13, 2020, plaintiff "underwent emergency surgery to address the medical complications she sustained during childbirth." *Id.* ¶ 77. Moreover, due to

complications, Sgt. Yampierre underwent two additional surgeries — one on May 15, 2020, and the other on June 16, 2020.  *See id.* ¶¶ 79, 81.

In the interim, on or around March 26, 2020, plaintiff was again contacted by Sgt. Arrington, who sought to discuss with plaintiff "the federal EEOC complaint that the Plaintiff had filed in January 2020." *Id.* ¶ 78.  Sgt. Arrington indicated that the BPD "requires that a separate internal investigation must be completed." *Id.*  However, according to plaintiff, since receiving this update from Sgt. Arrington, she has not "received [any] updates or information regarding this alleged internal investigation." *Id.*

Moreover, on June 15, 2020, the day before plaintiff's third surgery, she was again contacted by Detective Harvin, who stated that Maj. Lansey was "pressuring Detective Harvin's supervisor into obtaining the Plaintiff's return date." *Id.* ¶ 80.  Sgt. Yampierre responded that "she does not yet have a return date due to her prevailing medical complications that she sustained during childbirth." *Id.*

On July 7, 2020, plaintiff "returned to work on light duty." *Id.* ¶ 82.   On the same date, plaintiff was informed by Lt. Gene Ryan that "Director Reynolds directed him to communicate to Plaintiff that she is no longer permitted to park in the parking space that had been designated to her for the past eight years." *Id.* ¶ 83.  Lt. Ryan also said that "he did not have an alternate parking space yet available" for plaintiff, but that "she can continue to park there until they found a suitable alternate." *Id.*  Plaintiff asserts: "[O]n the days that [she] did not work, Sgt. McEntyre and other officers in the unit were free to park in that space without any repercussions or threat of disciplinary action." *Id.*

Approximately three weeks later, on July 27, 2020, Detective Geddis asked plaintiff again whether she had returned to work, and she told him that she had.  *Id.* ¶ 84.  "Detective Geddis then

directed the Plaintiff to report to Internal Affairs on July 29, 2020 so that she could be served the allegation papers." *Id.* On that date, plaintiff "was served [with] the allegation papers for Notice of Accused." *Id.* ¶ 85. Sgt. Yampierre does not specify the charges. *Id.*

In August 2020, Lt. Ryan informed plaintiff that Director Reynolds "had been inquiring about when the Plaintiff would return to full duty from light duty." *Id.* ¶ 86. Plaintiff replied that "she did not yet have an estimated date, due to her severe medical complications that she sustained due to childbirth." *Id.* Also in August 2020, Detective Geddis requested that plaintiff "report to Internal Affairs to sign a notification for her statement that she was scheduled to provide on September 3, 2020." *Id.* ¶ 87. However, on August 28, 2020, Detective Geddis sent an email to plaintiff stating that "her scheduled statement for September 3, 2020 had been canceled" and that the meeting would be rescheduled. *Id.* ¶ 88.[15]

On October 11, 2020, plaintiff "received her allegations papers via email from Detective Syreeta Harvin . . . ." *Id.* ¶ 90. Plaintiff "was offered the chance to provide a recorded statement over the phone." *Id.* Sgt. Yampierre has not specified the nature of the charges asserted in the "allegations papers." *Id.*

According to plaintiff, on November 18, 2020, she "received a notification that the internal complaint filed by Director Reynolds regarding the Plaintiff's parking spot was deemed 'unfounded.'" *Id.* ¶ 91. Further, plaintiff claims that "the three complaints filed by Lt. Brian Pearson were not sustained." *Id.*

---

[15] Plaintiff states that in September 2020, she "was transferred from locator and to a medical locator by order of her command, even though they had been advised against that decision by Lt. Ryan since the Plaintiff was still on light duty due to her pregnancy complications." ECF 24, ¶ 89. However, plaintiff does not explain the terms "locator" or "medical locator." *Id.* Nor does she indicate how this assignment differed from her previous assignment, if at all.

Director Reynolds informed Lt. Ryan on December 9, 2020, that he intended to "alter[ ] the Plaintiff's permanent Monday – Friday schedule that she had worked for the past eight years" and would instead "plac[e] her in a leave group with rotating shifts and days off . . . ." *Id.* ¶ 92. Plaintiff claims that Lt. Ryan disagreed with Director Reynolds's decision, on the ground that "Sgt. McEntyre was retiring, and Plaintiff would be the only remaining supervisor in the Unit." *Id.*

The following day, December 10, 2020, Sgt. Brian Frazier "ordered the Plaintiff to report to Internal Affairs to discuss another complaint lodged against her." *Id.* ¶ 93.  Upon plaintiff's arrival at IAD, "she was escorted into a private meeting" with Sgt. Frazier and Lt. Sean Mahoney. *Id.* Lt. Mahoney informed plaintiff that "the superior commanders, such as Major Stephanie Lansey did not react favorably to the 'not sustained' findings of the previous complaints, and that they were going to resubmit the charges in an effort to receive a different result." *Id.*

Accordingly, Lt. Mahoney and Sgt. Frazier asked Sgt. Yampierre "to sign a verbal letter[] that detailed these previous charges as 'not sustained.'" *Id.*[16]  When plaintiff declined to do so, Lt. Mahoney warned plaintiff that although "she would face no repercussions for refusing to sign the letter, . . . her refusal would provide ammunition to the other charges." *Id.*  Nevertheless, Sgt. Yampierre "wrote 'refused' on the signature line on the letter." *Id.*

Then, on December 11, 2020, Lt. Sharon Talley "ordered the Plaintiff to move her vehicle from her parking spot." *Id.* ¶ 94.  Lt. Talley stated that "this order came directly from Director Reynolds," and that Director Reynolds had also warned plaintiff that if she "refused to move her vehicle, he would have it towed." *Id.*  Consequently, plaintiff "complied with this order." *Id.* Thereafter, "Sgt. McEntyre then began parking in that space without repercussions." *Id.*

---

[16] The SAC states that a "verbal letter" is "a written warning of an infraction that has been alleged prior to any investigation[,]" and that a verbal letter "signed by the Officer in question will remain in that Officer's personnel file."  ECF 24, ¶ 93 n.1.

Sgt. Yampierre also alleges that on or around December 29, 2020, "Internal Affairs forwarded the Plaintiff's 2019 internal complaint to the States [sic] Attorney's Office in an effort to secure criminal charges against [her]." *Id*. ¶ 95.[17] In plaintiff's view, this action was "direct retaliation for [her] refusal to sign the verbal letter about the resubmission of charges." *Id.*

During the week of January 4, 2021, Sgt. Yampierre contacted Detective Geddis "to receive an update on the status of her case, as it would be expiring within 30 days." *Id.* ¶ 96. Detective Geddis advised "that the case was still pending review by the Commanders." *Id.* This response prompted plaintiff to inquire as to "how the case is pending review without the Plaintiff having completed an interview first." *Id.* But, Detective Geddis could not provide plaintiff with any further information, as the case "had been forwarded up the chain and was no longer his responsibility." *Id.*

The following week, five out of the ten detectives in the unit, including Sgt. McEntyre and Officer Ajikobi, received "Grand Jury summons to testify in a case against the Plaintiff." *Id.* ¶ 97. Notably, each of these officers had previously been "reprimanded" by Sgt. Yampierre. *Id.* In contrast, plaintiff asserts that the officers who had not been summoned all held "favorable opinions of the Plaintiff" and would provide "accurate retelling[s] of the issues presented that demonstrate the Plaintiff in the proper, lawful light." *Id.* Plaintiff claims that "the summoned officers appeared for their grand jury testimony" on January 19, 2021. *Id.* ¶ 98.

On or about January 28, 2021, after Sgt. Yampierre had arrived home from work, "she was ordered to report back to the unit," even though she had "informed Lt. Ryan that she had a doctor's appointment that she needed to attend." *Id.* ¶ 99. Because Lt. Ryan "urged" plaintiff to meet with

---

[17] Plaintiff does not specify whether her reference to the "2019 internal complaint" pertains to her complaint against Lt. Pearson or her multiple complaints against Lt. Effland.

Lt. Daniel Popp from IAD, plaintiff "canceled her doctor's appointment at the last minute and returned to Police Headquarters . . . ." *Id.* Upon her arrival, plaintiff was met by Lt. Ryan and two other BPD officers. *Id.* The "three commanders escorted" plaintiff to IAD "to inform the Plaintiff that she was being suspended, for a general charge of 'misconduct' without providing any further details or specificity." *Id.* In plaintiff's view, the "act of three commanding officers escorting a subordinate to the Internal Affairs Office is highly unusual" and "was done to humiliate, demean, and debase" her. *Id.*

Around the same date, Lt. Ryan called Yampierre and informed her that she "was being transferred from the administrative position that she had held for the past eight years to working patrol in the Eastern District as retaliation for the Plaintiff's pending EEOC complaint." *Id.* ¶ 100. Plaintiff asserts: "This involuntary transfer has not only changed the nature and terms of Plaintiff's employment, but has also prevented her from subsequently transferring again to a position of her liking." *Id.* However, the Complaint does not clarify whether plaintiff was transferred in lieu of being suspended, or if the transfer was rendered effective upon the completion of a suspension. Nor does Yampierre plead the date on which the transfer was effective. In any event, on March 29, 2021, Sgt. Arthur Paige was transferred to the Unit as plaintiff's replacement. *Id.* ¶ 103.

In the interim, on February 7, 2021, plaintiff received an email from Lt. John Ferinde indicating that plaintiff "needed to report to Internal Affairs on February 11, 2021 to attend a meeting with the States [sic] Attorney's Office . . . ." *Id.* ¶ 101. Plaintiff asserts that, at the time she received this message, she was on "medical leave to address the complications sustained from her high risk pregnancy." *Id.*[18] But, Lt. Ferinde indicated that failure to attend this meeting would

---

[18] Plaintiff does not indicate in the SAC the date that her medical leave commenced. However, in a subsequent EEOC Charge of Discrimination (ECF 25-5, the "Second Charge"),

result in disciplinary action. *Id.* Therefore, on February 11, 2021, plaintiff "attended the meeting at the States [sic] Attorney's Office with her criminal attorney, Allen Rombro, and the head attorney of the Public Integrity Bureau of the States [sic] Attorney's Office." *Id*. ¶ 102.

During the meeting, plaintiff "was told that she would not be able to speak or refute any statement," and she was then "accused of soliciting information about the grand jury proceedings . . . ." *Id.* However, according to plaintiff, the alleged solicitation occurred "during a time when [she] had been on medical leave and could not and did not have any contact with any individual involved in those proceedings." *Id.* "Without any further discourse, the Plaintiff and Mr. Rombro left the meeting." *Id.*

According to Yampierre, on March 8, 2021, "the Department of Justice ('DOJ') issued Plaintiff a Right-to-Sue Letter." *Id*. ¶ 9. This suit followed on May 17, 2021. *See* ECF 1.

Plaintiff alleges that "[a]fter the initial Complaint filing in this matter, [she] has faced continuous and systemic prejudice against her." ECF 24, ¶ 108. For instance, plaintiff states that on July 20, 2021, she "received an email from the Medical Unit informing her that her worker's compensation claim was being denied, and that any leave she had used was being replaced with her personal accrued leave." *Id*. ¶ 114. And, two days later, on July 22, 2021, "Plaintiff was informed that she must return to work on August 2, 2021. *Id*. ¶ 115. According to plaintiff, the BPD "cited that her hypertension was not a result of an injury that occurred in the line of duty and therefore they will no longer continue to compensate her while she is on medical leave." *Id*.

"On October 11, 2021, Plaintiff met with Major Ettice Brickus, the Medical Unit Commander, along with two grievance representatives, Lt. Elliot Cohen and Ofc. Scott Lawrence,

---

plaintiff indicates that she "went out on line of duty injury leave due to [her] disability on or about January 29, 2021." *Id*. at 2.

to discuss her vacation leave." *Id.* ¶ 123.  In the meeting, "Major Brickus stated that Plaintiff should have gone against her doctor's orders and come to work, at which point Ofc. Lawrence advised Major Brickus that going against doctors' orders is a liability and also against BPD policy." *Id.*  According to plaintiff, "Officer Lawrence then advised Major Brickus that her actions were premature, because the Public Service Infirmary ("PSI") doctor had indicated that Plaintiff should be kept out of work, and she was following those instructions to take her vacation leave when her workers compensation case was still pending resolution." *Id.*  Additionally, "Ofc. Lawrence stated that the decision was unfair because Plaintiff was currently pregnant and would not have any vacation leave to use for maternity leave, to which Major Brickus responded that it was not her problem and Plaintiff should have come to work." *Id.*

"As a result of the actions against Plaintiff's use of her leave, Plaintiff filed a second EEO Complaint (#531-2021-03400)." *Id.* ¶ 119.  Plaintiff did not provide the Court with a copy of this complaint, nor does she specify its date.  However, defendants attached to the Motion a copy of the Second Charge.  *See* ECF 25-5.  In particular, the Second Charge states, *id.* at 1:

> In May 2021, I filed a discrimination lawsuit in court.  Shortly thereafter, Respondent began making unannounced visits to my house trying to find out why I wasn't back at work.  I was out of work since January 29, 2021, but they did not start harassing me at my home, until after I filed my federal lawsuit on May 17, 2021.  Also around this time, I began receiving emails from Sergeant Albert Rotell stating I had to come back to work or he was going to AWOL me.  Around August 2021, my sick and vacation leave were taken away and I was put on a leave with no pay status.  I also received a $17,000 bill from Respondent for not having enough leave to cover my absence.  On or about September 14, 2021, I was transferred to the District, which is considered a demotion.

In the SAC, plaintiff also alleges that, at an unspecified time, Lt. Pearson has, "on multiple occasions, attempted to coerce Plaintiff into signing and approving Officer Edward Gorwell's overtime slips." ECF 24, ¶ 120.  She states: "Since Officer Gorwell was not entitled to overtime, Plaintiff refused to sign these slips as it is against Department policy." *Id.*  And, the SAC indicates

that "Officer Gorwell was forced to retire, in lieu of termination, because of the overtime fraud

and Lt. Pearson was under the belief that Plaintiff had reported the incident despite the fact that

she had not and was only a witness." *Id.* ¶ 121.

"On December 3, 2021, while giving a statement for a separate IID complaint, Plaintiff

was presented with a declination letter dated November 30, 2021 in which the Grand Jury declined

to charge her with anything." *Id.* ¶ 124; *see* ECF 25-7 ("Declination Letter").  In the Declination

Letter, however, the State's Attorney's Office stated: "We have serious concerns about the

integrity of this officer . . . While the evidence may not be 'beyond a reasonable doubt,' the

evidence is strong – and we hope, *and expect*, that BPD will take appropriate administrative actions

against this officer."  ECF 25-7 at 2 (emphasis in original).

Also on December 3, 2021, IAD detectives told plaintiff that Det. Raymond Cook claimed

"that he had Plaintiff on speaker phone when she allegedly asked him about the grand jury." *Id.* ¶

127.

The SAC alleges that Det. Raymond Cook had informed plaintiff that the BPD was

attempting to retaliate against her because of her federal lawsuit and EEOC complaints, "via the

Grand Jury investigation." *Id.* ¶ 125.  Det. Cook even advised plaintiff to "'watch [her] back' . . . ."

*Id.*

Further, plaintiff alleges that, "[o]n or about May 9, 2022, Plaintiff learned that Lt. Sean

Mahoney was in Internal Affairs (IA) making disparaging comments about Plaintiff such as 'why

did those girls go to the media?' (referring to a press conference Plaintiff attended with three other

BPD officers), 'whatever cases she has down here, she did it!,' and 'I do not like Sgt. Yampierre,'

or words to that effect." *Id.* ¶ 128.

On or around June 6, 2022, "Plaintiff returned from maternity leave after being on bed rest since December 22, 2021." *Id.* ¶ 130.  The following day, on June 7, 2022, "Plaintiff was ordered into IA by Sgt. Albert Rotell to receive her recommendation for punishment for charge 2021-0141." *Id.*  "Once Plaintiff arrived at IA, she was told that she was being recommended for termination due to Det. Cook's choice in informing her of BPD's retaliatory motives." *Id.* ¶ 131.  However, according to plaintiff, she "never solicited information from Det. Cook, who voluntarily shared information with her about the grand jury proceedings." *Id.*  She also states that "other officers outside of Plaintiff's protected classes have knowingly disseminated confidential information and have not been subjected to termination." *Id.*  And, the SAC states that "similarly-situated Officers have received better treatment than Plaintiff under similar circumstances." *Id.* ¶ 132.  The SAC includes names of other officers outside of plaintiff's protected classes who were not subject to termination. *Id.* ¶ 131.  She also includes names of similarly-situated officers who "received better treatment . . . under similar circumstances." *Id.* ¶ 132.

On June 9, 2022, "Plaintiff filed another EEO complaint (#531-2022-02786) regarding the attempted termination." *Id.* ¶ 133 (the "Third Charge").  The Court was not provided with a copy of the Third Charge.

Thereafter, on June 29, 2022, "Plaintiff learned that her husband, Det. Sean Yampierre was now also being targeted due to Plaintiff's complaints." *Id.* ¶ 134.  On that date, Sgt. George Giannakolias informed Det. Yampierre "that he was being written up for . . . 'stealing overtime'" by attending an ordered detail. *Id.* ¶ 136.  According to plaintiff, Sgt. Giannakolias told Sgt. Richardson that he would "'make sure'" to "'get Yampierre on something, because his wife is going through her situation and I know he needs money!'" *Id.* ¶ 137.  The SAC also states that "it

is obvious the BPD is not only retaliating against Plaintiff directly, but attempting to affect those around her, namely her husband, in retaliation for her complaints." *Id*. ¶ 139.

Plaintiff was assigned "to man" the front desk on September 21, 2022. *Id*. ¶ 142. When she learned of this reassignment, she said to Lt. Sean Miller, "I thought I was supposed to work for Lt. Lakishia Tucker (B-F) entering in data entry and being the missing persons liaison, *when did my job duties change*?" ECF 24, ¶ 142 (emphasis added). Plaintiff sought clarification from Captain David Brust. *Id.* ¶ 143. "[H]e stated that when there are no officers assigned to the desk, she would have to cover the desk to help because they are not paying a full duty Officer to man the front desk." *Id*. Plaintiff responded "that she would need frequent breaks while she [was] at the desk for lactation accommodations, because she [was] still nursing her baby." *Id*. ¶ 144.

On September 23, 2022, "Plaintiff authored an administrative report per policy 1730 for lactation accommodations, since Captain Brust and Lt. Miller were removing her original job duties and marginalizing her position as a 11-year veteran Sergeant to babysit officers at the desk." *Id*. ¶ 148. She asserts, *id.*: "The job duty of a Sergeant sitting at the front desk in a 4x4 area to sit and watch over two officers does not exist in any of the 9 districts on any of the 27 shifts."

Plaintiff learned on September 26, 2022, that Sgt. Wayne Adams, a white male, had occupied her office, and she "observed her personal belongings removed from her desk, packed up and placed in the corner." *Id.* ¶ 149. When plaintiff called Sgt. Adams to ask "him about the new arrangements," he "stated, 'I hate to be the bearer of bad news, but Captain David Brust and Lt. Sean Miller kicked you out of your office and advised me to move in over the weekend because they are moving you to the front desk." *Id.* ¶ 150. According to plaintiff, "[t]his move was made one business day after Plaintiff had put in her lactation accommodations request through her chain of command." *Id.* ¶ 151.

Plaintiff alleges that, when she asked Lt. Lakishia Tucker, her "immediate supervisor," for information about the reassignment, Lt. Tucker informed her that she could use "the women's supervisor's bathroom" for lactation sessions. *Id.* ¶ 153. "Plaintiff objected to Lt. Tucker's idea and advised her that it is not sanitary and is against federal law and departmental policy to pump in any bathroom." *Id.* ¶ 154. Plaintiff asserts that, "[a]t this point, [she] realized that the Department was trying to inconvenience her and make her very uncomfortable, because she had submitted her lactation request in writing on Friday, to ensure she would have lactation accommodations." *Id.* ¶ 155. Yampierre alleges, *id.*: "These accommodations were essential to Plaintiff in her assignment at the front desk, as she would need an Officer to relieve her so she could pump at least 2-3 times during the course of her shift . . . ."

According to plaintiff, after "she realized that [her removal from her office] was a retaliatory act because of her lactation accommodation request and prior protected activities, she started to feel sick," and noted that her blood pressure was "176/101." *Id.* ¶ 156. Although a nurse practitioner at the Public Safety Infirmary ("PSI") advised plaintiff to return to work, she "was not able to return back to work under th[e] hostile conditions and without a place for lactation accommodations." *Id.*

On October 3, 2022, Sgt. Cheneaka Green told plaintiff that Sgt. Green "had been asking for a lactation room for the Southern District for the past seven years," but the BPD "had ignored all of her requests." *Id.* ¶ 158. Sgt. Green also told plaintiff that "they[19] had indicated to her that Plaintiff could" use the office that Sgt. Adams occupied before moving to plaintiff's former office. *Id.* According to plaintiff, "[t]he office in question had no chair or table for her to sit at, and was piled up with unused items on all surfaces, including loose cables and keyboards strewn across the

---

[19] It is not clear to whom "they" refers.

dirty, unmopped floor, along with an awful stench." *Id.* After Sgt. Green refused to instruct plaintiff to occupy the "dirty office," "Sgt. Adams asked Sgt. Green, 'Where does she keep her breast pump and milk after she's done?'" *Id.* ¶ 159. Plaintiff found this "statement . . . very offensive and scary." *Id.*

Also on October 3, 2022, plaintiff "called for relief at 8:57am for her first lactation session," but no relief arrived until 9:38 a.m. *Id.* ¶ 160. Plaintiff "called for her second relief at 12:00pm," but relief personnel "did not show up until 12:45pm." *Id.* "Once her relief did arrive, she went to her car to express milk in 46 degrees, cold, and rainy weather." *Id.* Plaintiff states that for the following three days, she "continued to have to use her car to pump," because "she still had not been provided with sufficient accommodations indoors." *Id.*

According to plaintiff, on October 7, 2022, she asked Sgt. Green if any further arrangements for lactation accommodations had been made. *Id.* ¶ 161. Sgt. Green told plaintiff that Sgt. Wayne Adams "gave her a key to give to Plaintiff for the dirty, unoccupied office" or she could use a "computer room." *Id.* But, plaintiff maintains that the computer room has no place for plaintiff to sit, is not private, and "[t]here is constant foot traffic" in the room. *Id.* ¶ 162.

Plaintiff filed a fourth EEOC charge on October 12, 2022. *See* ECF 25-6 (the "Fourth Charge").[20] In this Charge, she described, *inter alia*, the events related to her lactation accommodation request as well as the alleged retaliation experienced by her husband. *Id.*

On October 21, 2022, plaintiff was charged with "not complet[ing] required online E-Learning training, despite the fact that the course occurred when Plaintiff was out on medical leave

---

[20] According to the BPD, "[i]t appears that the Fourth Charge was merged with the Third Charge." ECF 25-3 at 4 n.4. And, the BPD calls Charge No. 531-2022-02786 the "Fourth Charge," *id.* at 3–4, even though it preceded Charge No. 531-2022-02617 by several months. *See* ECF 24, ¶ 133 (stating that Charge No. 531-2022-02786 was filed on June 9, 2022); ECF 25-6 (showing that Charge No. 531-2022-0617 was filed on October 12, 2022).

with a due date of July 15, 2022 . . . ."  ECF 24, ¶ 168.  According to plaintiff, a later investigation report "stated that the E-Learning training was not completed by September 22, 2022," even though, "according to Plaintiff's Acadis records, the Performance Evaluation Training was completed and passed on September 15, 2022."  *Id.* ¶ 169.

On October 28, 2022, "after approximately a month of having to pump in her car under extreme stress despite the bad weather conditions, and weeks of her complaints and efforts to receive adequate accommodations, Plaintiff . . . received an email from Major Velte informing her that her lactation accommodations had been approved."  *Id.*  ¶ 166.  However, according to plaintiff, "[d]espite the eventual provision of accommodations" the delay in providing accommodations, her removal from her office, change in duties, and lack of relief on her breaks "caused [her] extreme discomfort, embarrassment, and distress."  *Id.* ¶ 167.  Plaintiff maintains that she "still is not able to get proper relief when she is working to pump her milk."  *Id.*

Plaintiff complains that she has been suspended since January 28, 2021, even though the Grand Jury has declined to indict her, and none of the disciplinary charges against her have been sustained.  *Id.* ¶ 170.  She alleges that she "has been involuntarily transferred to the Southern District Patrol and is not able to achieve a subsequent transfer to another position; has been denied reasonably [sic] and legally required accommodations for lactation following her pregnancy and delivery, and has experienced retaliation not only in the form of frivolous personnel actions against herself but also against her husband Det. Yampierre."  *Id.*

Additional facts are discussed, *infra*.

### III.  Standard of Review

The Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, a motion for summary judgment under Rule 56. *See* ECF 25. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d)*; see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (per curiam).

A court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so. *See Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give

notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.' ") (citation omitted). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165–67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co*., 637 F.3d at 448-449; *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Md. Dep't of Trans*., 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons,

it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted*), rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x 378 (4th Cir. 2013) (per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional

discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (internal citations omitted). Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id*. at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).

Curiously, plaintiff has not filed an affidavit under Rule 56(d). Nevertheless, plaintiff opposes the consideration of the Motion as one for summary judgment. ECF 32 at 2.

In my view, given that no discovery has taken place, it is not appropriate to construe the Motion as one for summary judgment. As the Fourth Circuit said in *McCray v. Md. Dep't of Trans*., 741 F.3d 480, 483 (4th Cir. 2014), "[s]ummary judgment before discovery forces the non-moving party into a fencing match without a sword or mask."  Moreover, plaintiff's claims implicate questions of intent and motive.  In general, defendant is in control of at least some of the relevant facts as to these issues. *See Tate v. Parks*, 791 F. App'x 387, 392 (4th Cir. 2019) ("[A]llowing a party enough time for discovery before summary judgment is particularly important when the other party has exclusive control of the relevant facts and when the case presents questions about intent and motive.") (internal citation omitted). Moreover,

Therefore, I shall construe the Motion as one to dismiss. This implicates Rule 12(b)(6).

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable*

*Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304–05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

To resolve a Rule 12(b)(6) motion, the question for the court is whether the plaintiff has stated a plausible claim for relief. *Twombly*, 550 U.S. at 570. With regard to a discrimination claim under Title VII, a plaintiff is not required to plead a prima facie case of discrimination. *McCleary-Evans v. Md. Dep't of Transportation*, 780 F.3d 582, 584-85 (4th Cir. 2015), *cert. denied*, 557 U.S. 1138 (2016); *see Felder v. MGM National Harbor, LLC*, 2022 WL 2871905, at *1 (4th Cir. July 21, 2022) (per curiam). "Instead, a plaintiff must allege sufficient facts 'to satisfy the elements of a cause of action created by [the applicable] statute.'" *Felder*, 2022 WL 2871905, at * 1 (quoting *McCleary-Evans*, 780 F.3d at 585) (alteration in *Felder*). Therefore, to survive a motion to dismiss, a plaintiff must "plausibly allege" discriminatory conduct because of her protected status, such as race or sex. *Felder*, 2022 WL 2871905, at *1; *see* 42 U.S.C. § 2000e-2(a)(1).

In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the prima facie case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973), "is an evidentiary standard, not a pleading requirement." Further, the Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Swierkiewicz*, 534 U.S. at 511. Therefore, "an employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id*. at 515; *see also Laurent-Workman v. Wormuth,* 54 F.4th 201, 210 (4th Cir. 2022); *Bing*, 959 F.3d at 616; *McCleary-Evans*, 780 F.3d at 584.

However, as the Second Circuit has observed, the Supreme Court's holding in Swierkiewicz is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544. *See Littlejohn v. Cty. of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory

intent." *Id*. at 309. On the other hand, in *Twombly* the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of *Twombly* is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]" *See Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x. 745, 747–48 (4th Cir. 2017) ("While a plaintiff need not plead a prima facie case to survive a motion to dismiss, a Title VII complaint is still subject to dismissal if it does not meet the ordinary pleadings standard under *Twombly* and *Iqbal*." (internal citations omitted)); *see also Holloway v. Maryland*, 32 F.4th 293, 298–99 (4th Cir. 2022); *McCleary*, 780 F.3d at 584; *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).

In other words, at the motion to dismiss stage the question "is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing v. Brivo Sys.*, *LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (quoting *Coleman*, 626 F.3d at 190). To that end, reference to the prima facie case informs a court's evaluation of a motion to dismiss. *See Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 314 (2015); *see also Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1300-01 (N.D. Cal. 2020) ("When a plaintiff does not plead a prima facie case, courts still look to the elements of the prima facie case 'to decide, in light of judicial experience and common sense, whether the challenged complaint contains sufficient factual matter, accepted as true, to state a claim for relief

that is plausible on its face.'") (citation omitted). However, the Fourth Circuit has "cautioned that 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable' . . . ." *Felder*, 2022 WL 2871905, at *1 (quoting *Woods*, 855 F.3d at 652).

It is well settled that a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of her opposition briefing. *See, e.g., De Simone v. VSL Pharmaceuticals*, 36 F.4th 518, 531 (4th Cir. 2022) (recognizing that, generally, new arguments cannot be raised in a reply brief); *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

Moreover, at the Rule 12(b)(6) stage, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); ac*cord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only]

to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint as well as the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); A*nand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979, 125 S.Ct. 479, 160 L.Ed.2d 356 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). The court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has

adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id*. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id*.

Under limited circumstances, however, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods*, 855 F.3d at 642; *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). For a document to be integral, a "plaintiff's claims must turn on, or otherwise be based on, the contents of the document." *Brentzel v. Fairfax Transfer and Storage, Inc.*, 2021 WL 6138286, at *2 (4th. Cir. Dec. 29, 2021) (per curiam) (citing *Goines*, 822 F.3d at 166). Further, to be "integral," a document must be one "that by its 'very existence, and *not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

44

322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips*, 572 F.3d at 180.  However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

"In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions."  *Campbell v. Mayorkas*, MOC-20-697, 2021 WL 2210895, at *1 n.3 (W.D.N.C. July 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)).

Based on the principles outlined above, I may consider the documents submitted with defendant's Motion, because they are referenced in or otherwise integral to the Second Amended Complaint, and plaintiff agrees they "are authentic documents and are incorporated by reference in her Complaint." ECF 32-1 at 3. The documents are the Second Charge (ECF 25-5); the Third Charge (ECF 25-6); the Declination Letter (ECF 25-7); BPD Policy 1726 (ECF 25-8); Danika Yampierre's 2020 FMLA Package (ECF 26-1); Sean Yampierre's 2020 FMLA Package (ECF 26-2); and Danika Yampierre's 2021 FMLA Package (ECF 26-3).

I shall also consider the first EEOC Charge (ECF 7-2). It was included as an exhibit with the defendant's initial motion to dismiss. And, defendant references the First Charge in the Motion. *See* ECF 25-1. Thus, just as I chose to take judicial notice of the First Charge in my prior Opinion, *see* ECF 11 at 32–33, I shall do so again.

## IV. Discussion

### A.   Title VII Claims (Count I, Count II, Count IV, Count VI)

Yampierre alleges that the BPD violated Title VII by discriminating against her on the basis

of race (Count I), sex (Count II), and pregnancy (Count VI); and by retaliating against her for the

exercise of rights protected by Title VII (Count IV).  The BPD has moved to dismiss Counts I, II,

IV, and VI.[21]  Before evaluating the parties' arguments, I shall first review general legal principles

with respect to Title VII.

### 1.   General Principles

Title VII prohibits an employer from discriminating against "any individual with respect

to [her] compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin," and from "limit[ing], segregat[ing], or

classify[ing] . . . employees or applicants from employment in any way which would deprive or

tend to deprive any individual of employment opportunities or otherwise affect his status as an

employee, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. §

2000e–2(a). "These two proscriptions, often referred to as the 'disparate treatment' (or 'intentional

discrimination') provision and the 'disparate impact' provision, are the only causes of action under

Title VII." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015).

"In . . . 'disparate treatment' cases, which involve 'the most easily understood type of

discrimination,' the plaintiff is required to prove that the defendant had a discriminatory intent or

motive." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986 (1988) (quoting *Teamsters v.*

*United States*, 431 U.S. 324, 335 n.15 (1977)).  As discussed below, at trial a plaintiff may establish

---

[21] As noted, I previously denied the BPD's motion to dismiss Count III, in which plaintiff
asserts sexual harassment (hostile work environment).  ECF 11 at 61.  Because the Motion does
not challenge Count III, the claim is not in issue here.

disparate treatment "through two avenues of proof." *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284 (4th Cir. 2004), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.* 557 U.S. 167 (2009).

A plaintiff "may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex or age discrimination motivated the employer's adverse employment decision." *Id.* Alternatively, a plaintiff may proceed under the framework outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This is "a 'pretext' framework, under which the [plaintiff], after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285 (citing *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981); *McDonnell Douglas Corp.*, 411 U.S. at 807)). But, "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext) . . . '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill*, 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000)).

To establish a prima facie case of disparate treatment under Title VII, the plaintiff must demonstrate "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc., Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d at 190); *see Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018).

However, "'an employment discrimination plaintiff need not plead a prima facie case of discrimination' to survive a motion to dismiss." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)).  Instead, a plaintiff need only "offer facts that plausibly support inferences that" the elements of her claim are satisfied. *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022).  Put another way, a plaintiff's "complaint must 'state a plausible claim for relief' that 'permits the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 508 (D. Md. 2019) (quoting *Coleman*, 626 F.3d at 190).

Unlike in a disparate treatment case, in a disparate impact case, "a plaintiff need not necessarily prove intentional discrimination in order to establish than an employer violated" Title VII.  *Watson*, 487 U.S. at 986.  Instead, a plaintiff may prove a violation by demonstrating that "policies or practice that are neutral on their face and in intent . . . nonetheless discriminate in effect against a particular group." *Teamsters*, 431 U.S. at 349. "The evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities."  *Watson*, 487 U.S. at 987.

Title VII also prohibits an employer from retaliating against an employee for "participating in a Title VII proceeding or opposing an employer's discriminatory practices." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *see* 42 U.S.C. § 2000e-3; *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 410–411 (4th Cir. 2022).  In particular, 42 U.S.C. § 2000e-3 states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter [Title VII], or because [the employee]

has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

To state a claim for retaliation, a plaintiff must allege "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'" *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted); *see also Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 653 (4th Cir. 2021); *Roberts v. Glenn Indus. Grp.*, 998 F.3d 111, 122 (4th Cir. 2021); *Kitlinski v. U.S. Dep't of Justice*, 994 F.3d 224, 232 (4th Cir. 2021); *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018); *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016).

And, Title VII provides a right of action for employees who are subjected to a hostile work environment on the basis of their membership in a protected class.  To state a  claim for hostile work environment under Title VII, a plaintiff must allege that there was: "'(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race [, color, sex, religion, or protected activity]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (quoting *Okoli*, 648 F.3d at 220); *see McIver*, 42 F.4th at 407.  "Hostile environment claims are different in kind from discrete acts," because "[t]heir very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

Section 701(k) of Title VII contains the Pregnancy Discrimination Act, enacted by Congress in 1978.  The PDA amended Title VII's definition of sex discrimination to include employment discrimination "because of or on the basis of pregnancy, childbirth, or related medical

conditions[.]"  42 U.S.C. § 2000e(k).  The PDA provides that "women affected by pregnancy . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  42 U.S.C. § 2000e(k).  In *Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015), the Supreme Court held, *id.* at 210, that the PDA "requires courts to consider the extent to which an employer's policy treats pregnant workers less favorably than it treats nonpregnant workers similar in their ability or inability to work."  "Thus, a plaintiff alleging that the denial of an accommodation constitutes disparate treatment under the [PDA's] second clause may make out a prima facie case by showing . . . that she belongs to a protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did not accommodate others 'similar in their ability or inability to work.'" *Id.* at 229.

In any case, before filing suit under Title VII, a plaintiff must exhaust administrative remedies.  *See Patterson v. McLean Credit Union,* 491 U.S. 164 (1989), *superseded on other grounds by* 42 U.S.C. § 1981(b); *see also Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 384 (4th Cir. 2022); *McCray v. Md. Dep't of Trans.*, 662 F. App'x 221, 224 (4th Cir. 2016); *Bryant v. Bell Atlantic, Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).  To do so, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of "the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e–5(e)(1); *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004).  This period is extended to 300 days in a deferral state, such as Maryland.  *See Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *4, n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols.*, Inc., 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F App'x 256 (4th Cir. 2008).

Moreover, "a complainant is entitled to a 'right-to-sue' notice 180 days after the charge is filed."  *Fort Bend Cty. v. Davis*, ___U.S.___, 139 S. Ct .1843, 1847 (2019) (citing § 20003-5(f)(1);

29 CFR § 1601.28.)  "And within 90 days following such notice, the complainant may commence a civil action against the allegedly offending employer."  *Id.* at 1847 (citing § 2000e-5(f)(1)).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).  Rather, it advances the "twin objectives" of "protecting agency authority in the administrative process and promoting efficiency in the resolution of claims." *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks, alterations, and citation omitted).  It "'ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible.'" *Cowgill*, 41 F.4th at 384 (citation omitted).  If an employee fails to exhaust her administrative remedies, she is generally barred from filing suit.  *See*, *e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Bryant*, 288 F.3d at 132.

However, exhaustion under Title VII is not jurisdictional.  It is, instead, a "claim-processing rule [ ] that must be timely raised to come into play." *Fort Bend Cty.*, 139 S. Ct. at 1846, 1850.  Although a defendant may waive arguments related to administrative exhaustion, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6).  *See Kenion v. Skanska USA Bldg., Inc.*, RBD-18-3344, 2019 WL 4393296, at \*4 (D. Md. Sept. 13, 2019) (discussing the import of *Fort Bend Cty.*).

Nevertheless, the administrative exhaustion process has substantive effect.  Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims named in the administrative charge.  *See* 42 U.S.C. § 2000e–5(f)(1); *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012); *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996).  Thus, "when the claims in [the] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are

procedurally barred." *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508). To illustrate, the Fourth Circuit has stated that a "'claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.'" *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 161 (4th Cir. 2018) (quoting *Chacko*, 429 F.3d at 509) (ellipsis in *Nnadozie*).

That said, the EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination[.]'" *Miles*, 429 F.3d at 491 (citation omitted); *see Chacko*, 429 F.3d at 512. And, because "EEOC charges often are not completed by lawyers," the Fourth Circuit has instructed courts to "construe them liberally." *Chacko*, 429 F.3d at 509; *see Sydnor*, 681 F.3d at 594 ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs."). Thus, a federal court may hear a claim that was not presented to the EEOC so long as it is "'reasonably related'" to the plaintiff's EEOC charge "'and can be expected to follow from a reasonable administrative investigation . . . .'" *Sydnor*, 681 F.3d at 594 (quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000)); *see also Cowgill*, 41 F.4th at 384; *Stewart*, 912 F.3d at 705.

### 2. Analysis

### (a) Discrimination (Count I, Count II, Count VI)

As noted, plaintiff advances claims of race discrimination (Count I), sex discrimination (Count II), and pregnancy discrimination (Count VI). These claims were considered in the Memorandum Opinion (ECF 11) and Order (ECF 12) of August 18, 2022. There, I determined, *inter alia*, that the allegations that plaintiff was (1) reprimanded by Lt. Effland and Lt. Pearson,

(2) pressured by Lt. Pearson and Director Reynolds to assume a light duty assignment that would have required her to transfer from the Unit, and (3) subjected to harassment when several BPD officers filed internal complaints against her, did not support a conclusion that she was subject to adverse employment action. *See* ECF 11 at 48–52.  Although I concluded that Director Reynolds's alleged revocation of plaintiff's supervisory responsibilities qualified as an adverse employment action, I found that plaintiff failed to allege facts sufficient to support a conclusion that the revocation was performed with discriminatory animus. *Id.* at 52.  Therefore, I dismissed plaintiff's claims for race and pregnancy discrimination, without prejudice, and with leave to amend. *Id.* at 53.

In addition, I concluded that, insofar as "sexual harassment is a species of sex discrimination" under Title VII, plaintiff's allegation that she was subject to sexual harassment by Lt. Pearson in the fall of 2019 adequately supported a claim for sex discrimination. *Id.*  However, I found that plaintiff failed to plead that Lt. Pearson's alleged harassment resulted in an adverse employment action. *Id.* at 54.  Moreover, I observed that, to the extent that plaintiff's sex discrimination claim rested entirely on allegations of sexual harassment by Lt. Pearson, it appeared to be duplicative of Count III, which alleged "sexual harassment (hostile work environment)." *Id.* at 53 n.21.  But, I afforded plaintiff an opportunity to amend Count II to include allegations of adverse employment action that would distinguish her claim of sex discrimination in Count II from her claim of sexual harassment in Count III. *Id.* at 54.

I also concluded that, under the 300-day limitations period established by 42 U.S.C. § 2000e-5(e)(1), Yampierre could "not rely on alleged discriminatory conduct that occurred . . . before July 16, 2019." *Id.* at 46.  Moreover, I concluded that she could not rely on conduct that allegedly occurred *after* she filed her Charge on May 11, 2020. *Id.* at 47.

Plaintiff has since amended her suit to include additional allegations in support of her discrimination claims. Plaintiff now alleges, *inter alia*, that six similarly-situated white male BPD employees "knowingly disseminated confidential information" but were not "subjected to termination." ECF 24 ¶ 131.  Further, she alleges that three "similarly-situated Officers"—two white males, and one Black male—"have received better treatment than Plaintiff under similar circumstances." *Id.* ¶ 132.  And, in support of her pregnancy discrimination claim, plaintiff alleges that she was removed from her private office to work at the front desk on September 21, 2022, and denied lactation accommodations for more than a month after requesting them on September 23, 2022.  *Id.* ¶¶ 142–167. Moreover, in an apparent effort to add to the discriminatory acts that this Court may consider, plaintiff alleges that she filed additional Charges of Discrimination with the EEOC. *Id.* ¶ 9; *see* ECF 25-5 (Second Charge); ECF 24, ¶ 133 (Third Charge); ECF 25-6 (Fourth Charge).

In moving to dismiss the discrimination claims, ECF 25, the BPD argues, first, that under Title VII's exhaustion rule, the Court may not consider facts alleged to have occurred between May 12, 2020, and March 16, 2021.  ECF 25-3 at 7–8.  According to the BPD, discriminatory acts alleged to have occurred between May 12, 2020 and March 16, 2021, post-date the First Charge and pre-date the Second Charge by more than 300 days.  *Id.* at 8.  In contrast, the BPD accepts that the Court may consider conduct alleged to have occurred in the 300 days preceding the First Charge, filed on May 11, 2020—that is, conduct that occurred between July 16, 2019 and May 11, 2020, as well as conduct alleged to have occurred in the 300 days preceding the Second Charge, filed on January 11, 2022—that is, between March 17, 2021 and January 11, 2022.  *Id.*

According to the BPD, dismissal is also warranted because plaintiff has failed to allege an adverse employment action and disparate or discriminatory treatment.  *Id.* at 8–17.  The BPD

asserts that Yampierre's "new allegations" that (1) Lt. Pearson attempted to coerce her into participating in overtime fraud, (2) the BPD's Medical Unit investigated her for medical leave abuse, (3) Lt. Sean Mahoney wanted to reopen internal investigations targeting her, (4) she was recommended for termination for having interfered with Grand Jury proceedings, and (5) she was the subject a complaint for failing to complete an E-training program, are all insufficient to plead an adverse employment action. *Id.* at 9–13.  In particular, the BPD argues that plaintiff does not "allege that she suffered any loss of income, rank, or benefits as result of" Lt. Pearson's alleged coercion. *Id.* at 10.  And, the BPD asserts that plaintiff's remaining allegations concern internal investigations that do not constitute adverse employment actions. *Id.* at 9, 11–13.

In addition, the BPD argues that, "[e]ven if Yampierre did suffer an adverse employment action, she fails to plead discriminatory treatment." *Id.* at 13.  According to the BPD, the comparators Yampierre identifies in support of her claim that she was subject to disparate investigation for Grand Jury interference are not "similarly situated in all relevant respects," because none had "committed the crime of obstructing justice by interfering with a Grand Jury investigation." *Id.* at 13.  And, according to the BPD, the other comparators identified by plaintiff are similarly inapposite, because none had demonstrated plaintiff's "inability to supervise," and none "were subject to the same standards, or . . . the same supervisors." *Id.* at 16–17.

In response to the BPD's contention that this Court may not consider events alleged to have occurred between May 12, 2020, and March 16, 2021, Yampierre asserts: "Plaintiff's claims from May 12, 2020 to the present . . . are in fact subject to the continuing violation doctrine."  ECF 32-1 at 5.  With respect to the BPD's assertion that plaintiff has failed to plead an adverse employment action, she argues: "She has been subjected to frequent, continuing investigations . . . suspended from work . . . threatened with termination . . . repeatedly denied accommodations both during her

pregnancy and for her lactation needs," and, "[w]ithout reason . . . removed from her private office." *Id.* at 7.  And, plaintiff insists that she "has provided sufficient factual allegations to establish that similarly situated employees who were outside of her protected class were treated more fairly." *Id.* 7–8.

In its Reply, the BPD argues that Yampierre "misunderstands," and therefore fails to meet, "the requirements for establishing a plausible claim of pregnancy discrimination under Title VII." ECF 35 at 4–5.  The BPD states that, "as Yampierre concedes, BPD provided her with lactation accommodations approximately one month after she submitted her request." *Id.* at 5.  Moreover, according to the BPD, "[w]hen attempting to base a claim on the failure to provide a clean, private space to accommodate her lactation needs, Yampierre must identify a similarly situated comparator who was provided with those facilities as an accommodation for a disability." *Id.*  "It is not enough," the BPD argues, "for Yampierre to allege that her office was given to a White male officer when she needed it as an accommodation due to her pregnancy." *Id.*  Instead, the BPD asserts, "[s]he must allege . . . that such accommodations were provided to others who required them." *Id.*

I begin with the BPD's argument that the Court may not consider discriminatory acts alleged to have occurred between May 12, 2020, and March 16, 2021.  To exhaust a claim for discrimination, a complainant in Maryland must file a charge of discrimination within 300 days of when "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see* *Garnes*, 2018 WL 276425, at *4, n.8.  Otherwise, a complainant "lose[s] the ability to recover for" the alleged act of discrimination.  *Morgan*, 536 U.S. at 110.  Moreover, as I explained in my previous Memorandum Opinion (ECF 11), discrimination claims that arise from events that *post-date* an EEOC charge "must be exhausted by a subsequent EEOC charge." *Id.* at 46 (quoting

*Brooks v. United Parcel Service, Inc.*, DKC-20-2617, 2021 WL 4339194, at *6 (D. Md. Sept. 23, 2021)).

Here, the plaintiff filed four charges: the First Charge on May 11, 2020 (ECF 7-2); the Second Charge on January 11, 2022 (ECF 25-5); the Third Charge on June 9, 2022 (ECF 24 ¶ 133); and the Fourth Charge on October 12, 2022 (ECF 25-6).  This means that the 300-day exhaustion period attributable to the First Charge ended on May 11, 2020, and that the 300-day exhaustion period attributable to the Second Charge began on March 17, 2021.  Therefore, I agree with the BPD that alleged acts of discrimination that occurred between May 12, 2020 and March 16, 2021, are not properly before the Court.

Plaintiff may not excuse this failure to exhaust by invoking the "continuing violation" theory with respect to her discrimination claims.  That theory does not apply where, as here, a plaintiff alleges a series of discrete discriminatory acts.  *See Morgan*, 536 U.S. at 110 ("A discrete retaliatory or discriminatory act 'occurred' on the day it 'happened.'  A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it.").  In particular, in *Morgan*, 536 U.S. at 114, the Supreme Court reversed the Ninth Circuit's holding "that so long as one act falls within the charge filing period, discriminatory and retaliatory acts that are plausibly or sufficiently related to the act may also be considered," even though they fall outside the charge period.  Instead, the Court concluded that because "[e]ach incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice,'" a complainant "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period."  *Id.*

To be sure, the Court in *Morgan* authorized courts to consider acts outside the charge period when evaluating a hostile workplace claim.  *Id.* at 115–118.  However, the BPD's exhaustion

argument is addressed only to plaintiff's discrimination claims.  Therefore, the Court's proviso for hostile workplace claims is irrelevant for present purposes.

In any event, I am satisfied that declining to consider discriminatory acts alleged to have occurred between May 12, 2020 and March 16, 2021, will not affect my evaluation of the SAC's sufficiency.  In particular, allegations from the excluded time period occupy about 23 paragraphs out of the 272 paragraphs in the SAC and are substantially duplicative of properly pleaded allegations.  *See* ECF 24-1, ¶¶ 79–103.

The Court next considers whether plaintiff's properly pleaded allegations support a claim for race, sex, or pregnancy discrimination under Title VII.  As noted, to establish a prima facie case under Title VII, a plaintiff must show "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'"  *Goode*, 807 F.3d at 626 (quoting *Coleman*, 626 F.3d at 190, *aff'd*, 566 U.S. 30 (2012)); *see Matias*, 780 F. App'x at 31; *Rayyan*, 719 F. App'x at 203.  Although a plaintiff need not plead a prima facie case of discrimination to withstand a motion to dismiss, a plaintiff must, at least, "offer facts that plausibly support inferences that" the elements of her claim are satisfied.  *Laurent-Workman*, 54 F.4th at 210.

The BPD does not dispute that plaintiff has sufficiently alleged that she is a member of a protected class, and for good reason.  *See* ECF 24, ¶ 174 ("Plaintiff is a member of a protected class as an African American woman.").  Nor does the BPD argue that Yampierre has failed to allege satisfactory job performance.  However, according to the BPD, plaintiff has failed to allege an adverse employment action.

An adverse employment action "affects the terms, conditions, or benefits of the plaintiff's employment."  *Holland v. Wash. Homes, Inc.* 487 F.3d 208, 219 (4th Cir. 2007).  It is an action

that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 337, 321 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also Laird v. Fairfax Cnty., Va.*, 978 F.3d 887, 893 ("For a discrimination claim, the plaintiff must show that her employer took an action that adversely 'affect[ed] employment or alter[ed] the conditions of the workplace.'") (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006)).

Plaintiff argues that she suffered an adverse employment action when the BPD "subjected [her] to frequent, continuing, investigations," suspended her from work, and threatened her with termination.  ECF 32-1 at 6–7.  In my view, the alleged conduct does not amount to adverse employment action.[22]

In my previous Memorandum Opinion, I rejected plaintiff's contention that she asserted an adverse employment action by alleging that she was the subject of internal investigations.  ECF 11 at 51–52. In particular, I explained that an allegation of "disparate investigation" is insufficient to state a claim under Title VII if the plaintiff does not also allege "that the investigation resulted in some form of employment injury."  *Id.* at 51 (citing *Jenkins v. Balt. City Fire Dep't*, 862 F. Supp. 2d 427, 446 (D. Md. 2012), *aff'd* 410 F. App'x 192 (4th Cir. 2013) (per curiam)).  Plaintiff makes no such allegations here.  Therefore, I conclude that plaintiff's allegations that she was investigated for medical leave abuse, *see* ECF ¶ 110, for interfering with a Grand Jury investigation, *id.* ¶ 125,

---

[22] My conclusion that the BPD's alleged misconduct does not amount to adverse employment action does not mean that Yampierre cannot pursue redress for this alleged misconduct under a different legal theory.  Indeed, many of plaintiff's allegations, although insufficient as allegations of adverse employment action, may be relevant to her hostile workplace claim.

and for failing to attend mandatory training, *id.* ¶ 169, do not suffice as allegations of adverse employment action.

Nor does plaintiff's alleged suspension constitute an adverse employment action. The nature and terms of plaintiff's alleged suspension are poorly described in the SAC.  But, the SAC indicates that plaintiff has, in fact, continued to work for the duration of the suspension.  ECF ¶ 170 (stating that plaintiff has been suspended since January 28, 2021). The SAC does not make clear in what respect, if any, plaintiff was "suspended."  In any event, plaintiff does not allege that the suspension has caused her a significant detriment, such as loss of pay.  Because paid leave "does not constitute adverse employment action for purposes of Title VII," plaintiff's alleged suspension, such as it is, does not qualify as an adverse employment action. *Nzabandora v. Rectors & Visitors of Univ. of Va.*, 749 F. App'x 173, 175 (4th Cir. 2018) (citing *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) ("A paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision.")).

Moreover, plaintiff's threatened termination is not an adverse employment action.  Indeed, a "proposed termination" is not an adverse action even under the "less strenuous" standard that applies to adverse action in a retaliation claim. *Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013); *see also Rock v. McHugh*, 819 F. Supp. 2d 456, 470 (D. Md. 2011) (concluding that there was "no precedent to support" the plaintiff's contention that a "proposed termination," as distinguished "from his actual termination," constituted an adverse action).

It follows that plaintiff's allegation that she was recommended for termination—but not actually terminated—for having interfered with a Grand Jury investigation does not suffice as an allegation of adverse employment action.

Plaintiff also claims that she was reassigned from her "data entry" position and as a "missing persons liaison" to the front desk, where she was responsible for supervising other officers. ECF 24, ¶ 142. According to plaintiff, this reassignment created a "safety issue," because it meant that she would be "the first line of defense at the front desk." *Id.* ¶ 143.[23]

"[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.'" *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) (quoting *Boone v. Goldin*, 178 F.3d 253, 256–257 (4th Cir. 1999)). By contrast, a reassignment can "'form the basis of a valid Title VII claim if the plaintiff'" alleges "'that the reassignment had some significant detrimental effect.'" *Id.* (quoting *Boone*, 178 F.3d at 256).

In *Boone*, 178 F.3d at 255, an electrical engineer employed by the National Aeronautics and Space Administration alleged that her reassignment to a "14-foot-by-22-foot wind tunnel" qualified as an adverse employment action under Title VII. In particular, the plaintiff "claim[ed] that poor working conditions in the wind tunnel made it an undesirable place to work, and that transfer to it thus constituted a significant or material change in her working conditions sufficient to rise to the level of an adverse employment action." *Id.* The Fourth Circuit disagreed, concluding that the plaintiff's "assertion . . . that the work in the wind tunnel was unfamiliar and more

---

[23] This is a curious assertion for a police officer. It is also surprising to the extent that plaintiff suggests that although other officers may be put in harm's way, she should not be placed in that situation.

stressful" could not "support a claim of discrimination under Title VII." *Id.* at 256.  The Court explained that "Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment." *Id.*

Therefore, plaintiff's allegations concerning her reassignment to the front desk do not suffice to constitute an adverse employment action. If anything, plaintiff has alleged that her reassignment *increased* her level of responsibility, insofar as it made her responsible for supervising other officers at the desk, a seemingly more substantial duty than "data entry." Moreover, plaintiff's concern for her safety, although certainly not "trivial," is a concern "endemic to employment" with a police department. *See Boone*, 178 F.3d at 256.  As such, it cannot provide a basis for concluding that her reassignment to the front desk was an adverse employment action.

In sum, I recognized in my previous Memorandum Opinion that Director Reynolds's alleged revocation of plaintiff's supervisory duties constituted an adverse employment action. ECF 11 at 52.  But, plaintiff has otherwise failed to plead any additional adverse employment actions.

The question remains whether plaintiff has adequately alleged that Director Reynolds's alleged revocation of plaintiff's supervisory responsibilities was discriminatory in nature.  As noted, a plaintiff can prove discriminatory motive either by adducing direct or circumstantial evidence that the employer acted with discriminatory intent, or by demonstrating, as part of a prima facie case, that the employer treated the employee differently from similarly-situated employees outside the employee's protected class. *See Hill*, 354 F.3d at 284.  Whatever the plaintiff's chosen means of proof, "'[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *See Hill*, 354 F.3d at 286 (quoting *Reeves*, 530 U.S. at 153)).

Although a plaintiff need not allege a prima facie case of discrimination to survive a motion to dismiss, a plaintiff's "complaint must 'state a plausible claim for relief' that 'permits the court to infer more than the mere possibility of misconduct . . . .'" *Brennan*, 361 F. Supp. 3d at 508 (quoting *Coleman*, 626 F.3d at 190). Therefore, the Court must consider whether any of plaintiff's various allegations of discriminatory intent or differential treatment create "more than the mere possibility" that Director Reynold's alleged revocation of her supervisory responsibilities was the result of intentional discrimination. *Id.*

As mentioned, plaintiff has alleged that certain similarly-situated officers outside of plaintiff's protected class were not "subjected to termination," despite having "knowingly disseminated confidential information." ECF 24, ¶ 131. This allegation follows plaintiff's statement that IAD "recommended [her] for termination due to Det. Cook's choice in informing her of BPD's retaliatory motives," and appears to suggest that IAD's motive in recommending her for termination was discriminatory. *Id.* However, plaintiff's allegation of differential treatment by IAD is unrelated to Director Reynolds's alleged revocation of her supervisory duties. Director Reynolds is described as a member of plaintiff's "unit[]" and is not otherwise alleged to be affiliated in any way with IAD. *Id.* ¶ 36. Therefore, plaintiff's allegations in paragraph 131 of disparate treatment by IAD provide no basis for concluding that Director Reynolds acted with discriminatory intent.

The only possible adverse employment action to which the comparison proffered in paragraph 131 might relate is IAD's recommended termination of plaintiff's employment. However, as discussed, a proposed or recommended termination, as distinguished from an actual termination, does not suffice as an adverse employment action. *See Wonasue*, 984 F. Supp. 2d at 492; *Rock*, 819 F. Supp. 2d at 470. Absent any allegation of an adverse employment action related

to the comparison proffered in paragraph 131, plaintiff's allegation of differential treatment with respect to officers outside her protected class who "knowingly disseminated confidential information," ECF 24, ¶ 131, can provide no basis for relief.

In any event, Yampierre has not provided "a plausible basis for believing" that plaintiff and the comparators identified in paragraph 131 of the SAC "were actually similarly situated." *Coleman*, 626 F.3d at 191.  To be sure, "a comparison between similar employees 'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances.'"  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)).  "Rather, to establish [or allege] a valid comparator, the plaintiff must produce evidence [or allege] that the plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Haynes*, 922 F.3d at 223–24 (quoting *Haywood v. Locke,* 387 F. App'x 355, 359 (4th Cir. 2010)).

Measured by this standard, Yampierre's allegation of differential treatment in paragraph 131 of the SAC is clearly insufficient.  Yampierre does not allege that she and the six proposed comparator-officers had the same supervisor(s), nor does she specify who or what entity decided how to punish the comparator-officers, let alone that the same person or entity responsible for punishing the comparator-officers also recommended her termination.  ECF 24, ¶ 131.  Moreover, Yampierre does not allege that she and the comparator-officers were subject to the same standards. *Id.*  Most decisive, however, is that Yampierre fails to allege that any of the comparator-officers committed wrongdoing as serious as the wrongdoing for which IAD recommended her termination, namely, Grand Jury interference.

In particular, the State's Attorney for Baltimore City sent a letter to IAD on November 30, 2021, noting "serious concerns about the [plaintiff's] integrity."  ECF 25-7 at 2.  The State's Attorney explained: "[A]s your detectives know, we developed intel that strongly suggested that [Yampierre] either attempted to interfere with [a] Grand Jury investigation, or, at a minimum, made inquiries into what was presented in front of the Grand Jury—either of which is wildly inappropriate."  *Id.*  Although the State's Attorney declined to prosecute Yampierre, the State's Attorney considered "the evidence [against her] strong," and "hope[d], *and expect[ed]*, that BPD [would] take appropriate administrative actions against" her.  *Id.* (emphasis in original).

By contrast, the comparator-officers proposed by Yampierre "stole overtime", "disseminated Deputy Commissioner Andre Bonaparte's arrest picture for personal gain", and "disseminated answers to a Sergeants test [sic]."  ECF 24, ¶ 131.  As in *Coleman*, 626 F.3d at 191, plaintiff does "not even allege . . . that any impropriety [on behalf of the proposed comparators] was comparable to the acts [plaintiff] was alleged to have committed."  "Absent such support, the complaint's allegations of race [or sex] discrimination do not rise above speculation."  *Id.*  For these reasons, Yampierre's allegation in paragraph 131 of the SAC does not provide a plausible basis to conclude that she was subject to differential treatment on the basis of her protected status.

Yampierre proffers additional comparators in paragraph 132 of the SAC, claiming that these comparators "received better treatment . . . under similar circumstances."  But, she does not specify the adverse employment action to which these allegations relate, nor does she provide any basis on which to conclude that they relate to Director Reynolds's alleged revocation of her supervisory duties.  Put simply, these allegations, as with the allegations in ECF 24, ¶ 131, do not relate to any adverse employment action.

Moreover, plaintiff's allegations in paragraph 132 of the SAC suffer many of the same defects as those in the preceding paragraph. Plaintiff does not identify the comparators' supervisors, does not allege that they were subject to the same standards, and does not allege that they committed comparable wrongdoing. *Id.*

To be sure, plaintiff alleges that Sgt. Ethan Newberg "was indicted last year on several charges for false imprisonment, misconduct and a plethora of other charges but has since returned to work full duty," and that "Lt. Naisha Garcia was promoted to Lieutenant, despite a sustained EEOC complaint against her for racial discrimination." *Id.* Although the wrongdoing allegedly committed by Sgt. Newberg and Lt. Garcia is serious, Yampierre's allegations are otherwise so threadbare that the Court cannot determine whether she is "similar in all relevant respects to [her] comparator[s]." *Haywood*, 387 F. App'x at 359. The Court is left to speculate, among other things, about the circumstances of the "EEOC complaint" that was "sustained" as to Lt. Garcia, the circumstances and outcome of Sgt. Newberg's indictment, and the reasons for which BPD declined to take more punitive action against Lt. Garcia and Sgt. Newberg for their alleged wrongdoing.

I decline to engage in such speculation. In my view, the comparisons plaintiff proffers in paragraph 132 of the SAC are so devoid of detail that they do not "'permit[] the court to infer [anything] more than the mere possibility of misconduct.'" *Brennan*, 361 F. Supp. 3d at 508 (quoting *Coleman*, 626 F.3d at 190).

Having concluded that plaintiff's allegations of less favorable treatment relative to similarly-situated officers outside her protected class are insufficient to permit an inference of discriminatory intent, the question is whether plaintiff alleges any other facts sufficient to permit such an inference. She does not.

The SAC is surfeited with factual allegations, many of which add little to the Court's understanding of the alleged discrimination. But, when it comes to the crucial question of discriminatory intent, the SAC is silent. At most, plaintiff alleges that "Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff," ECF 24, ¶ 188, and that "Plaintiff's sex was a determining factor in Defendant's unlawful conduct toward Plaintiff," *id.* ¶ 208. Such conclusory allegations are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

The SAC could be construed to allege that the decision to reassign Yampierre to the front desk was made with intent to discriminate against her on the basis of her status as a lactating mother. ECF 24, ¶ 151. However, the SAC suggests that Captain Brust ordered this reassignment *before* plaintiff informed him of her need for lactation accommodations. *Id.* ¶¶ 142–44. Moreover, the SAC does not contain any other allegations that could support a plausible inference that Director Reynolds revoked plaintiff's supervisory responsibilities with the intent to discriminate based on race or sex.

I turn to the question of whether plaintiff's allegation as to Lt. Pearson's alleged harassment of plaintiff states a claim for sex discrimination prohibited by Title VII. As indicated, in my previous Memorandum Opinion (ECF 11), I concluded that plaintiff's claim that she was subject to sex discrimination when Lt. Pearson allegedly sexually harassed her could proceed insofar as sexual harassment was a species of sex discrimination. *Id.* at 53. However, I also observed that, to the extent that plaintiff's sex discrimination claim rested entirely on allegations of sexual harassment, it appeared to be duplicative of Count III, which alleges sexual harassment. *Id.* at 53 n.21. Nevertheless, I permitted plaintiff to amend her Complaint to include allegations concerning

Lt. Pearson's alleged wrongdoing that would distinguish her sex discrimination and sexual harassment theories of liability. *Id.* at 54.

In particular, I noted that, to the extent plaintiff invoked a sex discrimination theory, she must allege facts showing that Lt. Pearson took an adverse employment action against her. *Id.* But, there are no such allegations in the SAC. Therefore, I shall consider plaintiff's allegations concerning Lt. Pearson to relate to her claim of sexual harassment in Count III, rather than to her claim of sex discrimination.

In sum, I conclude that plaintiff has alleged only one action that qualifies as an adverse employment action: Director Reynolds's alleged revocation of her supervisory duties. Nonetheless, I conclude that plaintiff has alleged no facts that support an inference that Director Reynolds took this action with discriminatory intent. Moreover, I conclude that plaintiff's allegations concerning sexual harassment by Lt. Pearson are properly considered in relation to a claim of sexual harassment, not sex discrimination. As a result, I shall dismiss Count II.

### (b) Retaliation (Count IV)

In my previous Memorandum Opinion, I allowed Yampierre's claim of retaliation to proceed "to the extent it is predicated on a job transfer, the loss of supervisory duties, the initiation of internal investigations of plaintiff, and any criminal investigation that followed." ECF 11 at 75. But, I "otherwise grant[ed]" the BPD's motion, without prejudice and with leave to amend. *Id.*

In the SAC, Yampierre alleges two additional forms of retaliation: (1) retaliation against her husband, ECF 24, ¶¶ 134–39, and (2) retaliation by way of an assignment change to the front desk and a resulting delay in lactation accommodations, *id.* ¶¶ 130–67. The BPD urges dismissal of Yampierre's retaliation claim insofar as it rests on these additional factual allegations. ECF 25-3 at 19.

However, the number of ways or times in which plaintiff may have been subjected to retaliation is beside the point at this juncture. What matters is whether plaintiff has stated a claim for retaliation. And, I previously held that she has. *See* ECF 11 at 75. Therefore, it is not necessary to decide here whether the additional allegations provide another basis for a claim of retaliation.

## B. FEPA (Count V)

In Count V, Yampierre alleges that the BPD violated the FEPA, Maryland's "state law analogue to Title VII." *Alexander v. Marriott Int'l, Inc.*, RWT-09-02402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011). She contends, in particular, that BPD violated FEPA by discriminating against her on the basis of her race and sex, ECF 24, ¶¶ 246–50.

Previously, I concluded that Yampierre failed to plead compliance with the notice requirement applicable to FEPA claims, which is set forth in the Local Government Tort Claims Act ("LGTCA"), Md. Code (2020 Repl. Vol., 2022 Supp.), § 5-304(b) of the Courts and Judicial Proceedings Article ("C.J."). ECF 11 at 89–93. For that reason, I dismissed Yampierre's FEPA claim, without prejudice and with leave to amend. *Id.* at 92.[24]

The BPD urges dismissal of the FEPA claim on two grounds. *See* ECF 25-3 at 19–22. The BPD first asserts that Yampierre has not rectified her failure to plead compliance with the LGTCA's notice requirement. *Id.* at 20. The BPD acknowledges that Yampierre now alleges that she satisfied the LGTCA's notice requirement by "fil[ing] her EEOC Charge detailing her injury at the hands of [the BPD] by January 2020." *Id.* (quoting ECF 24, ¶ 251). However, according to the BPD, Yampierre's allegation that she filed an "EEOC Charge" in January 2020 is contradicted by her allegations elsewhere in the SAC that she filed a *pre-charge inquiry* with the EEOC—but

---

[24] The BPD had also asserted sovereign immunity as to the FEPA claim. But, I did not consider that issue because I dismissed the claim on other grounds. ECF 11 at 92.

not the charge itself—on January 9, 2020.  *Id.*  And, the BPD posits that a pre-charge inquiry does not satisfy the LGTCA's notice requirement. ECF 35 at 9.

Second, the BPD argues that, with respect to the FEPA claim, it enjoys sovereign immunity.  According to the BPD, the BPD "'exists as an agency of the State, and therefore enjoys the common law sovereign immunity from tort liability of a State agency."  ECF 25-3 at 20 (quoting *Baltimore Police Dep't v.  Cherkes*, 780 A.2d 410, 428, 140 Md. App. 282, 313 (2001)). Moreover, the BPD argues that the Maryland General Assembly has not specifically waived the BPD's immunity to FEPA claims.  *Id.* at 21.

For her part, plaintiff asserts that she alleged in the SAC that she filed an "EEOC Charge detailing her injury at the hands of Defendant by January 2020," ECF 24, ¶ 251, and she argues that this filing suffices to plead substantial compliance with the LGTCA's notice requirement. ECF 32-1 at 11–12.  Plaintiff also contends that the BPD does not enjoy sovereign immunity with respect to her FEPA claim.  ECF 32-1 at 12–13.

The LGTCA notice provision requires a plaintiff to give local government defendants notice of state law tort claims within one year of the alleged injury.  C.J. § 5-304(b)(1).  "The notice shall be in writing and shall state the time, place, and cause of the injury."  *Id.* § 5-304(b)(2). "The purpose of the notice requirement is to apprise local governments of possible liability at a time when they can conduct their own investigation into the relevant facts, while evidence and the recollection of witnesses are still fresh."  *Watson v. City of Aberdeen*, JKB-15-0307, 2015 WL 2174885, at *3 (D. Md. May 8, 2015) (quoting *Hansen v. City of Laurel*, 193 Md. App. 80, 94– 95, 996 A.2d 882, 891 (2010)).

"Compliance with the LGTCA is a condition precedent to maintaining suit against a local government." *Edwards v. Montgomery College*, TDC-17-3802, 2018 WL 4899311, at *8 (D. Md.

Oct. 9, 2018) (citing *Rios v. Montgomery Cnty.*, 386 Md. 104, 127, 872 A.2d 1, 14 (Md. 2005)). "As a result, a plaintiff is required, in the complaint, to plead compliance with the notice provision of the LGTCA." *Id.* "Failure to so plead subjects a plaintiff's claims to dismissal." *Hispanic Nat'l Law Enforcement Ass'n NCR v. Prince George's Cnty.*, TDC-18-3821, 2020 WL 903205, at *6 (D. Md. Feb. 25, 2020) (citing *Hansen v. City of Laurel*, 420 Md. 670, 694, 25 A.3d 122, 137 (2011)).

In my view, Yampierre has not alleged substantial compliance with the LGTCA's notice requirement. As noted, Yampierre argues that she provided adequate notice to the BPD of her injury by filing an "EEOC Charge detailing her injury . . . by January 2020." *See* ECF 24, ¶ 251. Elsewhere in the SAC, however, plaintiff alleges that on January 9, 2020, she merely "filed a pre-Charge inquiry with the Baltimore Field Office" of the EEOC "and notified BPD of her filing." *Id.* ¶ 8; *see also id.* ¶ 70 ("On or around January 9, 2020, after exhausting all of her administrative remedies to no avail, the Plaintiff filed an EEOC pre-Charge inquiry . . . . BPD was advised of Plaintiff's complaint immediately."); *id.* ¶ 73 (referring to "Plaintiff's EEOC inquiry on January 9, 2020").

None of the four Charges Yampierre identifies in the SAC was filed in January 2020. The First Charge was filed on May 11, 2020 (ECF 7-2; ECF 25-5 at 2); the Second Charge on January 11, 2022 (ECF 25-5); the Third Charge on June 9, 2022 (ECF 24, ¶ 133); and the Fourth Charge on October 12, 2022 (ECF 25-6).

The Court is not "constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06

(S.D.N.Y. 2001) (collecting cases); *see also Hosack v. Utopian Wireless Corp.*, DKC-11-0420, 2011 WL 1743297, at *5 (D. Md. May 6, 2011) ("[W]hen a complaint contains inconsistent and self-contradictory statements, it fails to state a claim."). Therefore, I need not accept as true Yampierre's allegation that she filed an "EEOC Charge . . . by January 2020," when all other allegations and the exhibits of which I may take judicial notice suggest that she filed a pre-charge inquiry, not a charge, in January 2020.

In any event, what to call Yampierre's January 2020 filing is less important than what it contains.   As noted, the purpose of the LGTCA's notice requirement is "'to protect the municipalities and counties of the State from meretricious claimants and exaggerated claims" by informing the municipality or county of its possible liability "at a time when it [can] conduct its own investigation.'" *Renn v. Board of Com'rs of Charles Cnty.*, 352 F. Supp. 2d 599, 603 (D. Md. Jan. 24, 2005) (quoting *Bartens v. City of Baltimore*, 293 Md. 620, 626, 446 A.2d 1136, 1138–39 (1982)).

"In light of this purpose, the Maryland Court of Appeals[25] has held that 'strict compliance with the notice provisions of the LGTCA is not always required; substantial compliance may suffice.'"  *Renn*, 352 F. Supp. 2d at 603 (quoting *Moore v. Narouzi*, 371 Md. 154, 171, 807 A.2d

---

[25] In the general election held in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  The voters also approved changing the name of the State's intermediate appellate court, the Maryland Court of Special Appeals, to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland (Dec.                                       14,                                       2022), https://www.courts.state.md.us/media/news/2022/pr20221214#:~:text=Effective%20immediately %2C%20the% 20Court% 20of,the%20Appellate% 20Court% 20of% 20Maryland.

To avoid confusion, I will refer to the names of the courts as they existed when the cited cases were decided.

632, 643 (2002)).   "[S]ubstantial compliance is 'such communication that provides the [government] requisite and timely notice of facts and circumstances giving rise to the claim.'" *Moore*, 371 Md. at 172, 807 A.2d at 643 (quoting *Condon v. State of Maryland–University of Maryland*, 332 Md. 481, 496, 632 A.2d 753, 755 (1993)) (internal quotation marks and citation omitted); *see also Ferguson v. Loder*, 186 Md. App. 707, 728, 975 A.2d 284, 296 (2009); *Francis v. Maryland*, ELH-21-1365, 2023 WL 2456553, at *25–28 (D. Md. Mar. 10, 2023) (discussing substantial compliance standard under the Maryland Tort Claims Act).[26]

The doctrine of substantial compliance is "narrowly construed," however.   *McDaniel v. Maryland*, RDB-10-0189, 2010 WL 3260007, at *4 (D. Md. Aug. 18, 2010).   The doctrine certainly does not provide "license to ignore the clear mandate" of the LGTCA.   *Chinwuba v. Larsen*, 142 Md. App. 327, 355, 790 A.2d 83, 98 (2002), *rev'd on other grounds*, 377 Md. 92, 832 A.2d 193 (2003).   Indeed, "[t]he doctrine of substantial compliance has no application to an outright failure to comply. . . ."   *Simpson v. Moore*, 323 Md. 215, 228, 592 A.2d 1090, 1096 (1991).

At least one judge in this District has found that the statutory notice requirement is satisfied if, after a claim against a municipality is filed with the EEOC, the EEOC informs the municipality of "the identity of the claimant, the time and place of the event, the nature of the claim, and the

---

[26] Although the LGTCA and the Maryland Tort Claims Act ("MTCA"), C.J. § 5-522, are not identical, analysis of one statute informs analysis of the other.   Indeed, the Maryland Court of Appeals has drawn comparisons between the LGTCA and MTCA.   *See, e.g.*, *Espina v. Jackson*, 442 Md. 311, 324, 112 A.2d 442, 450 (2015) (drawing on analysis of the MTCA to find that the LGTCA "appears to encompass constitutional torts"); *Bd. of Educ. of Prince George's Cnty. v. Marks–Sloan*, 428 Md. 1, 29–30, 50 A.3d 1137, 1154–55 (2012) (using both statutes for guidance to interpret Maryland law governing county boards of education); *see also Heron v. Strader*, 361 Md. 258, 263, 761 A.2d 56, 58–59 (2000).

Plaintiff's intent to pursue litigation." *Nelson v. City of Crisfield*, BEL-10-181, 2010 WL 4455923, at *2 (D. Md. Nov. 5, 2010).  Even so, there is no indication here that these criteria were met.

Plaintiff asserts many statutory claims, supported by a broad web of varied facts.  It is precisely in a case such as this, where many instances of misconduct are alleged to have occurred over a period of several years, that notice to the governmental entity is most vital, so that the defendant has an opportunity to investigate the allegations in a timely manner.  *See Haupt v. State*, 340 Md. 462, 470, 667 A.2d 179, 183 (1985) (recognizing, under the MTCA, that the notice requirement is intended to "afford[] the State the opportunity to investigate the claims while the facts are fresh and memories vivid, and, where appropriate, settle them at the earliest possible time"); *Francis*, 2023 WL 2456553, at *27 (noting that the MTCA notice requirement "serves important public purposes," because it allows the government to "consider[] the fiscal consequences of a claim, and then decide[] which of several options to pursue") (quotation marks and citation omitted).

To be sure, plaintiff alleges that she "notified" or "advised" the BPD of her January 2020 filing. ECF 24, ¶¶ 8, 70.   But, plaintiff does not specify what information this notice to the BPD contained, nor does she allege that she provided the notice in writing, as the LGTCA requires. *See* C.J. § 5-304(b)(2).  For all the Court can discern from the allegations, Yampierre's purported notice to the BPD may have been nothing more than a phone call stating, without further detail, that she had submitted a filing to the EEOC.

Moreover, the SAC's threadbare allegations about the contents of the January 2020 filing provide so little detail that the Court is left to guess whether the filing would have satisfied the LGTCA's notice requirement, even if Yampierre provided a copy of it to the BPD. *See, e.g.,* ECF 24, ¶ 8 (providing no information about contents of "pre-Charge inquiry" except that it "alleg[ed]

race (African American) discrimination, sex (Female), sexual harassment, disability, and retaliation"). In my view, plaintiff's cryptic allegations about her January 2020 filing, and her "notice" to the BPD of this filing, are plainly insufficient to plead actual or substantial compliance with the LGTCA's notice requirement.

It is also noteworthy that C.J. § 5-304(d) permits a claimant to move the court, for good cause shown, to entertain a suit not preceded by the required notice, if the defense has not been prejudiced. However, Yampierre has made no such motion.

For these reasons, I conclude that, with respect to the FEPA claim, plaintiff has not adequately pleaded facts that, if true, would substantially satisfy the notice requirement of the LGTCA.

The BPD also urges the Court to find that it is a State agency and thus has sovereign immunity as to the FEPA claim. ECF 25-3 at 20–21. "Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, —— U.S. ——, 142 S. Ct. 522, 532 (2021). Sovereign immunity is "a weighty principle, foundational to our constitutional system." *Cunningham v. Lester*, 990 F.3d 361, 365 (4th Cir. 2021). Moreover, "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied* ___ U.S. ___, 139 S. Ct. 417 (2018).

Immunity under the Eleventh Amendment bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, sometimes referred to as an "arm of the state." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984) ("It is clear, of

course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005). Put another way, immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Lane v. Anderson*, 660 F. App'x 185, 195–96 (4th Cir. 2016) (quoting *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (cleaned up).

Several judges of this Court have dismissed FEPA claims against the BPD on grounds of sovereign immunity, based on the determination that the BPD is a State entity. *See, e.g., Forrest v. Balt. Police Dep't*, JMC-22-3220, 2023 WL 3847429, at *13–14 (D. Md. June 6, 2023); *Effland v. Balt. Police Dep't*, CCB-20-3503, 2022 WL 3107144, at *6 (D. Md. Aug. 4, 2022); *Grant v. Balt. Police Dep't*, RDB-21-2173, 2022 WL 16746703, at *9 (D. Md. Nov. 7, 2022). However, in the general election held in November 2022, the voters in the City of Baltimore approved the transfer of control over the BPD from the State of Maryland to the Mayor and City Council of Baltimore. The transfer was to take effect on January 1, 2023. *See* Paul Gessler, "Baltimore votes for term limits, control of city's police department," *WJZ News* (Nov. 9, 2022), https://www.cbsnews.com/baltimore/news/baltimore-votes-for-term-limits-control-of-citys-police-department/. As a result of the electoral decision, Public Local Laws of Maryland ("PLL"), Art. 4, § 16-2(a) now provides: "The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the City of Baltimore."

Judge Blake's decision in *Effland*, 2022 WL 3107144, at *6, was issued in August 2022, *i.e.*, prior to the November 2022 election.  She concluded that, "[u]nder Maryland law, BPD is not an agency of the municipality of Baltimore," but instead "an agency of the state."  In support, she cited section 16-2(a) of the 2021 edition of the PLL.  At the time, the provision stated: "The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland."  *See Effland*, 2022 WL 3107144, at * 6.  However, as noted, the provision has since been changed.

As far as I am aware, no court has considered the significance of this major change in the law in relation to the BPD's claim of sovereign immunity.  At the very least, the change in status of the BPD means that I would be unjustified in relying on the several cases that depend on the previous version of PLL § 16-2(a).

Moreover, the BPD moved to dismiss on February 21, 2023, several months after the election of November 2022, and more than a month after the change was to take effect.  Yet, the BPD's Motion did not address how, if at all, the change affects its claim of sovereign immunity.  Indeed, the BPD's discussion of the change is limited to a footnote in its Reply, where it urges the Court to "take judicial notice of the fact that local control of BPD has not yet been effected." ECF 35 at 9 n.5.  The BPD directs the Court to a newspaper article published by The Baltimore Sun. *See id.* (citing Emily Opilo, "Baltimore City Council, advocates seek faster implementation of local control of police: 'Sometimes you just have to move,'" *The Baltimore Sun* (Feb. 22, 2023), https://www.baltimoresun.com/politics/bs-md-ci-baltimore-council-local-control-hearing-20230222-snu5z4aeyjch5fwleugawbswf4-story.html).

In fact, a more recent article published in The Baltimore Sun describes an ongoing disagreement about whether and to what extent the amendment has placed the BPD under local

control.  Emily Opilo and Darcy Costello, "Baltimore is again in charge of its police. But the legislature has left a gray area that could invite legal challenges," *The Baltimore Sun* (Apr. 17, 2023),        https://www.baltimoresun.com/politics/bs-md-ci-local-control-now-what-20230417-26hfds6pwrb3rmrz4q7ybtymse-story.html.  Although the BPD asks the Court to "take judicial notice of the fact that local control of BPD has not yet been effected," ECF 35 at 9, n.5, I cannot reach that conclusion on the basis of news articles, especially when one such article references a "legal gray area" concerning the matter in question. Opilo and Costello, *supra*.

Because sovereign immunity is a jurisdictional doctrine, when presented with a claim of sovereign immunity and a defense on the merits, a court "must generally . . . decide[] [sovereign immunity] first."  *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019). Nonetheless, state sovereign immunity "is akin to an affirmative defense," because "the defendant bears the burden of demonstrating" it.  *Hutto v. South Carolina Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).  In many cases it will not be appropriate for resolution on a motion to dismiss.  *See Forst*, 4 F.3d at 250 ("In the limited circumstances where the allegations of the complaint give rise to an affirmative defense, the defense may be raised under Rule 12(b)(6), but only if it clearly applies on the face of the complaint.") (citation omitted).  This is one such case.  The parties have failed to address the change in the status of the BPD in any meaningful way and have provided the Court with no basis on which to decide whether the BPD remains an "arm of the state." Therefore, resolution of the issue of sovereign immunity is premature.

Nonetheless, as stated, plaintiff has failed to plead substantial compliance with the LGTCA's notice requirement.  For that reason, I shall dismiss Count V.

### C. FMLA Claims (Count VII and Count VIII)

#### 1. FMLA Generally

"The FMLA is intended 'to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons.'" *Rhoads v. F.D.I.C.*, 257 F.3d 373, 381 (4th Cir. 2001) (quoting *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 (4th Cir. 1999), *cert. denied*, 529 U.S. 1116 (2000), *abrogated on other grounds*, *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006)). Under the FMLA, an "eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . .[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employee is eligible if the employee "has been employed . . . (i) for at least 12 months by the employer . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). At the end of such leave the employee is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced." 29 U.S.C. § 2614(a)(1)(A).

A "serious health condition" is an "illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id*. § 2611(11). "Continuing treatment" includes any "period of incapacity or treatment for such incapacity due to a chronic serious health condition." 29 C.F.R. § 825.115(c). "A chronic serious health condition is one which: (1) Requires periodic visits . . . for treatment . . .; (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." *Id*. In some cases, "[a]bsences attributable to incapacity" caused by a chronic serious health condition "qualify

for FMLA leave even though . . . the covered family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three consecutive, full calendar days." *Id.* § 825.115(f).

Of relevance here, a serious health condition includes "[p]regnancy or prenatal care." *Id.* § 825.115(b). This is defined as "[a]ny period of incapacity due to pregnancy, or for prenatal care." *Id.*

There are two types of claims under the FMLA: "(1) 'interference,' in which the employee alleges that an employer denied or interfered with her substantive rights under the FMLA, and (2) 'retaliation,' in which the employee alleges that the employer discriminated against her for exercising her FMLA rights." *Edusei v. Adventist Healthcare, Inc*., DKC-13-0157, 2014 WL 3345051, at *5 (D. Md. July 7, 2014) (quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 294-95 (4th Cir. 2009)); *see also Fry v. Rand Construction Corporation*, 964 F.3d 239, 244 (4th Cir. 2020). "Because the FMLA grants valuable leave and restoration rights to eligible employees, it also secures these rights by making it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under the FMLA, 29 U.S.C. § 2615(a)(1)." *Hannah P. v. Haines*, ___F.4th___, 2023 WL 5208882, at *6 (4th Cir. Aug. 15, 2023) (quotations omitted) (citing *Throneberry v. McGehee Desha Cnty. Hosp*., 403 F.3d 972, 977 (8th Cir. 2005)).

"While the FMLA does not specifically forbid discharging an employee in retaliation for his use of FMLA leave, 29 C.F.R. § 825.220(c) states that employers are 'prohibited from discriminating against employees or prospective employees who have used FMLA leave' and that 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.'" *Dotson*, 558 F.3d at 294–95; *see also Greene v.*

*YRC, Inc.*, 987 F. Supp. 2d 644, 655 (D. Md. 2013).  Therefore, courts have interpreted the FMLA to provide a cause of action for retaliation. *Dotson*, 558 F.3d at 295.

An interference claim "'merely requires proof that the employer denied the employee his entitlements under the FMLA[.]'" *Bosse v. Baltimore Cty.*, 692 F. Supp. 2d 574, 588 (D. Md. 2010) (quoting *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051 (8th Cir. 2006)). In contrast, retaliation requires "'proof of retaliatory intent.'" *Bosse*, 692 F. Supp. 2d at 588 (quoting *Stallings*, 447 F.3d at 1051); *see also Edusei*, 2014 WL 3345051, at *6. In addition to refusing FMLA leave, interference includes "discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

"[T]o establish a claim for [FMLA] interference, a plaintiff must show: '(1) [s]he was an eligible employee; (2) [her] employer was covered by the statute; (3) [s]he was entitled to leave under the FMLA; (4) [s]he gave [her] employer adequate notice of [her] intention to take leave; and (5) the employer denied [her] FMLA benefits to which [s]he was entitled.'" *Carey v. Baltimore City Board of School Commissioners*, GLR-22-2, 2022 WL 17254067, at *6 (D. Md. Nov. 28, 2022) (quoting *Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 477 (D. Md. 2015)) (alterations in *Carey*).

FMLA retaliation claims are analogous to Title VII retaliation claims.  *See Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). To establish an FMLA retaliation claim, a plaintiff must show that (1) "'[the plaintiff] engaged in protected activity'"; (2) "'[his employer] took adverse action against [him]'"; and (3) "'the adverse action was causally connected to the plaintiff's protected activity.'" *Boone v. Bd. of Governors of Univ. of North Carolina*, 858 F. App'x. 622, 624 (4th Cir. 2021) (per curiam) (quoting *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016)); *see also Adams v. Anne Arundel Cnty. Pub. Schools*, 789 F.3d

422, 429 (4th Cir. 2015); *Wright v. Southwest Airlines*, 319 F. App'x. 232, 233 (4th Cir. 2009);

*Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006).

### 2.   FMLA Interference (Count VII)

In Count VII, plaintiff alleges that defendant interfered with her FMLA rights by denying

her claim for FMLA leave, ECF ¶ 264, even though she "was entitled to leave under FMLA due

to her severe at-risk pregnancy that was causing several physical ailments that were exacerbated

by Plaintiff's work," *id.* ¶ 262. Further, plaintiff alleges, *id.* ¶ 109:

> In 2020, Plaintiff had requested twelve (12) weeks of leave under the Family and
> Medical Leave Act ("FMLA") so that she could give birth to her daughter. At this
> time, Human Resources personnel Nia Malika-Brown denied this request and
> advised Plaintiff and her husband to take six (6) weeks leave, but that they were not
> entitled nor would be approved for the entire twelve (12) weeks. Plaintiff then
> underwent a severe birth that had life-threatening complications. After fully
> disclosing this fact to Ms. Malika-Brown when Plaintiff made another FMLA leave
> request for a subsequent pregnancy, Plaintiff was once again denied.

The BPD denies that Yampierre was improperly denied twelve weeks of FMLA leave for

her pregnancy in 2020. ECF 25-3 at 23–24. According to the BPD, Yampierre and her husband,

also a BPD employee, were jointly entitled to twelve weeks of leave under the BPD's FMLA

policy.  *Id.* at 23.  The BPD asserts that, when both applied for leave in relation to Yampierre's

pregnancy, plaintiff was awarded 8.286 weeks of continuous leave for childbirth, and her husband

was awarded four weeks of leave for the same reason.  *Id.*  According to the BPD, plaintiff and

her husband therefore received more FMLA leave than they were entitled to.  *Id.* at 24.

In addition, the BPD argues that plaintiff was denied FMLA leave for a subsequent

pregnancy.  *Id.*  According to the BPD, the only record of a subsequent FMLA application that

BPD has on file shows that Yampierre was granted pregnancy-related FMLA leave in September

2021. *See id.*; ECF 26-3.

In response, Yampierre "acknowledges that during her pregnancy in 2020, she was advised that she and her husband could only take a combined twelve weeks of FMLA leave for her pregnancy." ECF 32-1 at 14. However, she avers that she "requested FMLA leave not only for her pregnancies but also for hypertension and other severe health issues." *Id.* According to Yampierre, the BPD denied these requests for non-pregnancy-related leave, "despite the fact that this leave was . . . needed for surgical procedures and not simply for additional time with the new baby or other standard pregnancy-related leave." *Id.*

In its Reply, the BPD argues that Yampierre fails to "provid[e] a meaningful response to BPD's arguments in support of dismissal of the FMLA claim based on her 2020 pregnancy." ECF 35 at 11. Instead, the BPD asserts, Yampierre impermissibly attempts to insert "new factual allegations into the case through her Opposition" by claiming that her leave requests were not related to her pregnancy. *Id*.

Under the FMLA, "[i]n any case in which a husband and wife entitled to leave . . . are employed by the same employer, the aggregate number of workweeks of leave to which both may be entitled may be limited to 12 workweeks during any 12-month period, if such leave is taken" in relation to childbirth or adoption. 29 U.S.C. § 2621(f)(1)(A). With its Policy 1726, the BPD has elected to make such a limitation. *See* ECF 25-8.

In support of the Motion, the BPD has proffered exhibits showing that plaintiff received more than eight weeks of FMLA leave (ECF 26-1) and that her husband received six weeks of FMLA leave (ECF 26-2) in connection with the birth of their child in 2020. [27] Plaintiff and her husband were both employed by the BPD. *See, e.g.,* ECF 24, ¶¶ 20, 139. Therefore, under the

---

[27] I may consider these exhibits because they are integral to the SAC. *See Goines*, 822 F.3d at 165.

BPD's Policy 1726, enacted pursuant to 29 U.S.C. § 2621(f)(1)(A), plaintiff received all the FMLA leave to which she was entitled in relation to the birth of her child in 2020.

As for the BPD's alleged denial of plaintiff's request for FMLA leave due to a subsequent pregnancy, plaintiff's allegation to this effect is the kind of "unadorned, the-defendant-unlawfully-harmed-me accusation" that does not withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678. Indeed, plaintiff has not indicated when she was denied leave, why the BPD denied her request for leave, or what aspect of her pregnancy entitled her to leave (e.g., birth, other prenatal care, etc.).

To be sure, plaintiff is correct that BPD's exhibit memorializing the approval of plaintiff's FMLA request for a reduced workload in September 2021 in relation to her high-risk pregnancy does not necessarily mean that plaintiff was not denied leave in connection with the same pregnancy at a different time. But, at this stage, the burden does not rest with the BPD to prove that plaintiff was not denied leave at some other time. Rather, it is plaintiff's burden to allege facts, beyond conclusory allegations, that if true, entitle her to relief.  With respect to the alleged FMLA denial for her subsequent pregnancy, plaintiff has failed to do so.

Plaintiff asserts in the Opposition that she requested FMLA leave for reasons other than her pregnancy, and that the BPD denied her requests.  *See* ECF 32-1 at 14.  But, allegations to that effect are missing from the SAC.  "The Court may not address new claims raised in opposition to a dispositive motion, because it is not a vehicle for amending the complaint." *Potts v. DiPaola*, RDB-21-1073, 2022 WL 616814, at *3 (D. Md. Mar. 2, 2022) (citing *Whitten v. Apria Healthcare Grp., Inc.*, PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015)).  For that reason, I cannot accept plaintiff's assertion that she applied for, but was denied, leave unrelated to her pregnancy as a well-pleaded allegation.

In sum, I am persuaded that plaintiff has not adequately pleaded facts that, if proven, would establish a claim for FMLA interference (Count VII). Therefore, I shall grant the Motion with respect to Count VII.

### 3.   FMLA Retaliation (Count VIII)

In Count VIII, plaintiff alleges that the BPD retaliated against her for "reporting several instances of misconduct . . . including, but not limited to, sexual harassment, corruption, and abuse of power," by "unlawfully and arbitrarily denying [her] multiple leave of absence requests under FMLA for which she is entitled." ECF 24, ¶ 270.

In the Motion, the BPD asserts that the only retaliatory action plaintiff pleaded in Count VIII was the allegedly unlawful denial of FMLA leave. ECF 25-3 at 25–26.  According to the BPD, however, the BPD did not improperly withhold FMLA leave from Yampierre, and therefore did not take any adverse action against her.  *Id.* at 25 (citing ECF 26-1, 26-2).

In her Opposition, plaintiff maintains that she was unlawfully denied FMLA leave. ECF 32-1 at 13–15. Moreover, she asserts that "investigations and charges against [her], such as the investigation for medical leave abuse which was not sustained, are evidence of retaliation against her for engaging in protected activity." ECF 32-1 at 14–15.

As noted, to establish a prima facie claim of FMLA retaliation, a plaintiff must demonstrate that (1) "'[the plaintiff] engaged in protected activity'"; (2) "'[his employer] took adverse action against [him]'"; and (3) "'the adverse action was causally connected to the plaintiff's protected activity.'" *Boone*, 858 F. App'x. at 624 (quoting *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016)).

In my view, plaintiff has failed plausibly to allege that she was retaliated against for engaging in activity protected under the FMLA.  Plaintiff alleges that the protected activity for

which she was retaliated against was "reporting several instances of misconduct . . . including, but not limited to, sexual harassment, corruption, and abuse of power."  ECF 24, ¶ 270.  However, "the FMLA only protects an employee from retaliation for an activity protected under the FMLA itself."  *Walker v. Gambrell*, 647 F. Supp. 2d 529, 540 (D. Md. 2009).  The FMLA entitles an eligible employee to leave and affords certain employment and benefits protections to an employee who takes leave.   *See* 29 U.S.C. §§ 2612, 2614.  It does not, however, provide protection to an employee who reports "sexual harassment, corruption, and abuse of power"—even though other federal laws may do so.  ECF 24, ¶ 270. For that reason, I conclude that plaintiff's allegation of FMLA retaliation fails insofar as it depends on the proposition that reporting sexual harassment, corruption, and abuse of power is activity protected under the FMLA.

Plaintiff's allegation of adverse action is also insufficient.  The adverse action plaintiff alleges is that the BPD "prohibit[ed] her entitled use of FMLA leave."  *Id.* ¶ 270. However, I already concluded in my discussion of Count VII that Yampierre did not sufficiently allege that the BPD improperly denied her FMLA leave.  Therefore, Yampierre's allegation that the BPD improperly denied her FMLA leave does not suffice as an allegation of adverse action.

Accordingly, I shall grant the Motion as to Count VIII.

## V.   Conclusion

For the foregoing reasons, I shall grant the Motion in part and deny it in part.  In particular, I shall grant the Motion as to Counts I (race discrimination), II (sex discrimination), V (FEPA), VI (pregnancy discrimination), VII (FMLA interference) and VIII (FMLA retaliation).  However, I shall deny the Motion as to Count IV (Title VII retaliation).  And, because I previously ruled that Count III (sexual harassment (hostile workplace)) states a claim, that claim remains.

An Order follows.

Date:   September 15, 2023                              _____/s/_____

                                                       Ellen L. Hollander
                                                       United States District Judge