## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **DANIKA YAMPIERRE,** | * |
| | * |
| *Plaintiff,* | |
| v. | |
| | *       Civil Case No: 1:21-cv-01209-JMC |
| **BALTIMORE POLICE** | |
| **DEPARTMENT,** | |
| | * |
| *Defendant.* | |
| | * |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION AND ORDER

Plaintiff, Danika Yampierre, filed this lawsuit against the Baltimore Police Department ("Defendant" or "BPD") on May 17, 2021, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"); the Maryland Fair Employment Practices Act ("MFEPA"); 42 U.S.C. § 1981; the Health Insurance Portability and Accountability Act ("HIPAA"); the Americans with Disabilities Act ("ADA"); and the Pregnancy Discrimination Act of 1978 ("PDA"). *See generally* (ECF No. 1). The Court granted in part and denied in part Defendant's subsequent motion to dismiss Plaintiff's Complaint on August 18, 2022, leading Plaintiff to file her Amended Complaint on September 8, 2022. (ECF Nos. 11, 12, 13); *Yampierre v. Balt. Police Dep't*, No. CV ELH-21-1209, 2022 WL 3577268 (D. Md. Aug. 18, 2022) ("*Yampierre I*"). Plaintiff then filed a Second Amended Complaint on January 12, 2023, with Defendant's consent. (ECF Nos. 22, 23, 24). The Court granted in part and denied in part Defendant's motion to dismiss the Second Amended Complaint on September 15, 2023, before Defendant filed its Answer to Plaintiff's Second Amended Complaint on September 29, 2023. (ECF Nos. 38, 39, 40); *Yampierre v. Balt. Police*

*Dep't*, No. CV ELH-21-1209, 2023 WL 6049489 (D. Md. Sept. 15, 2023) ("*Yampierre II*"). Presently before the Court is Defendant's Motion for Summary Judgment. (ECF No. 64). The motion is fully briefed (ECF Nos. 64, 70, 73) and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons that follow, Defendant's motion will be granted in part and denied in part.

## I.    BACKGROUND

### A.  Factual Background

Plaintiff, an African American female, joined the BPD in August 2006 and was promoted to sergeant in August 2011. (ECF No. 64-5 at 4, 19–20).[1] Plaintiff is currently assigned to the Report Management Section ("RMS") at BPD's headquarters. *Id.* at 4.

Defendant transferred Plaintiff to the Building Security Unit ("BSU") in September 2014. (ECF No. 64-9 at 3–4). The BSU fell under the command of Director Randolph Reynolds from roughly January 2018 to May 2022. (ECF No. 64-10 at 2). In that role, Director Reynolds oversaw Plaintiff and Lt. Brian Pearson. (ECF No. 64-10 at 2–3). Lt. Deanna Effland was then placed in charge of the BSU in April 2019. (ECF No. 64-1 at 7; ECF No. 70-1 at 4).

Plaintiff submitted an internal report to Lt. Effland on April 26, 2019, in which Plaintiff alleged that Detective Abdulsalam Ajikobi acted improperly with reference to an interaction he had with another officer, Detective Raymond Cook. (ECF No. 71-3 at 82). Three days prior on April 23, 2023, Detective Cook and Detective Ajikobi got into a verbal altercation, prompting Detective Cook to file an internal report with Plaintiff regarding Detective Ajikobi's actions. *Id.*

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. For a comprehensive account of all the factual allegations in Plaintiff's Second Amended Complaint, see *Yampierre v. Baltimore Police Dep't*, No. CV ELH-21-1209, 2023 WL 6049489 (D. Md. Sept. 15, 2023). The following factual background contains many recitations of those facts based on the evidence submitted in connection with this motion, but some facts have been omitted given the remaining claims in this case following the Court's prior rulings.

at 83–84.  Plaintiff organized a meeting with Detective Cook and Detective Ajikobi on April 26, 2019, to address the situation, and both detectives acknowledged via text message that they would attend the meeting.  *Id.* at 85–86.  Notwithstanding his text, Detective Ajikobi did not attend the meeting.  Later that day, Plaintiff filed the internal report with Lt. Effland, explaining Detective Ajikobi's improper conduct on April 23, 2019, his subsequent decision to skip the meeting on April 26, 2019, a prior incident in which Detective Ajikobi got into a verbal altercation with another officer, and asking Lt. Effland to address the situation "swiftly."  *Id.* at 82.

Plaintiff then filed another internal report on May 3, 2019, with Director Reynolds.  In that report, Plaintiff averred that she followed up with Lt. Effland regarding Plaintiff's April 26, 2019, report and that Lt. Effland declined to discipline Detective Ajikobi but would "handle it accordingly."  *Id.* at 87.  Plaintiff again reported Detective Ajikobi to Director Reynolds on September 3, 2019, because Detective Ajikobi failed to arrive for his designated shift that day, something he had allegedly done on prior occasions.   *Id.* at 80.  Detective Cook also reported Detective Ajikobi on that same date for failing to properly secure a parking garage by allowing civilians to enter without security clearance.  *Id.* at 88.

Plaintiff's Second Amended Complaint further alleges that in roughly mid-June 2019, Lt. Effland "relinquished the Plaintiff's duty of organizing and completing the unit's officer schedules," for which Plaintiff had been responsible for four years.  (ECF No. 24 at 7).  Lt. Effland allegedly "did this so that she could schedule herself and officers she favored in the unit to coveted shift times."  *Id.*

BPD eventually began investigating Lt. Effland for improperly providing overtime shifts.  (ECF No. 64-5 at 71–73).  BPD's internal affairs department questioned Plaintiff regarding that investigation.  Plaintiff stated in her deposition that, upon learning of Plaintiff's participation in

the investigation (as a witness rather than complainant), Lt. Effland tried forcing Plaintiff to explain to Lt. Effland why Plaintiff was summoned to the internal affairs meeting and what exactly Plaintiff said during that meeting. *Id.* Plaintiff did not disclose to Lt. Effland the contents of her meeting, but instead filed another report to internal affairs regarding Lt. Effland confronting Plaintiff about the investigation. *Id.* Plaintiff claims that Lt. Effland retaliated against Plaintiff for Plaintiff's participation in that investigation by forcing Plaintiff to work overtime shifts in August 2019. *Id.* at 72–73. Specifically, Plaintiff alleges that "Lt. Effland told Plaintiff that Lt. Effland was no longer going to work the overtime shifts she assigned to herself . . . forcing Plaintiff to cover Lt. Effland's overtime or find someone else to work shifts." (ECF No. 70-1 at 6).

Lt. Effland was transferred out of the BSU effective September 1, 2019. (ECF No. 64-10 at 3). That same day, Director Reynolds selected Lt. Pearson to lead the BSU. *Id.* According to Plaintiff, Detective Ajikobi filed a claim with the Equal Employment Opportunity Commission ("EEOC") shortly after Lt. Pearson took over the BSU at Lt. Pearson's request because Lt. Pearson believed that Plaintiff was actively trying to have Detective Ajikobi removed from the BPD. (ECF No. 70-1 at 7). Detective Ajikobi purportedly filed another complaint asserting the same, this time with BPD internal affairs, on September 13, 2019. (ECF No. 72 at 4).

Beginning in early October 2019, Plaintiff alleges that she started to experience "constant, inappropriate, and sexually harassing behavior from Lt. Pearson." (ECF No. 70-1 at 7). Lt. Pearson's behavior reportedly "started out with small flirtatious gestures, commenting on how [Plaintiff was] or how nice [Plaintiff] look[ed] pregnant and proceeded to ask Plaintiff" and another female Sergeant to go out with him frequently "although both Sergeants consistently refused." *Id.* Plaintiff testified in her deposition that Lt. Pearson's alleged sexual harassment consisted of the following: making comments to Plaintiff about and asking Plaintiff when she changed her last

name, which was especially uncomfortable for Plaintiff because Lt. Pearson supposedly "has a reputation of being very flirtatious to women in the department, especially black females"; making comments to Plaintiff throughout her employment regarding Plaintiff's appearance; attempting to obtain Plaintiff's personal address for non-work related purposes; repeatedly asking Plaintiff out despite Plaintiff consistently rejecting Lt. Pearson's advances; and asking another officer whether Plaintiff's husband is the father of all of Plaintiff's children.  (ECF No. 64-5 at 37, 41–42).

Plaintiff also testified that Lt. Pearson made repeated inappropriate comments to her regarding Detective Ajikobi riddled with sexual innuendos.  Lt. Pearson was aware of the ongoing conflicts between Plaintiff and Detective Ajikobi.  *Id.* at 39.  During a small birthday party for Plaintiff in roughly early November 2019, Lt. Pearson asked Plaintiff (only after Plaintiff's husband stepped away) if she "was going to make [her] boy" a plate of food (referring to Detective Ajikobi) before joking that either Detective Ajikobi or Lt. Pearson may "jump out" of Plaintiff's birthday cake.  *Id.* at 39.  At least one other officer was present when Lt. Pearson made those remarks, and Plaintiff even claims that one officer confronted Lt. Pearson for making inappropriate comments that upset Plaintiff.  *Id.*  Lt. Pearson also sent Plaintiff text messages following the birthday party in which he again made the cake joke, which Plaintiff believes to be an ongoing sexual innuendo employed by Lt. Pearson.  *See id.* at 40 ("Why would a person who I don't like or somebody popping out of my birthday cake?  That's sexual.  I mean, when you think about it, you think about people popping out a birthday cake in a sexual event.  When do you get cakes that women pop out, men pop out birthday cakes, why would he pop out of my birthday cake?").  Plaintiff herself then told Lt. Pearson to stop making such comments.  *Id.* at 40–41.

But according to Plaintiff, Lt. Pearson did not stop.  Rather, Plaintiff posits that on November 8, 2019, Lt. Pearson sent Plaintiff and another sergeant a group message indicating that

Detective Ajikobi was going to be transferred.  (ECF No. 71-3 at 13).  Lt. Pearson eventually followed that message up by again saying that Detective Ajikobi was going to pop out of Plaintiff's cake.  *Id.*  Moreover, Plaintiff submits that Lt. Pearson also asked Plaintiff if Plaintiff "saved him some cake" when Plaintiff returned from vacation.  *Id.*  Plaintiff then confronted Lt. Pearson by again telling him to stop making such comments and to refrain from collecting Plaintiff's personal information.  *Id.*

Plaintiff filed a report with Director Reynolds on November 22, 2019, "documenting the hostile work environment and sexual harassment she had experienced consistently from Lt. Pearson."  (ECF No. 70-1 at 8; ECF No. 71-3 at 13).  Plaintiff supposedly slid that report under Director Reynolds' door.  Director Reynolds denies that this ever occurred and swears that Plaintiff did not submit that form nor make Director Reynolds aware of any sexual harassment at that time.  (ECF No. 64-10 at 3).  The record does contain a report dated November 22, 2019, from Plaintiff to Director Reynolds in which, among other things, Plaintiff asserts that "Lt. Pearson's unfair treatment has escalated and started sexually harassing me and another female sergeant, after we both repeatedly rejected his advances on hanging out with him off duty after work[.]"  (ECF No. 71-3 at 14–16).  That report also discusses Lt. Pearson's efforts to obtain Plaintiff's personal information and comments about Plaintiff's name and the paternity of her children.  *Id.* at 15–16.  The record also contains another report dated November 22, 2019, by Plaintiff to Director Reynolds in which Plaintiff alleges that Lt. Pearson confronted Plaintiff about the report she slid under Director Reynolds' door because Plaintiff did not follow the chain of command.  *Id.* at 17.

Although Director Reynolds denies ever receiving a report on November 22, 2019, Director Reynolds acknowledges that he sent an email to Lt. Pearson and Plaintiff on November 22, 2019, "explaining that in order to eliminate concerns of nepotism, favoritism, and/or

implications of wrongdoing: (1) Lt. Pearson would handle all BSU scheduling, including overtime, moving forward; (2) Sergeant Leslie Williams was no longer authorized to work overtime in the BSU; and (3) Detective Sean Yampierre [Plaintiff's husband] was no longer authorized to work overtime in the BSU." (ECF No. 64-10 at 3; ECF No. 64-18). This stripped Plaintiff of her supervisory duty of handling certain BSU scheduling matters. Director Reynolds asserts that he sent this email because he "had been made aware of complaints from other officers and supervisors in the BSU that Sgt. Yampierre was showing favoritism in how she assigned overtime shifts for the unit, for instance by giving preference to her husband . . . and her friend . . . neither of whom was assigned to the BSU for their regular shifts." (ECF No. 64-10 at 4). Director Reynolds attests that he "did not see, nor was [he] made aware of" Plaintiff's supposed November 22, 2019, report before he sent the above email. *Id.*

According to Plaintiff, Lt. Pearson began frivolously writing Plaintiff up for infractions "Once Lt. Pearson was advised by Director Reynolds" of the November 22, 2019, report. (ECF No. 71-3 at 13). This is the point in time that Plaintiff asserts is when Lt. Pearson "started doing the hostile work environment," although the record submitted in connection with this motion seems to indicate some conflation between Plaintiff's retaliation claim and her hostile work environment claim. (ECF No. 64-5 at 41). Plaintiff claims that Lt. Pearson began forcing her to work overtime following her November 22, 2019, report. *Id.*

Plaintiff filed another internal report with Director Reynolds on November 25, 2019. (ECF No. 71-4 at 30). In that report, Plaintiff alleges that Lt. Pearson scheduled a meeting with Plaintiff and another sergeant to "clear the air," referring to the prior feuds with Detective Ajikobi. *Id.* Lt. Pearson supposedly asked Plaintiff her opinions on whether it would be best if Detective Ajikobi was transferred before Plaintiff expressed her continued disdain for Detective Ajikobi's prior

conduct as well as Lt. Pearson's.  *Id.* at 31–33.  Plaintiff also avers that Lt. Pearson instructed her to disobey Director Reynolds' November 22, 2019, email by continuing to handle scheduling matters.  *Id.*

Plaintiff testified that, after expressing her concerns during the November 25, 2019, meeting with Lt. Pearson, Lt. Pearson wrote Plaintiff up for disrespectful behavior exhibited during that meeting, including using inappropriate language.  *Id.* at 50, 53; ECF No. 72-1 at 8–9, 20–22.  Plaintiff was not disciplined for this write-up.  (ECF No. 64-5 at 54).  However, Plaintiff claimed in her deposition that the charges against her stemming from the November 25, 2019, meeting were ultimately sustained only because Plaintiff refused to sign documentation regarding that charge.  *Id.*[2]  Plaintiff clarified that this write-up also faulted Plaintiff for not signing off on an officer's overtime slips who worked shifts that Plaintiff was not assigned to.  *Id.* at 50.  At this point in Plaintiff's deposition, she confirmed that the first instance of alleged retaliation was the November 22, 2019, email which modified Plaintiff's duties, and that the second instance of retaliation was Lt. Pearson writing Plaintiff up for her purported conduct during the November 25, 2019, meeting.  *Id.* at 56.  Moreover, Plaintiff explained that (1) the November 22, 2019, email was retaliation by Lt. Pearson and Director Reynolds for allegedly submitting her sexual harassment report that day; and (2) the November 25, 2019, writeup was retaliation by Lt. Pearson also for Plaintiff allegedly submitting her sexual harassment report on November 22, 2019.  *Id.*

Plaintiff then alleges that she was further retaliated against for her November 22, 2019, report when Lt. Pearson took away Plaintiff's parking spot.  Specifically, Plaintiff testified that an

---

[2] The document with which Plaintiff took issue was an internal report dated December 8, 2020.  According to that report, the investigation into Lt. Pearson's charge "was initially classified as 'not sustained' prior to the statute expiration date and the case was closed.  After an internal audit, it was determined the case should have been 'sustained.'  Therefore, the finding has been changed to 'sustained' and non-punitive counseling will be given."  (ECF No. 72-1 at 11).  Plaintiff refused to sign the subsequent "Non-Punitive Counseling Memo" issued to Plaintiff.  *Id.* at 13.

incident arose on November 27, 2019, in which a SWAT officer refused to vacate Plaintiff's parking spot at Plaintiff's request because "he wasn't moving until he got finished, until he got ready to do whatever he was doing." *Id.* at 58. Although Plaintiff claims it was her parking spot to which she was entitled access, she alleges that Lt. Pearson was made aware of the incident before having Director Reynolds write Plaintiff up for "parking in an unknown parking spot." *Id.* at 58–59. Depriving Plaintiff of her parking spot at that time was particularly egregious to Plaintiff because "Both Lt. Pearson and Director Reynolds knew that Plaintiff was having a high-risk pregnancy due to previous line of duty injury." (ECF No. 70-1 at 10); *see also* (ECF No. 71-4 at 81) (reporting to Director Reynolds on August 27, 2019, that Plaintiff was "8 weeks pregnant" and that she had a high-risk pregnancy due to "underlying health issues").

On December 27, 2019, Plaintiff emailed Sergeant Anthony Faulk, referencing another internal complaint that Plaintiff filed on December 18, 2019. (ECF No. 64-15 at 2). Although that email itself is not contested, Defendant takes issue with the exact internal complaint that is referenced therein. For instance, Plaintiff's December 27, 2019, email reads: "Good Morning Sgt. Faulk . . . Can you please advise whoever reads this complaint not to disclose any information to Major Stephanie Lansey, due to her involvement in the case and how she can make matters worse." *Id.* However, it is unclear from the record what exact report was submitted in connection with that email. The record contains two "Formal Complaints" dated December 18, 2019, written by Plaintiff. Both of those formal complaints detail most of the above factual background, including Plaintiff faulting her supervisors for failing to address Plaintiff's prior internal complaints regarding Detective Ajikobi, Lt. Effland's purported misuse of overtime assignments, Lt. Pearson's cake comments, and Lt. Pearson's purportedly false internal complaints. *See* (ECF No. 64-15 at 3–7; ECF No. 71-3 at 127–31). But only one of those formal complaints explicitly sets forth

allegations of sexual harassment.  One complaint references "a hostile work environment" involving Lt. Pearson and alleges that "Lt. Pearson is making my work environment so uncomfortable while I am pregnant, so I can go out on stress medical and they can easily transfer me without a legitimate reason."  (ECF No. 64-15 at 3–7).  That complaint notes that, after Plaintiff began reporting issues to her supervisors, she "started experiencing retaliatory conduct, adverse actions, bullying, intimidation, false accusations, isolation, ostracizing and great significant emotional stress during my pregnancy."  *Id.* at 3.  It does not include any allegations related to sexual harassment specifically.

The other complaint does.  It asserts that Plaintiff "did not start having all these problems, until after I consistently rejecting Lt. Pearson's advances on going out with him."  (ECF No. 71-3 at 130).  This formal complaint provides details regarding the alleged sexual harassment, such as describing the "inappropriate comments" Lt. Pearson made at Plaintiff's birthday party and in subsequent text messages.  *Id.* at 130–31.  It also includes an allegation that Lt. Pearson engaged in sexually harassing behavior and that "Lt. Pearson['s] main reason for targeting me is because I rejected his advances" rather than asserting that Plaintiff was being targeted for being "a pregnant black female."  *Id.* at 131.

On December 31, 2019, Plaintiff contacted Eric Melancon, then-Chief of Staff, having yet to receive any assistance from Sergeant Faulk regarding her December 27, 2019, email.  (ECF No. 64-33 at 2).  Mr. Melancon declined to meet with Plaintiff "because during [his] time as Chief of Staff to the Police Commissioner, [he] followed a practice of not becoming involved in mediating disputes between BPD members and chose instead to rely on the processes outlined in the Memorandum of Understanding [] between BPD and Baltimore City Lodge No. 3, Fraternal Order of Police, Inc., Unit II and the relevant BPD policies."  *Id.* at 2–3.  Mr. Melancon further declares

that he was "not aware that [Plaintiff] had made allegations of sexual harassment against Lieutenant Brian Pearson or complained of retaliation for allegedly reporting the claimed sexual harassment" when he decided not to meet with Plaintiff in December 2019.  *Id.* at 3.

On January 6, 2020, Lt. Pearson "respectfully report[ed] severe ethical violations by Sgt. Danika Yampierre." (ECF No. 72-3 at 36, 48).  These violations purportedly included complaints from other officers regarding Plaintiff's attendance at work and Plaintiff improperly claiming overtime.  *Id.*  Lt. Pearson described in that complaint how tracking Plaintiff's "swipe access" to the parking lot verified that Plaintiff either entirely failed to report for work or arrived to work noticeably late on numerous occasions during the forty-five (45) days prior.  *Id.* at 49.  Lt. Pearson's January 6, 2020, internal complaint also alleged that "it became increasingly difficult to manage Sgt. Yampierre" following the November 22, 2019, email regarding the change in Plaintiff's duties because Plaintiff began failing to notify others regarding her time off, extended absences from work, and general tardiness, leading several officers to file complaints with Lt. Pearson regarding the same.  *Id.*

Plaintiff's Second Amended Complaint alleges that she filed a pre-charge inquiry with the Baltimore Field Office of the EEOC on January 9, 2020, alleging discrimination based on race, sex, and disability, sexual harassment, and retaliation.  (ECF No. 70-1 at 12).  Plaintiff further claims that she notified BPD of her filing this inquiry, but Plaintiff points to no evidence in the record corroborating the inquiry itself or Plaintiff's notification.  Judge Hollander observed as much in her prior Memorandum Opinion.  *See Yampierre II*, 2023 WL 6049489, at *37.

On April 29, 2020, Detective Teddy Paris supposedly told Plaintiff that two other officers were asking about "Plaintiff's filing an EEOC complaint against Lt. Pearson, and that one of the officers stated that 'Lt. Pearson was going to get [Plaintiff] removed from the Unit.'" (ECF No.

11

70-1 at 13).  Plaintiff also alleges that "Throughout February 2020 to July 2020, Plaintiff was constantly harassed by Internal Affairs to come down to the office for allegation papers or to provide statements even though Plaintiff was out on maternity leave the whole time."  *Id.* at 13; ECF No. 71-3 at 24–25.

Plaintiff filed a formal Charge of Discrimination with the EEOC on May 11, 2020, alleging discrimination based on race and sex (but not disability as alleged regarding the pre-charge inquiry) and unlawful retaliation.  (ECF No. 7-2 at 1).  That charge faults Lt. Effland for asking Plaintiff to disclose her involvement in Lt. Effland's investigation "while similarly-situated White employees were not harassed."  *Id.*  Plaintiff also alleged that, beginning roughly September 3, 2019, Plaintiff was "subject to pregnancy-related harassment" by Lt. Pearson; that Lt. Pearson initiated false disciplinary investigations against Plaintiff (including the November 25, 2019, complaint); that Plaintiff was excluded from meetings and emails; that many of her administrative job duties were taken away; that Internal Affairs failed to investigate pregnancy discrimination by Lt. Pearson and race discrimination by Lt. Effland; and that Plaintiff was subjected to harassment while on maternity leave by being notified that internal complaints had been filed against her.  *Id.* at 1–2. Nowhere in that Charge of Discrimination does Plaintiff suggest that she was the subject of *sexual* harassment by Lt. Pearson.

"Around September 2020, Plaintiff was involuntarily transferred to a medical locator by order of command despite Lt. Ryan's advice against the transfer since Plaintiff was still on light duty due to her pregnancy complication."  (ECF No. 70-1 at 13).  Plaintiff cites to no record evidence regarding this transfer or Lt. [Gene] Ryan's advice.  In fact, Judge Hollander previously noted that "plaintiff does not explain the terms 'locator' or 'medical locator'" nor "does she indicate how this assignment differed from her previous assignment, if at all."  *Yampierre II*, 2023

WL 6049489, at *12 n.15.  Plaintiff does not provide any further clarity in her opposition and cites to no record evidence supporting this statement other than the corresponding allegation in her Second Amended Complaint, which is given no deference at the summary judgment stage.

Plaintiff next asserts that "On December 29, 2020, Internal Affairs sent Plaintiff's case [] where Lt. Pearson accused Plaintiff of stealing overtime, to Baltimore City State's Attorney to obtain criminal charges against Plaintiff, but the State's Attorney declined to institute any criminal charges based on the alleged conduct after reviewing the case." (ECF No. 70-1 at 13–14).  Plaintiff provides no evidence corroborating that date.  Rather, the record reveals that Detective Eric Geddis, who was assigned to investigate Plaintiff's purported misconduct, forwarded all investigation materials to the State's Attorney's office on August 25, 2020.  (ECF No. 65-4 at 26).

A grand jury was eventually impaneled to investigate Plaintiff's alleged timekeeping misconduct pursuant to Lt. Pearson's January 6, 2020, internal complaint.  BPD subsequently investigated Plaintiff for misconduct regarding that grand jury investigation.  (ECF No. 72-4 at 4).  According to Detective Cook, upon Detective Cook's return to BPD headquarters after testifying before the grand jury on January 19, 2021, Detective Cook received a phone call from Plaintiff in which Plaintiff requested information regarding the grand jury.  *Id.*  Despite Detective Cook telling Plaintiff that he could not divulge any information regarding the grand jury investigation into Plaintiff's alleged misconduct, Plaintiff proceeded to call Detective Cook from an unknown phone number to again ask about the proceedings.  *Id.* at 5–6.  Detective Cook declined to share any information with Plaintiff.  *Id.*  Plaintiff's initial phone call to Detective Cook was on speaker phone and overheard by Sergeant Marlon McEntyre, Lt. Pearson, and Lt. Ryan who all corroborated Detective Cook's statements.  *Id.* at 5–7.

"A couple of days later, Cook approached Major Mark Howe due to their 20-year relationship of knowing each other throughout the department.  Cook stated he trust[s] Howe and since he is a major felt comfortable in expressing his concern in reference to [Plaintiff] reaching out."  *Id.* at 6, 24.  Plaintiff claims that Lt. Pearson coerced Detective Cook into informing Major Howe of Plaintiff's conduct, but this allegation is conclusory and not supported by the record citations Plaintiff provides in support of this notion.

However, Plaintiff's statement provided during the grand jury tampering investigation sets forth a different sequence of events.  According to Plaintiff's statement made during that investigation:

> On January 19, 2021, [Plaintiff] advised that she did call Cook but it was to inquire on his availability on taking a group photo for an upcoming trip.  Especially since her previous photographer had cancelled.  [Plaintiff] advised she recalled calling Cook twice.  On the first phone call, he answered and asked if she could call back in 30 minutes.  [Plaintiff] advised she was not able to relay any information and agreed to call him back.  On the second phone call to Cook, [Plaintiff] advised that Cook answered the phone and stated, 'Hey Sgt. I couldn't answer the first time because I was down here at the grand jury.  It is about you.'  Cook mentioned that he, and other members that were also at the grand jury to include Lieutenant Pearson.  [Plaintiff] advised she responded, 'ok' and the conversation ended. [Plaintiff] advised that she did not have to inquire about the grand jury because Cook had already told her about it on numerous occasions.

*Id.* at 8–9.

On January 28, 2021, Plaintiff was suspended with full pay and benefits due to "An allegation of misconduct or criminal activity," effective immediately.  (ECF No. 71-5 at 4).  BPD policy supports such an action, as it provides that "All permanent-rank sergeants and above are authorized to . . . suspend police powers of any member when the member is alleged to have engaged in serious or criminal misconduct."  (ECF No. 64-38 at 2).

Later that evening, Plaintiff received a voicemail from Lt. Ryan informing Plaintiff that she was being transferred from the BSU to the Eastern District.  (ECF No. 64-1 at 22; ECF No. 70-1

14

at 14; ECF No. 71-3 at 26).  However, Plaintiff went out on medical leave beginning January 29, 2021, until September 2021, so Plaintiff never reported to the Eastern District.  (ECF No. 71-2 at 31; ECF No. 71-3 at 26).  While on medical leave, Lt. John Ferinde from Internal Affairs asked Plaintiff to come to Internal Affairs on February 11, 2021, for a meeting with the State Attorney's Office.  (ECF No. 70-1 at 14).

Plaintiff's Second Amended Complaint alleges that Plaintiff received a right to sue letter regarding her EEOC filings on March 8, 2021.  (ECF No. 24 at 3).  This right to sue letter is not mentioned in Plaintiff's opposition and Defendant does not argue that this is inaccurate.  Plaintiff then filed the present lawsuit on May 17, 2021.  (ECF No. 1).

On June 23, 2021, an individual named "Mi Ha" emailed a complaint to BPD's Public Integrity Bureau ("PIB") alleging that Plaintiff "attended a party at National Harbor Maryland while on medical" leave.  (ECF No. 72-5 at 4).  The PIB's ensuing investigation revealed that Plaintiff did, in fact, attend an event on or around June 23, 2021, but that Plaintiff's attendance was not improper.  *Id.* at 5.  "Therefore, the allegation of Neglect of Duty-Medical Leave Violation against [Plaintiff]" was "rendered Exonerated."  *Id.*

Next, Plaintiff asserts that in "July 2021, after filing her current lawsuit on May 17, 2021, Plaintiff started getting unannounced visits from the medical section at BPD, which was retaliation and harassment in nature."  (ECF No. 70-1 at 14).

Then, according to Plaintiff, "In August 2021 Major Ettice Brickus ordered Sgt. Albert Rotell to take away all Plaintiff's vacation leave when she was out on a line-of-duty injury, an act of retaliation."  *Id.* at 15.  At all times relevant to this lawsuit, Major Brickus was the "Commanding Officer [of] the Administrative Duties Division ('ADD')."  (ECF No. 64-29 at 2).  In that role, Major Brickus oversaw "all BPD members on long term medical, light duty for two consecutive

15

pay periods or longer." *Id.*  ADD also "provide[d] oversight for fitness for duty evaluations." *Id.*
This included "monitoring medical leave and light-duty" requests for "waste, fraud, and abuse,
including conducting surveillance and home visits, when appropriate." *Id.* at 3.  According to
Major Brickus, he "did not order then-Sergeant Albert Rotell, who at the time was serving in ADD,
to take Sgt. Yampierre's vacation leave." *Id.* at 4.  Rather, a third-party risk management vendor
concluded that Plaintiff's "situational/psychological stress"—the injuries Plaintiff relied upon in
taking her medical leave—"was not compensable as a line-of-duty injury." *Id.*  BPD accordingly
"began the process of reconciling Sgt. Yampierre's leave." *Id.*; *see also* (ECF No. 64-32 at 41)
("If it is determined that the injury is non-line-of-duty and the employee has been paid for days in
excess of his accrued leave days, he shall repay or be docked for such pay.").

Plaintiff submitted another internal complaint on August 30, 2021, regarding BPD's
conduct while Plaintiff was out on medical leave.  (ECF No. 71-5 at 68).  In that complaint, Plaintiff
asserted that she was retaliated against for her May 17, 2021, lawsuit by having officers perform
wellness checks on her and telling Plaintiff that she would have her leave taken away if she did
not return to work. *Id.*  According to Major Brickus, he was "not aware that Sgt. Yampierre had
filed a lawsuit against BPD or that she had made claims of sexual harassment against Lt. Brian
Pearson" when instructing officers to perform the wellness checks on Plaintiff.  (ECF No. 64-29
at 4).

Plaintiff was subsequently transferred to the "Southern District" in September 2021 upon
her return from medical leave.  (ECF No. 64-1 at 22–23; ECF No. 70-1 at 15).  Plaintiff claims
that this action was done in retaliation for her August 30, 2021, complaint, but Plaintiff's Second
Amended Complaint also asserts that she specifically requested to be transferred to the Southern

District back on January 28, 2021, when she was initially transferred to the Eastern District (which never took effect because Plaintiff went out on medical leave).  (ECF No. 24 at 26).

On November 30, 2021, the State's Attorney's Office informed Defendant that it declined to institute any criminal charges against Plaintiff resulting from her alleged payroll theft.  (ECF No. 72-3 at 35).  The State's Attorney's Office also explained:

> However . . . We have serious concerns about the integrity of this officer.  As you know, prosecution requires proof beyond a reasonable doubt.  While the evidence may not be 'beyond a reasonable doubt,' the evidence is strong – and we hope, *and expect*, that BPD will take appropriate administrative actions against the officer.
>
> Our concerns about this officer's integrity go beyond the initial allegations – as your detectives know, we developed intel that strongly suggested that the officer either attempted to interfere with the Grand Jury investigation, or, at a minimum, made inquiries into what was presented in front of the Grand Jury – either of which is wildly inappropriate.  We strongly urge the BPD to consider this if/when administrative action is taken.

*Id.* (emphasis in original).

Plaintiff then took additional medical leave from December 2021 through "the summer" of July 2022.  (ECF No. 64-5 at 31).  Combined with the prior medical leave, this effectively meant that "for the 18-month period from February of 2021 through July of 2022, [Plaintiff] was out of work for approximately 14 of those months."  (ECF No. 64-1 at 20).

In the interim while Plaintiff was on her second medical leave, Plaintiff filed another Charge of Discrimination on January 11, 2022.  In pertinent part, Plaintiff's second Charge states:

> In May 2021, I filed a discrimination lawsuit in court. Shortly thereafter, Respondent began making unannounced visits to my house trying to find out why I wasn't back at work. I was out of work since January 29, 2021, but they did not start harassing me at my home, until after I filed my federal lawsuit on May 17, 2021.  Also around this time, I began receiving emails from Sergeant Albert Rotell stating I had to come back to work or he was going to AWOL me.  Around August 2021, my sick and vacation leave were taken away and I was put on a leave with no pay status.  I also received a $17,000 bill from Respondent for not having enough leave to cover my absence.  On or about September 14, 2021, I was transferred to the [Southern] District, which is considered a demotion.

(ECF No. 72-7 at 2).

In June 2022, Lt. Sean Mahoney of Defendant's Disciplinary Review committee and Captain Michael Newton recommended Plaintiff's employment termination following BPD's investigation into Plaintiff's January 19, 2021, grand jury tampering investigation. (ECF No. 71-4 at 91–95). Plaintiff did not accept that recommendation. Rather, she requested a thirty (30) day period to "consult with a representative regarding the charges and the recommended punishment" to evaluate whether Plaintiff would invoke her right to an administrative hearing regarding her potential termination. *Id.* at 95.

Plaintiff's Second Amended Complaint now alleges that, in addition to her being subject to unlawful retaliation, Plaintiff's husband began facing retaliation. Specifically, Plaintiff claims that her husband faced retaliation in June 2022 for Plaintiff's internal and EEOC complaints when Lt. Valencia Carter assigned Plaintiff's husband's unit to work three details in the Inner Harbor throughout June. (ECF No. 24 at 37). Plaintiff's claim regarding the root of that retaliation is contradicted by her husband. The record indicates that Plaintiff's husband received written counseling on or around June 29, 2022, after he allegedly bypassed his direct supervisor to obtain approval for overtime regarding the mandatory Inner Harbor details. (ECF No. 65-11 at 2–3). Plaintiff's husband then submitted an administrative report on July 29, 2022, alleging that he did not engage in any such violations. *Id.* "According to [Plaintiff's husband], he suspect[ed] that [BPD] issued him a Written Counseling as a form of retaliation . . . based on his expressed support for Detective Carlos Sinchi and Sergeant Regina Richardson" who previously filed complaints against their supervisors regarding "the recruitment section's management." *Id.* at 3–4. Plaintiff's husband's claim of retaliation was "Not Sustained." *Id.* at 10.

Plaintiff then filed a third Charge of Discrimination with the EEOC on July 27, 2022, regarding her suggested termination.  (ECF No. 71-15 at 2).[3]  Notably, Plaintiff's third Charge was based on her purported retaliatory termination and in no way referenced her husband's conduct or supposed retaliation.  (ECF No. 71-15 at 2–4).

Plaintiff returned to her duties in the Southern District after her return from maternity leave.  (ECF No. 65-12 at 2).  As of September 22, 2022, Plaintiff "had her own private office" in the Southern District where she did primarily data entry and analysis, such as auditing body camera footage.  *Id.*; ECF No. 64-5 at 93.  However, on September 22, 2022, Captain Davis Brust advised Plaintiff that she was being reassigned to "front desk duties."  *Id.*  According to Plaintiff, "Plaintiff's detective work duties were involuntarily, permanently changed to working at [the] front desk."  (ECF No. 70-1 at 16).

On September 26, 2022, Sergeant Tiffany Willis filed an internal complaint against Plaintiff for failing to attend and complete required training.  (ECF No. 72-6 at 2–3).  Defendant exonerated Plaintiff of that allegation after data entries highlighted that Plaintiff had, in fact, completed the subject training after returning from leave.  *Id.* at 4.  Defendant then transferred Plaintiff to her current role in February 2023.  (ECF No. 64-5 at 29).

B.  Procedural Background

The claims in Plaintiff's original Complaint were broken down as follows: discrimination on the basis of race under Title VII (Count I); discrimination on the basis of sex under Title VII (Count II); sexual harassment/hostile work environment under Title VII (Count III); unlawful

---

[3] Plaintiff claims in her opposition that she filed an EEOC charge on or about June 9, 2022, "regarding the attempted termination."  (ECF No. 70-1 at 15).  However, Plaintiff points to no evidence in the record supporting this assertion.  Rather, the exact EEOC case number that she provides in support of that proposition is the case number associated with an EEOC charge filed on July 27, 2022.  (ECF No. 71-15 at 2–4).  The record further reflects that Plaintiff submitted two EEOC charges on July 27, 2022.  (ECF No. 71-13 at 2–3; ECF No. 71-15 at 2–4).

retaliation under Title VII (Count IV); violations of 42 U.S.C. § 1981 (Count V); violations of HIPAA (Count VI); violations of the ADA (Count VII); MFEPA violations (Count VIII); and PDA violations (Count IX).  (ECF No. 1).

Judge Hollander dismissed Counts V, VI, and VII with prejudice.  *Yampierre I*, 2022 WL 3577268, at *48.  Judge Hollander also dismissed Counts I (race discrimination), VIII (FEPA), and IX (PDA) without prejudice and with leave to amend.  *Id.*  Further, Judge Hollander denied Defendant's first motion to dismiss Count II (sex discrimination) to the extent that Count II is predicated "on the sexual harassment to which plaintiff was allegedly subjected" but otherwise dismissed Count II with leave to amend; denied Defendant's motion to dismiss Count IV (retaliation) to the extent that it relied on "plaintiff's transfer, the loss of her supervisory duties, the initiation of the internal investigations about plaintiff, and the criminal investigation that followed," but otherwise dismissed Count IV with leave to amend; and denied Defendant's motion entirely regarding Count III (sexual harassment).  *Id.*

Plaintiff's Second Amended Complaint asserts eight counts: "five claims under Title VII: discrimination on the basis of race (Count I); discrimination on the basis of sex (Count II); sexual harassment (hostile work environment) (Count III); retaliation (Count IV); and discrimination on the basis of pregnancy (Count VI). She also assert[ed] a claim of interference (Count VII) and retaliation (Count VIII) in violation of the [Family and Medical Leave Act], as well as a claim under the FEPA (Count V)."  *Yampierre II*, 2023 WL 6049489, at *2.  Defendant moved to dismiss Plaintiff's Second Amended Complaint as well.  In her ensuing decision, Judge Hollander dismissed Counts I, II, V, VI, VII, and VIII.  *Id.* at *45; ECF No. 39.  Judge Hollander denied Defendant's motion regarding Count IV (retaliation).  Thus, in conjunction with Judge Hollander's decision on Defendant's first motion to dismiss, two claims remain in this case at the summary

20

judgment stage: (1) Plaintiff's claim for sexual harassment/hostile work environment under Title VII (Count III), and Plaintiff's claim for unlawful retaliation under Title VII (Count IV).

Regarding Count IV (retaliation), Judge Hollander's most recent Memorandum Opinion affirmed that Plaintiff's retaliation claim could proceed only "to the extent that it is predicated on a job transfer, the loss of supervisory duties, the initiation of internal investigations of plaintiff, and any criminal investigation that followed." *Yampierre II*, 2023 WL 6049489, at \*36. Plaintiff's Second Amended Complaint now alleges two additional forms of unlawful retaliation: the retaliation against Plaintiff's husband, and (2) the retaliation by way of an assignment change to the front desk and a resulting delay in lactation accommodations. *Id.* Judge Hollander did not determine the sufficiency of those allegations because she had already concluded that Count IV was, at minimum, permissible as limited above. *Id.*

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)).

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

## III.   ANALYSIS

### A.   Sexual Harassment/Hostile Work Environment (Count III)

Defendant first argues that Plaintiff's claim for sexual harassment/hostile work environment under Title VII fails as a matter of law for two reasons: (1) the alleged harassment is not imputable to BPD, and (2) even if the alleged harassment is imputable to BPD, "the conduct about which [Plaintiff] complains does not amount to actionable sexual harassment." (ECF No. 64-1 at 27). Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "Courts have long endorsed and adopted the EEOC's interpretation that sexual harassment is a form of prohibited sex discrimination." *Bruce v. Fair Collections & Outsourcing, Inc.*, No. 13-3200, 2014 WL 3052477, at *3 (D. Md. June 30, 2014). "Actionable workplace sexual harassment claims come in two forms: (1) claims of a hostile work environment due to severe or pervasive sexual harassment and (2) claims of *quid pro quo* sexual harassment." *Williams v. Silver Spring Volunteer Fire Dep't*, 86

F. Supp. 3d 398, 411 (D. Md. 2015) (citing *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d

379, 390 (D. Md. 2010)).  Plaintiff's claim is based on the first form.

"To establish a Title VII claim for sexual harassment in the workplace, a female plaintiff

must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was

sufficiently severe or pervasive to alter the conditions of her employment and create a hostile work

environment, and (4) was imputable to her employer."  *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d

325, 331 (4th Cir. 2003). Regarding the third element, this Court previously explained:

> The severe or pervasive element has both a subjective and objective component.
> To show that [a] defendant's conduct was sufficiently severe or pervasive, the
> objective severity of harassment should be judged from the perspective of a
> reasonable person in the plaintiff's position, considering all the circumstances.  The
> circumstances a court considers in determining whether the alleged conduct is
> objectively hostile include the frequency of the discriminatory conduct; its severity;
> whether it is physically threatening or humiliating, or a mere offensive utterance;
> and whether it unreasonably interferes with an employee's work performance.  To
> be sure, the severe and pervasive element sets a high bar, such that the law tolerates
> a level of poor conduct by an employer that is at odds with the courtesy and respect
> that an employee might not unreasonably expect.  As such, [R]ude treatment by
> [coworkers], callous behavior by [one's] superiors, or a routine difference of
> opinion and personality conflict with [one's] supervisor, are not actionable under
> Title VII.
>
> Similarly, offhand comments[] and isolated incidents (unless extremely serious)
> will not amount to discriminatory changes in the terms and conditions of
> employment.  Indeed, even the utterance of an epithet may not, on its own, be
> enough to alter the conditions of employment under Title VII.   Rather, a hostile
> work environment is one that is permeated with discriminatory intimidation,
> ridicule, and insult.

*Faulkenberry v. U.S. Dep't of Def.*, 670 F. Supp. 3d 234, 254–55 (D. Md. 2023) (quotations and

citations omitted).   "The status of the harasser is also a 'significant factor' to be considered;

harassment by a supervisor tends to be more serious, while harassment by a co-equal is less

serious."  *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 408 (4th Cir. 2022) (quoting *Boyer-*

*Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276–77 (4th Cir. 2015) (en banc)); *see also Williams*,

86 F. Supp. 3d at 413 ("Indeed, the Fourth Circuit has held that a reasonable jury may find harassing behavior by a direct supervisor, who has significant authority over the employee on a day-to-day basis and the ability to influence the rest of the employee's career to be objectively more severe than the same behavior by a fellow employee.") (citations omitted).

Regarding the fourth element, "Sexual harassment is imputable to an employer when the employer knew or should have known about the harassment and failed to take effective action to stop it." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 255 (4th Cir. 2015); *see also Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 118 (4th Cir. 2021) ("Knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment."). "Once the employer has notice, it must respond with remedial action reasonably calculated to stop the harassment." *Roberts*, 998 F.3d at 118 (citing *Amirmokri v. Balt. Gas & Elec.*, 60 F.3d 1126, 1131–32 (4th Cir. 1995)). Notice of alleged sexual harassment need not be actual. Rather, "an employer may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victim to register complaints." *Ocheltree*, 335 F.3d at 334.

Regarding Defendant's argument that Lt. Pearson's alleged conduct cannot be imputed to BPD, there exists a genuine dispute of material fact regarding, at least, whether Defendant had actual knowledge of Plaintiff's complaints of sexual harassment. Defendant relies on Director Reynolds denying receipt of the November 22, 2019, report detailing Lt. Pearson's alleged sexual harassment and faults Plaintiff for "provid[ing] no admissible evidence to support that anyone at BPD ever saw, read, or knew about it." (ECF No. 64-1 at 28). Similarly, a common theme throughout Defendant's motion and reply is faulting Plaintiff for relying on her own deposition testimony and/or written discovery responses in presenting a genuine issue of material fact.

24

"But courts have 'long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'" *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017) (quoting *Berry v. Chi. Trans. Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)).  "Rather, if such an affidavit is based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts."  *Id.* (quotation omitted); *see also Allegis Grp., Inc. v. Bero*, No. CV ELH-22-686, 2023 WL 5989438, at *20 (D. Md. Sept. 1, 2023) ("But, if testimony is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving.") (citing *Lovett*, 700 F. App'x at 212).  Here, Plaintiff testified in her deposition that she provided Director Reynolds with a report detailing the allegations of Lt. Pearson's sexual harassment on November 22, 2019.  A copy of that report is also provided in the record.  *See* (ECF No. 71-3 at 14–16).  Further, Plaintiff claims that Lt. Pearson learned of Plaintiff's November 22, 2019, report because Lt. Pearson telephoned Plaintiff that afternoon to fault Plaintiff for not following the chain of command in submitting that report.  *Id.* at 17.  Even if uncorroborated, such testimony is based on Plaintiff's firsthand experience and therefore can be evidence of a disputed fact.  Here, that disputed fact is whether BPD had knowledge of Plaintiff's sexual harassment complaints, which is in turn material to establishing a cause of action for unlawful sexual harassment/hostile work environment under Title VII.  Moreover, a reasonable jury could conclude based on the second November 22, 2019, report and Plaintiff's accompanying testimony that at least Lt. Pearson was aware of Plaintiff's first November 22, 2019, report.  There accordingly exists a genuine dispute of material fact regarding whether Defendant had actual notice of Plaintiff's sexual harassment concerns and failed to act properly in addressing those concerns.

Defendant next argues that, even assuming *arguendo* that BPD had knowledge of Plaintiff's sexual harassment complaints, that the conduct Plaintiff complains is not severe or pervasive enough to be actionable.  (ECF No. 64-1 at 29–32).  Judge Hollander previously opined that Plaintiff set forth a plausible cause of action for unlawful sexual harassment under Title VII based on the allegations in Plaintiff's Second Amended Complaint.  *Yampierre I*, 2022 WL 3577268, at *30–31.  This included Plaintiff's allegations that Lt. Pearson engaged in repeated flirtatious behavior despite Plaintiff asking Lt. Pearson to stop doing so, asked Plaintiff out despite Plaintiff rejecting Lt. Pearson, and Lt. Pearson asking other officers inappropriate questions about Plaintiff's personal life and information as well as making inappropriate comments to Plaintiff in front of other officers.  According to Judge Hollander, this pattern of conduct was particularly actionable under Title VII standards given that Lt. Pearson supervised Plaintiff, thereby making his alleged conduct more serious and more likely to amount to a change in the terms or conditions of Plaintiff's employment.  *Id.*  Those factual allegations have not changed.  Plaintiff testified to the occurrence of those allegations firsthand throughout her deposition and in the exhibits submitted in connection with the present motion.  Given the Court's prior rulings, the status of the alleged harasser, and the conduct supported by evidence in the record, whether Lt. Pearson's actions were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment is best left to a trier of fact.

## B.  Retaliation (Count IV)

Defendant next argues that Plaintiff cannot make out a case of unlawful retaliation as a matter of law.  (ECF No. 64-1 at 32–43).  "Title VII bars employers from taking a materially adverse action against an employee in retaliation for opposing an unlawful employment practice covered under the statute, such as making a complaint of sex [or race] discrimination."  *Hunt v.*

*Constantine Com. Constr.*, No. CV TDC-20-1846, 2023 WL 2744491, at *9 (D. Md. Mar. 31, 2023); 42 U.S.C. § 2000e-2(a). "To prove a claim of unlawful retaliation, a plaintiff must demonstrate that (1) the plaintiff engaged in 'protected activity,' such as a complaint of discrimination; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a 'causal connection between the protected activity and the adverse action.'" *Hunt*, 2023 WL 2744491, at *9 (quoting *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018)). "If Plaintiff satisfies this burden, 'the burden then shifts to the employer to establish a legitimate non-retaliatory reason for the action.' If the employer does so, Plaintiff 'then must show that the employer's proffered reasons are pretextual.'" *James v. Verizon*, 792 F. Supp. 2d 861, 868 (D. Md. 2011) (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)).

Defendant initially argues that Plaintiff's retaliation claim cannot be based upon her participation in Lt. Effland's investigation or upon the PIB referring Plaintiff's "time fraud and theft investigation to the SAO." (ECF No. 64-1 at 33–34). Specifically, Defendant contends that Plaintiff's participation in Lt. Effland's investigation was not a protected activity given the context in which it occurred, and that the PIB's referral was purportedly in retaliation for attending medical appointments, which is also not a protected activity. *Id.* Plaintiff concedes that participating in Lt. Effland's investigation as a witness "was not exactly a protected activity under Title VII," so the Court grants summary judgment in favor of Defendant on this issue. Regarding forwarding Plaintiff's grand jury tampering investigation to the State's Attorney's Office, Plaintiff's Second Amended Complaint actually asserts that this "was direct retaliation for the Plaintiff's refusal to sign the verbal letter about the resubmission of charges," referencing Plaintiff's refusal to acknowledge that her November 25, 2019, misconduct was sustained. (ECF No. 24 at 24–25). However, as noted above, the record evidence indicates that Plaintiff's grand jury tampering

investigation was forwarded to the State's Attorney's Office on August 25, 2020, nearly three months *prior* to Plaintiff refusing to sign that letter.  (ECF No. 64-5 at 26; ECF No. 72-1 at 13).  Moreover, Plaintiff's grand jury tampering investigation was forwarded to the State's Attorney's Office mandatorily given BPD policy.  *See* (ECF No. 64-21 at 102) ("[I]f an investigator initially determines that an allegation appears to be a disciplinary matter, but later evidence leads the investigator to conclude that criminal conduct may have occurred, they *must* cease using the methods and procedures appropriate for an administrative investigation and notify the prosecutor immediately before proceeding further.") (emphasis added).  Plaintiff's claim of unlawful retaliation regarding forwarding her grand jury investigation to the State's Attorney's Office therefore also fails.

Defendant next argues that Plaintiff's retaliation claim fails because she "has not alleged, proven, or even articulated *any* adverse actions that she suffered."  (ECF No. 64-1 at 34) (emphasis in original).  Defendant's argument is contradicted by Judge Hollander's previous Memorandum Opinion, which concluded that Plaintiff did, in fact, plead various adverse actions taken against her.  Specifically, Judge Hollander held that Plaintiff's retaliation claim could proceed "to the extent it is predicated on a job transfer, the loss of supervisory duties, the initiation of internal investigations of plaintiff, and any criminal investigations that followed."  *Yampierre I*, 2022 WL 3577268, at *39.  With that in mind, the Court turns to the specific arguments that Defendant raises regarding the job transfers, loss of supervisory duties, and initiation of internal investigations.

Beginning with the initiation of internal investigations into Plaintiff's alleged misconduct, "Although an investigation of an employee may constitute an adverse employment action in certain circumstances, disciplinary investigations 'reasonably rooted in articulable facts justifying such an investigation' typically do not rise to the level of an adverse employment action."  *Blakes v. City*

*of Hyattsville*, 909 F. Supp. 2d 431, 436–37 (quoting *Settle v. Balt. Cnty.*, 34 F. Supp. 2d 969, 992 (D. Md. 1999)); *Harvey v. Enoch Pratt Free Libr.*, No. CV RDB-20-0874, 2021 WL 3603041, at *7 (D. Md. Aug. 13, 2021).  Plaintiff argues that all the internal investigations against her were groundless, relying on the fact that all but one were not sustained.  (ECF No. 70-1 at 22–23).  As a preliminary matter, Plaintiff's own testimony undercuts her argument that the investigations into her alleged misconduct were unreasonable because she opined that "all complaints should be investigated."  (ECF No. 64-5 at 110).  Regardless, the record evidence indicates that there is no genuine dispute of material fact that the internal investigations into Plaintiff's alleged misconduct were all reasonably rooted in articulable facts justifying those investigations.

The first instance in which an investigation was conducted into Plaintiff's alleged misconduct was after Detective Ajikobi complained on September 3, 2019, "regarding unfair treatment at work" by Plaintiff.  (ECF No. 72 at 4).  Detective Ajikobi provided a detailed account of the facts supporting his complaint, including Plaintiff singling out Detective Ajikobi in group texts and improperly suspending Detective Ajikobi's overtime.  *Id.* at 4–9.  Although Detective Ajikobi's claims against Plaintiff were ultimately unsubstantiated, there is no indication that Defendant's investigation into Detective Ajikobi's complaint was based on anything other than the articulable facts supplied by Detective Ajikobi in that complaint.

The first instance in which a *supervisor* filed an internal complaint against Plaintiff prompting an investigation was when Lt. Pearson complained that Plaintiff displayed inappropriate workplace conduct during the November 25, 2019, meeting.  (ECF No. 72-1 at 4).  Not only did Lt. Pearson set forth articulable reasons justifying his complaint by providing a detailed account of what happened during the November 25, 2019, meeting, but Sergeant McEntyre also corroborated Lt. Pearson's statements regarding what happened at that meeting (leading Lt.

Pearson to file his internal complaint and sparking the ensuing investigation).  *Id.* at 6.  Initiating an internal investigation into Plaintiff's alleged November 25, 2019, misconduct therefore cannot constitute an adverse action.

The next instance is November 28, 2019, when Director Reynolds alleged that Plaintiff disobeyed a direct order.  (ECF No. 72-2 at 2).  Specifically, Director Reynolds alleged that Plaintiff disregarded his direct order to discontinue parking in a parking garage's annex at the specific request of Deputy Commissioner James Gillis.  *Id.*  Director Reynolds instructed Plaintiff to discontinue parking in the annex spot, but later received an administrative report from another officer suggesting that Plaintiff may have violated that order by continuing to park in the annex area.  *Id.* at 3.  Director Reynolds' complaint was rooted in articulable facts both in terms of his own knowledge of Plaintiff's parking habits as well as the administrative report he received implicating Plaintiff's defiance of Director Reynolds' order per Deputy Commissioner Gillis.  The ensuing investigation into that internal complaint therefore does not constitute an adverse action.

Then came the report about Plaintiff's alleged time theft on January 6, 2020.  (ECF No. 72-3 at 2, 51).  That report was initiated by Director Reynolds because it was "brought to [his] attention by Lt. [] Pearson that [Plaintiff] . . . misrepresented on several occasions the number of hours worked on her timesheet."  *Id.*  BPD's investigation notes highlight that Director Reynolds' report and decision to investigate Plaintiff's conduct at that time was based on supporting documentation from Lt. Pearson regarding Plaintiff's timesheet and "swipe card record."  *Id.* at 3.  Director Reynolds' report was thus based on articulable facts reasonably justifying that investigation given that he was presented with documentation from one of Plaintiff's supervisors purportedly highlighting Plaintiff's misconduct.  Additionally, the State's Attorney's Office concluded that the evidence was "strong" that Plaintiff engaged in "theft via payroll" although it

ultimately decided not to institute criminal charges against Plaintiff. *Id.* at 35. Accordingly, neither can this internal investigation rise to the level of an adverse action.

The same conclusion applies to Detective Cook's and Major Howe's reporting of Plaintiff's alleged misconduct during the grand jury investigation, which resulted in a separate internal investigation. That report was based on the articulable facts that Detective Cook conveyed to Major Howe, namely that Plaintiff attempted to obtain information regarding her own grand jury investigation while it was still pending. Although Plaintiff argues that this investigation (and others) was "petty and frivolous," ECF No. 70-1 at 22, the articulable facts supporting that investigation were also corroborated by Sergeant McEntyre, Lt. Pearson, and Lt. Ryan, who were all present when Plaintiff telephoned Detective Cook regarding the grand jury investigation. (ECF No. 72-4 at 7–8). And similar to the investigation into Plaintiff's alleged time theft, the State's Attorney's Office conveyed to BPD that it "developed intel that strongly suggested that [Plaintiff] either attempted to interfere with the Grand Jury investigation, or, at a minimum, made inquiries into what was presented in front of the Grand Jury – either of which is wildly inappropriate." (ECF No. 72-3 at 35). Likewise, neither can Plaintiff's suspension with pay and full benefits pending the outcome of this investigation constitute an adverse action. *See Blakes*, 909 F. Supp. 2d at 437 ("Consistent with these authorities, several Circuits, including the Fourth, have come to the conclusion that the suspension of a police officer with pay pending the outcome of an internal investigation reasonably rooted in articulable facts does not constitute adverse employment action.").

The next internal investigation conducted into allegations of Plaintiff's misconduct stemmed from the June 23, 2021, anonymous email from "Mi Ha" regarding Plaintiff's attendance at a party/event in the Inner Harbor. (ECF No. 72-5 at 4). This internal investigation was not only

reasonably based on articulable facts given the social media posts presented in connection with that complaint, but the Maryland Code even provides that BPD *must* review such civilian complaints. *See* Md. Code Ann., Pub. Safety § 3-113 ("The investigating unit of a law enforcement agency shall immediately review a complaint by a member of the public alleging police officer misconduct.").

Regarding the final investigation conducted into Plaintiff's alleged misconduct—failing to complete required training—that investigation was reasonably based on the articulable facts presented to BPD by Major Dereck Loeffler and Sergeant Tiffany Willis, who received "a list . . . through the BPD Broadcast for those who had not completed the training," which included Plaintiff. (ECF No. 72-6 at 2–3). Although it was later discovered that Plaintiff was on leave when the training was initially due, this investigation was nevertheless based on articulable facts supported by BPD's internal training database. Further, with reference to the other elements of a *prima facie* case of retaliation, there is no indication in the record that either Major Loeffler or Sergeant Willis had any knowledge of Plaintiff's previous protected activities let alone that there exists a causal connection between those officers' complaints and Plaintiff's protected activities. Accordingly, none of the internal investigations into Plaintiff's alleged misconduct rise to the level of an adverse action supporting Defendant's liability for unlawful retaliation.[4]

The Court next turns to Plaintiff's job transfers. In her opposition, Plaintiff first argues that the September 2020 transfer to a "locator" position was an adverse action because it "was involuntary due to her light duty assignment. The transfer completely changed Plaintiff's permanent schedule for the past eight years to a rotating shift schedule while Plaintiff was going

---

[4] Additionally, to the extent that Plaintiff may argue that her recommended termination itself was an adverse employment action, Judge Hollander previously concluded the opposite. *See Yampierre II*, 2023 WL 6049489, at *33 ("However, as discussed, a proposed or recommended termination, as distinguished from an actual termination, does not suffice as an adverse employment action.").

32

through a high-risk pregnancy." (ECF No. 70-1 at 21). This Court has previously noted that a job transfer is not an adverse action simply because it is involuntary. *See, e.g.*, *Henson v. Balt. City Bd. of Sch. Comm'rs*, No. CV ADC-23-0004, 2023 WL 2992727, at *8 (D. Md. Apr. 18, 2023); *Wilder v. Balt. City Police Dep't*, No. CV AMD 07-3090, 2009 WL 10727178, at *5 (D. Md. May 19, 2009). Judge Hollander also previously concluded that "the change in plaintiff's weekly work schedule" is "insufficient to constitute an adverse action." *Yampierre I*, 2022 WL 3577268, at *36. Additionally, Plaintiff provides no specifics regarding how, if at all, this reassignment further adversely impacted Plaintiff. In fact, the only citations that Plaintiff provides in support of the notion that the September 2020 transfer constituted an adverse action are to Plaintiff's own Second Amended Complaint, which is owed no deference at the summary judgment stage. Plaintiff's September 2020 transfer therefore cannot constitute an adverse action supporting an unlawful retaliation claim under Title VII.

Regarding Plaintiff's January 2021 transfer to the Eastern District, Plaintiff argues that this transfer "not only changed the nature and terms of her employment but also prevented Plaintiff from subsequently transferring to a position Plaintiff desired." (ECF No. 70-1 at 21). Plaintiff's only citation to the record in support of the notion that this transfer precluded Plaintiff from seeking subsequent positions is again to her Second Amended Complaint. Plaintiff provides no actual evidence in support of this notion. But more dispositive of this matter is the fact that Plaintiff never reported to the Eastern District because she instead went on medical leave. *See* (ECF No. 64-5 at 29) (Q: "How long were you in the Eastern?"; A: "I never went."; Q: "You never reported to the Eastern?"; A: "No."; Q: "Okay. Why did you never report to the Eastern?"; A: "Because, at that time, that's when I went out on medical."); ECF No. 64-5 at 87 (Q: "Now, you never went to

33

the Eastern, correct?"; A: "Correct.").  The January 2021 transfer to the Eastern District that never occurred therefore cannot constitute an adverse action.

Regarding Plaintiff's September 2021 transfer to the Southern District, as noted previously, Plaintiff asserted herself in her Second Amended Complaint that, when Plaintiff was informed of her transfer to the Eastern District, "Plaintiff requested instead to be sent to the Southern District patrol, because Major Stephanie Lansey was the Commander at the Eastern District."  (ECF No. 24 at 26).  Plaintiff's deposition testimony asserts in contradiction that Plaintiff never requested a transfer to the Southern District, but Plaintiff repeatedly asserted that she requested to go elsewhere.  She even stated that Sergeant Rotell "asked me where did I wanted to go and I said I don't know."  (ECF No. 64-5 at 87).  Further, Plaintiff testified that, in the face of her Eastern District transfer, Plaintiff told Sergeant Rotell that she wanted to "do admin work" given the pending investigations against her and suspension of her police powers.  *Id.*

Plaintiff does not clearly explain in her opposition how exactly her transfer to the Southern District negatively impacted or otherwise adversely impacted her employment.   Plaintiff's deposition testimony regarding the September 2021 transfer seems to hinge on the fact that her duties in the Southern District were altered because her police powers were suspended and she was doing administrative, rather than detective, work.  However, the Court already noted above that Plaintiff's police powers were appropriately suspended given the allegations of misconduct against her.  And combined with the fact that Plaintiff specifically requested a transfer to a division in which she could do "admin work" given her suspension of police powers, Plaintiff has failed to present evidence indicating that this transfer constitutes an adverse action.

The same conclusion applies to Plaintiff's September 2022 assignment change to the front desk for similar reasons.  Plaintiff asserts in her opposition that when Plaintiff was assigned front

desk duties in the Southern District, "Her duty was changed completely because she was previously assigned to do detective work.  The level of responsibility and opportunity for promotion were inevitably impacted as the reassignment stripped Plaintiff of any supervisory duties.  The alteration thus in duties affected Plaintiff's leadership experience, which is a valuable component of promotion potential."  (ECF No. 70-1 at 21–22) (quotations omitted).  But the record does not support Plaintiff's assertion.  Plaintiff has not presented evidence that she actually had such supervisory duties upon her initial transfer to the Southern District or that, even if she did, her new duties at the front desk materially altered her employment.  Plaintiff described in her deposition that she was "doing detective work inside of the Southern District DDU.  My job duties was to help the detective unit.  They were my job duties."  (ECF No. 71-2 at 93).  When specifically asked what work Plaintiff did inside of the Southern District at that time, Plaintiff responded that "I was doing the inspections on the cameras for the detectives.  I was ensuring that they was doing their Power DMSs for the detectives.  Power DMS.  And I was also doing an audit on their body cameras."  *Id.*  Plaintiff further testified that she did not have access to any other BPD systems.  *Id.*  Moreover, when asked why Plaintiff believed that her reassignment to the front desk was retaliatory, Plaintiff explained that the reassignment was "Retaliation for changing my job duties and removing me from my office."  *Id.* at 94.  Simply asserting that a reassignment altered her job duties and inconvenienced Plaintiff because she no longer had her own private office without supporting evidence that this reassignment materially altered Plaintiff's employment is insufficient to survive summary judgment.  *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004), *abrogated on other grounds by Muldrow v. City of St. Louis, Mo.*, 144 S. Ct. 967 (2024) ("The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action.").  Plaintiff's opposition also ignores that Plaintiff was

unable to perform the same duties she had done in the past given that her police powers were suspended despite acknowledging as much in her deposition.  *See* (ECF No. 71-2 at 87).

It is useful at this juncture to discuss whether there exists a genuine issue of material fact regarding whether the suspension of Plaintiff's police powers constitutes unlawful retaliation.  This issue implicates the burden-shifting framework described above.  Even assuming *arguendo* that the suspension of Plaintiff's police powers constituted a *prima facie* case of unlawful retaliation for the protected activities Plaintiff had engaged in up to that point, Defendant has established a legitimate non-retaliatory reason for the action: that Plaintiff's police powers were suspended pursuant to BPD's own policy because there existed substantial allegations of misconduct lodged against Plaintiff, both in terms of employment and criminal malfeasance, and because she was recommended for termination.  Defendant has established this non-retaliatory reason with credible evidence of the complaints lodged against Plaintiff, the BPD policy itself, and even the State's Attorney's Office's subsequent indication that there did exist evidence supporting Plaintiff's misconduct.   Further, the State's Attorney's Office noted that it *expected* BPD to take administrative action against Plaintiff given the evidence supporting her misconduct.  (ECF No. 72-3 at 35).  Plaintiff's only argument to rebut pretext is that "Defendant has not claimed legitimate, nondiscriminatory, and nonretaliatory reasons for . . . suspending Plaintiff's police powers for years."  (ECF No. 70-1 at 29).  But Defendant's motion and the evidence cited in connection with that motion do demonstrate Defendant's legitimate, non-retaliatory reasons for Plaintiff's suspension without rebuttal from Plaintiff on this point.

Returning to Plaintiff's job transfers, the final transfer forming the basis of Plaintiff's retaliation claim is Plaintiff's transfer from the Southern District to her current role in February 2023.  (ECF No. 71-2 at 29).  Plaintiff's only argument supporting the notion that this transfer

constitutes retaliation is because Plaintiff did not request the reassignment.  *See id.* at 96 (Q: "Why do you claim that this involuntary transfer was retaliation?"; A: "Because I never requested."; Q: "So it was retaliation simply because you did not request a transfer?"; A: "Yes, and they took me out of this other and placed me in RMS."; Q: "Okay.  And the basis of your claim that that was retaliation is you did not request it?"; A: "I did not request it."; Q: "So, therefore, it was retaliation?"; A: "Correct.").  As explained previously, a job transfer is not actionable under Title VII simply because it is involuntary.  Plaintiff further conceded during her deposition that BPD policy permits individuals to be involuntarily reassigned.  *See id.*  Nor is it actionable simply because Plaintiff preferred an alternate assignment or because Plaintiff no longer worked at the same desk.  *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013).  Having presented no further evidence that Plaintiff's transfer to RMS in February 2023 materially altered Plaintiff's employment, Plaintiff's retaliation claim must also fail to the extent it alleges unlawful retaliation for this transfer.

In light of the above rulings, the remaining allegations which Plaintiff may possibly base her unlawful retaliation claims on are (1) the loss of Plaintiff's supervisory duties; (2) retaliation against Plaintiff's husband; and (3) failure to timely accommodate Plaintiff's lactation requests.  Beginning with the supervisory duties, this Court has consistently recognized that the "loss of job title or supervisory responsibility" constitutes an adverse action for Title VII purposes.  *Pollard v. Balt. Cnty. Bd. of Educ.*, 65 F. Supp. 3d 449, 454 (D. Md. 2014).

Plaintiff argues in her opposition that "First, in August 2019, Lt. Effland took away Plaintiff's duty to schedule shifts and overtime for the officers."  (ECF No. 70-1 at 22).  Plaintiff's only citation in support of this notion is to Plaintiff's Second Amended Complaint.  Further review of the record demonstrates that Plaintiff did testify to the fact that Lt. Effland took over scheduling

duties while Lt. Effland led the BSU.  (ECF No. 64-5 at 72).  However, Plaintiff testified that Lt. Effland subsumed the scheduling responsibilities "because she wanted to schedule herself to work overtime."  *Id.*; *see also* ECF No. 24 at 7 ("On or around mid-June 2019, Lt. Effland relinquished the Plaintiff's duty of organizing and completing the unit's officer schedules, which has been her responsibility for four (4) years.  Lt. Effland did this so that she could schedule herself and those same officers to overtime shifts.").  Plaintiff also noted elsewhere in her opposition that this duty change occurred in "mid-June 2019," similar to her Second Amended Complaint, so Plaintiff's own account of when this change happened is contradictory and muddled.  (ECF No. 70-1 at 4).

Despite the fact that Plaintiff has not set forth clear evidence of this change in her scheduling duties, it nevertheless highlights that Plaintiff's claim based on Lt. Effland's actions is undercut in two fatal ways.  First, Plaintiff herself has consistently stated that her scheduling powers were taken away for Lt. Effland's own personal gain rather than to retaliate against Plaintiff for engaging in protected activity.  That stance appears to have changed now only in the face of Defendant's motion for summary judgment.  Second, and more notably, the length of time between Plaintiff's protected activities and Lt. Effland taking away Plaintiff's scheduling abilities belies a causal connection therebetween under either proposed date.  The most recent protected activity at that point was May 3, 2019, which is almost two months before Lt. Effland's conduct if it occurred in mid-June 2019, or roughly three months before Lt. Effland's conduct if it occurred in August 2019.  *See Reid v. MJ Logistics, LLC*, No. 1:22-CV-03112-JMC, 2024 WL 2302320, at *9 (D. Md. May 21, 2024); *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 448 (D. Md. 2022).  And although a causal connection may be alternatively demonstrated based on "the existence of facts indicative of an adverse action because of the protected activity" rather than temporal proximity, Plaintiff proffers no such facts, particularly in light of her assertions to the contrary that Lt. Effland's actions

were motivated by her own self-interests.  *Rodgers*, 586 F. Supp. 3d at 448.  Further, Plaintiff admitted that she re-obtained her scheduling duties upon Lt. Effland's departure from the BSU. (ECF No. 64-5 at 72).  Accordingly, Plaintiff's claim that Lt. Effland retaliated against her by relinquishing Plaintiff's scheduling duties fails as a matter of law.

Turning to Director Reynolds' decision to strip Plaintiff of her scheduling duties on November 22, 2019, there is a genuine dispute of material fact regarding whether Plaintiff filed an internal complaint—and thus engaged in more protected activity—mere minutes or hours before Director Reynolds took away Plaintiff's scheduling authority as explained above.  The Court assumes for purposes of this issue that Plaintiff did, in fact, provide that November 22, 2019, report to Director Reynolds and that Director Reynolds was aware of the November 22, 2019, report. This extremely short temporal length would support a causal connection as well if the email was drafted shortly after receiving Plaintiff's report.

But the Court must then turn to whether Defendant has offered a legitimate, non-retaliatory reason for the purported retaliation.  Here, Defendant has done exactly that.  According to Director Reynolds' sworn declaration:

> Prior to sending the 9:17 AM 'Building Security' email, I had been made aware of complaints from other officers and supervisors in the BSU that [Plaintiff] was showing favoritism in how she assigned overtime shifts for the unit, for instance by giving preference to her husband . . . and her friend . . . neither of whom was assigned to the BSU for their regular shifts.  Additionally, there were multiple times I needed to access the BSU logbook (which is the hardcopy document used to record all scheduling, including overtime, for the BSU) but was unable to locate it because [Plaintiff] had either locked the logbook in her office or had taken it home, even though the logbook was supposed to remain in the BSU console room.
>
> I believed these issues were creating discontent among the officers in the BSU and those who worked overtime in the unit and were disrupting the good working order of the unit.  As a result, I instructed Lt. Pearson to draft my 'Building Security' email for my review and approval, which he provided to me on November 21, 2019 . . . I sent the 9:17 AM 'Building Security' email the following morning.

(ECF No. 64-10 at 4).  The record further contains the November 21, 2019, email from Lt. Pearson to Director Reynolds in which Lt. Pearson was to handle all scheduling matters given concerns of nepotism and favoritism.  (ECF No. 64-17 at 2).  Plaintiff made no effort to rebut this legitimate reason for the scheduling change in her opposition, and instead charges in conclusory fashion just that "Defendant has not claimed legitimate, nondiscriminatory, and nonretaliatory reasons for . . . taking away Plaintiff's supervisory responsibilities and authorities."  (ECF No. 70-1 at 29).  That assertion is inaccurate given that Defendant does present a legitimate reason for the change in Plaintiff's supervisory responsibilities at that time.  It also fails to refute the fact that Director Reynolds was already in the process of changing the scheduling authority before Plaintiff even allegedly submitted her November 22, 2019, report.  And given the length of time between Plaintiff's most recent protected activity and the November 21, 2019, email draft, there can be no inference of causation based on time.  Nor does Plaintiff provide additional "facts indicative of an adverse action because of the protected activity" regarding Director Reynolds' decision to modify Plaintiff's scheduling duties on November 21, 2019, and the following day.  *Rodgers*, 586 F. Supp. 3d at 448.  This claim therefore also fails as a matter of law.

Plaintiff's claim that Defendant retaliated against Plaintiff's husband for Plaintiff's protected activities fares no better.  First, Plaintiff's husband is not a party to this lawsuit so it is unclear whether Plaintiff has standing to assert retaliation claims on behalf of her husband.  Second, and dispositive of this claim, Plaintiff's husband's written counseling does not constitute an adverse action under Title VII.  *See, e.g.*, *Finnegan v. Dep't of Pub. Safety & Corr. Servs.*, 184 F. Supp. 2d 457, 461 (D. Md. 2002); *Thorn v. Sebelius*, 766 F. Supp. 2d 585 (D. Md. 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012); *Kalama v. State of Maryland*, No. CIV. WDQ-05-2769, 2006 WL 2559767, at *2 (D. Md. Aug. 30, 2006).

Finally, to the extent that Plaintiff now argues that she was retaliated against by way of failing to properly address Plaintiff's lactation accommodation request, it is unclear how Plaintiff may still assert this claim given that Judge Hollander previously dismissed Plaintiff's claims alleging that Defendant failed to accommodate Plaintiff during and after her pregnancy. Regardless, Plaintiff sets forth no evidence that she suffered an adverse employment action regarding that delay in accommodation, particularly in light of the fact that the accommodation was eventually granted. *See, e.g.*, *E.E.O.C. v. Vamco Sheet Metals, Inc.*, No. 13 CIV. 6088 JPO, 2014 WL 2619812, at *6 (S.D.N.Y. June 5, 2014).

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 64) is granted in part and denied in part. Defendant's motion is granted to the extent that it is entitled to summary judgment regarding Plaintiff's unlawful retaliation claim (Count IV) and that claim is hereby dismissed in its entirety as a matter of law. Defendant's motion is denied to the extent that genuine disputes of material fact exist regarding Defendant's liability for sexual harassment/hostile work environment (Count III). The parties are hereby directed to confer and jointly inform the Court within fourteen (14) days from the date of this Memorandum Order and Opinion whether there is mutual desire to participate in another settlement conference with Judge Abelson before proceeding to schedule a trial and related dates. *See* (ECF No. 44).

Date: <u>June 17, 2024</u>                                   _____/s/_____
                                                                            J. Mark Coulson
                                                                            United States Magistrate Judge